**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Geraldine Ponto

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| | Adv. Pro. No. 10-_____ (BRL) |
| v. | |
| STEVEN B. MENDELOW, NTC & Co. LLP, as former custodian of an Individual Retirement Account for the benefit of STEVEN B. MENDELOW, NANCY MENDELOW, NTC & Co. LLP as former custodian of an Individual Retirement Account for the benefit of NANCY MENDELOW, CARA MENDELOW, PAMELA | |

| |
|---|
| CHRISTIAN, C&P ASSOCIATES, LTD., and C&P ASSOCIATES, INC., |
| Defendants. |

## COMPLAINT

Irving H. Picard, (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff, individually ("Madoff"), by and through his undersigned counsel, for his Complaint, states as follows:

## INTRODUCTION

1.    This adversary proceeding arises from the massive Ponzi scheme perpetrated by Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at BLMIS. In early December 2008, BLMIS generated client account statements for its approximately 4,900 open client accounts.  These statements purport that clients of BLMIS had invested an aggregate of approximately $65 billion with BLMIS.  In reality, BLMIS had assets on hand worth a small fraction of that amount.  On March 12, 2009, Madoff admitted to engaging in a fraudulent scheme and pled guilty to 11 felony counts and was sentenced on June 29, 2009 to 150 years in prison.  Defendants received, directly or indirectly, avoidable transfers from BLMIS, and the purpose of this proceeding is to recover the avoidable transfers received by the Defendants.

2.    Defendant Steven B. Mendelow ("Mendelow") is a "principal" at Konigsberg Wolf & Co., P.C. ("KW"), an accounting firm with numerous significant links to BLMIS and Madoff.  Mendelow has been with KW for more than 25 years.  Trained as an accountant, Mendelow's biography on the KW website states that he "specializes in unique transactions,

family wealth building and generational matters, and financial restructuring." Upon information and belief, Mendelow has been and continues to be a member of the boards of directors of various public companies and serves or served on the audit committee of those companies. Mendelow had special access to BLMIS, its employees, and Madoff. Mendelow contacted Madoff directly to help prospective clients open accounts with the notoriously secretive BLMIS.

3.      Mendelow reaped the benefits of Madoff's fraud for almost 20 years. In 1989, Mendelow, along with another individual, Edward Glantz ("Glantz"), started Telfran Associates Ltd. Telfran Associates Ltd.'s general partner was Telfran Associates Corp., an entity formed in 1982, which was owned by Mendelow and Glantz. (Telfran Associates Ltd. and Telfran Associates Corp. are collectively referred to as "Telfran.") As discussed *infra*, Telfran and Mendelow initially funneled money to BLMIS through the accounting firm owned and operated by Frank Avellino and Michael Bienes ("Avellino & Bienes"), and later Mendelow funneled money directly to BLMIS.

4.      From 1989 to 1992 Telfran operated as an unregistered investment company selling unregistered securities to the public. Telfran solicited approximately 800 clients to invest through Telfran promising them a guaranteed rate of return on their original investment. In an effort to avoid scrutiny from securities regulators, Telfran called these investments "loans" and provided letters promising investors a fixed rate of return. Telfran was able to guarantee the rate of return to its investors by simply turning around and making similar arrangements with Avellino & Bienes, with a higher guaranteed rate of return. Telfran profited by the spread in the guaranteed rates of return. Avellino & Bienes, however, was nothing more than a feeder fund for BLMIS, and thus funneled money raised from Telfran investors directly into Madoff's Ponzi scheme.

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

5.      On or about September 29, 1993, in the matter of *Securities and Exchange Commission v. Telfran Associates, Ltd., Telfran Associates Corp., Steven Mendelow and Edward Glantz*, 92 Civ. 8564 (JES), Telfran and Mendelow were permanently enjoined by the United States Securities & Exchange Commission ("SEC") for selling unregistered securities, and both were fined.  Avellino & Bienes (also the subject of an SEC action) and Telfran were forced to return all money invested to their "investors."  The majority of that returned money was almost immediately reinvested directly with BLMIS by the investors.  Thereafter, under a new arrangement between Madoff and Mendelow, Mendelow was compensated by BLMIS directly through a fraudulent side payment (an annual payment made to Mendelow for referring former Telfran investors to BLMIS) and a guaranteed rate of return on his individual BLMIS customer accounts instead of through the spread.

6.      C&P Associates, Ltd. and C&P Associates Inc. (collectively "C&P Associates") and Mendelow, his wife, Nancy Mendelow, his daughters, Cara Mendelow and Pamela Christian, are all collectively referred to as "Defendants."  All had accounts with BLMIS, that, upon information and belief, were managed and/or overseen by Mendelow.

7.      Defendant NTC & Co. LLP, as former custodian of the Individual Retirement Account for the benefit of Steven B. Mendelow, and Defendant NTC & Co. LLP, as former custodian of the Individual Retirement Account for the benefit of Nancy Mendelow (collectively "Defendant NTC"), is either an initial transferee of the avoidable Transfers (as defined below) or a conduit of such Transfers for the benefit of Defendant Steven B. Mendelow ("FBO Defendant S. Mendelow") or Defendant Nancy Mendelow ("FBO Defendant N. Mendelow") (collectively "FBO Defendants").  If Defendant NTC is the initial transferee, then FBO Defendants are the subsequent transferees of the Transfers for purposes of this Complaint.  To the extent Defendant

NTC served as a conduit for the funds withdrawn for the benefit of FBO Defendants, FBO Defendants are initial transferees of the Transfers for whose benefit such Transfers were made for purposes of this Complaint. The within defendants, Defendant NTC and/or FBO Defendants, received avoidable transfers from BLMIS.

8.    Defendants, Defendant NTC and/or FBO Defendants were beneficiaries of Madoff's Ponzi scheme and received avoidable transfers from BLMIS. Since the opening of these various accounts, Defendants, Defendant NTC and/or FBO Defendants withdrew the amount of $20,250,720 from BLMIS in connection with the accounts they held at BLMIS. The Trustee's investigation has revealed that $11,435,809 of this amount was fictitious profit from the Ponzi scheme, in that Defendants, Defendant NTC and/or FBO Defendants withdrew more than they invested in their BLMIS accounts. Accordingly, Defendants, Defendant NTC and/or FBO Defendants have received $11,435,809 that was stolen from other BLMIS customers, under circumstances that should have put Defendants, Defendant NTC and/or FBO Defendants on notice of fraud.

9.    Upon information and belief, Defendants Mendelow, Nancy Mendelow, Cara Mendelow and Pamela Christian are also "Subsequent Transferee Defendants" as they received subsequent transfers of the avoidable transfers referenced above from C&P Associates. Upon information and belief, Mendelow is also a subsequent transferee of FGLS Equity LLC ("FGLS"). Upon information and belief, FGLS was an investment vehicle operated by Mendelow through which he invested other people's money in BLMIS. FGLS is or will be the subject of a separate preference action commenced by the Trustee and the allegations contained in the complaint in that action are incorporated herein. To the extent the funds transferred from BLMIS to Defendant NTC, C&P Associates, and FGLS were for the benefit of the Subsequent

Transferee Defendants, Subsequent Transferee Defendants are included in the definition of Defendants for purposes of the allegations herein.

10.    Mendelow, and the accounts he oversaw, were some of a small number of BLMIS customers with special access to information from BLMIS.  Among other reasons, Defendants, Defendant NTC and/or FBO Defendants knew or should have known that Defendants, Defendant NTC and/or FBO Defendants were profiting from fraud because of the implausibly consistent and high rates of return that their accounts supposedly achieved, in some instances as high as 43%, 34.7%, and 28.7%, while other of Defendants' or FBO Defendants' accounts in the same investment strategy received returns that were less than half those amounts, ranging from no greater than 10.4% to 14.5% over the same period.  These rates of return were neither credible nor consistent with legitimate trading activity, and should have caused any reasonable investor to inquire further.  Defendants, Defendant NTC and/or FBO Defendants also knew or should have known that Defendants, Defendant NTC and/or FBO Defendants were reaping the benefits of manipulated purported returns and false documents based on apparent trading irregularities.

11.    Mendelow is an accountant with a high level of experience and sophistication in the world of investments, including extensive investments in real estate.  He is not a casual investor and knew or should have known he was reaping the benefits of a fraudulent scheme. Moreover, Mendelow was on notice for over 15 years that all was not as it seemed at BLMIS. At least since he was fined by the SEC in 1993, and perhaps even earlier, he knew or should have known that BLMIS was engaged in fraud.

## NATURE OF PROCEEDING

12.    This adversary proceeding is brought pursuant to §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), §§ 105(a), 544, 548(a), 550(a) and 551 of title 11 of the United States Bankruptcy

Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debtor & Creditor § 270, *et seq*. (McKinney 2001) ("DCL")), NY CPLR 203(g) and 213(8), and other applicable law, and the avoidance and recovery of fraudulent conveyances, or their value, made by BLMIS to or for the benefit of Defendants, Defendant NTC and/or FBO Defendants, which shall be preserved for the benefit of BLMIS's defrauded customers.

## JURISDICTION AND VENUE

13.     This is an adversary proceeding brought before the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending.   The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.   This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and § 78eee(b)(2)(A), (b)(4).

14.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

15.     Venue in this district is proper under 28 U.S.C. § 1409.

## DEFENDANTS

16.     Upon information and belief, Defendant, FBO Defendant and Subsequent Transferee Defendant Steven B. Mendelow is an individual residing in New York, New York. FBO Defendant holds a BLMIS account in the name, "NTC & Co. FBO Steven B. Mendelow," with the account address reported as P.O. Box 173859 Denver, Colorado 80217.

17.     Upon information and belief, Defendant, FBO Defendant and Subsequent Transferee Defendant Nancy Mendelow is an individual residing in New York, New York.  FBO Defendant holds a BLMIS account in the name, "NTC & Co. FBO Nancy Mendelow," with the account address reported as P.O. Box 173859 Denver, Colorado 80217.

18.     Defendant NTC is a limited liability partnership that was formed under the laws of the state of Colorado.  Its principal place of business is located at 717 17th Street, Suite 2100, Denver, Colorado 80202.

19.     Upon information and belief, Defendant and Subsequent Transferee Defendant Cara Mendelow is an individual residing in New York, New York.  Defendant holds a BLMIS account in the name, "Cara Mendelow," with the account address reported in New York, New York.

20.     Upon information and belief, Defendant and Subsequent Transferee Defendant Pamela Christian is an individual residing in Ridgewood, New Jersey.    Defendant holds a BLMIS account in the name, "Pamela Mendelow," with the account address reported in Ridgewood, New Jersey.

21.     Upon information and belief, C&P Associates, Ltd. is a Florida limited partnership formed on January 15, 1988.  Mendelow is its general partner.

22.     Upon information and belief, C&P Associates, Inc. is a Florida corporation incorporated on January 8, 1988.  Its principal place of business is 440 Park Avenue South, 10th Floor, New York, New York 10016, which is the same address as Mendelow's employer, KW. Steven Mendelow and Nancy Mendelow are the only officers.  C&P Associates, Inc. is a general partner of C&P Associates, Ltd.  Upon information and belief, C&P Associates holds an account in the name "C&P Associates" with an account address reported in New York, New York.

23.     Furthermore, Mendelow's knowledge and bad faith should be imputed to C&P Associates because of his equitable and/or beneficial ownership and his domination and control over C&P Associates' investment account.

24.     Upon information and belief, Mendelow and his wife, Nancy, were at all times the equitable, absolute and/or beneficial owners of C&P Associates and the account held in its name. Upon information and belief, Mendelow and Nancy Mendelow not only owned, formed, funded, directed and controlled C&P Associates, they also retained the beneficial use over all funds and assets of that entity, including its BLMIS account.  Any actions Mendelow and Nancy Mendelow took with respect to C&P Associates' BLMIS account was taken for their benefit.

25.     Furthermore, Mendelow and Nancy Mendelow are the only officers of C&P Associates.  They acted on behalf of, and, in effect, as agents for, C&P Associates, and thus their bad faith and knowledge should be imputed to it.  Additionally, upon information and belief, the corporate form of C&P Associates should be disregarded.   Upon information and belief, Mendelow and Nancy Mendelow routinely disregarded corporate formalities of C&P Associates, a company that they owned, formed, funded, dominated and controlled, and freely transferred funds among themselves and C&P Associates.  Upon further information and belief, Mendelow and Nancy Mendelow deliberately used C&P Associates to shield from their creditors the fictitious profits and other fraudulent transfers that C&P Associates received from Madoff that they either knew, or should have known, were the product of fraudulent activity.  Accordingly, there is no distinction between the knowledge and bad faith of Mendelow, Nancy Mendelow and C&P Associates.

## BACKGROUND, THE TRUSTEE AND STANDING

26.     On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud,

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding

investment adviser fraud, and mail and wire fraud.   Contemporaneously, the SEC filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS.   The District Court Proceeding remains pending in the District Court.   The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

27.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver ("Receiver") for the assets of BLMIS.

28.     On December 15, 2008, pursuant to § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").   Thereafter, pursuant to § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

29.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

    a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant to § 78eee(b)(3);

    b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to § 78eee(b)(3); and

    c.     removed the case to this Bankruptcy Court pursuant to § 78eee(b)(4).

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

---

was commenced." § 78*lll*(7)(B).  Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

30.    By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person.    Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

31.    At a Plea Hearing on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  *See* Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213(DC) (S.D.N.Y. March 12, 2009) (Docket No. 50).  Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (*Id*. at 23:20-21.)  On June 29, 2009, Madoff was sentenced to 150 years in prison.

32.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information.  Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS since at least the 1980s.  *See* Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. August 11, 2009) (Docket No. 11).

33.    As the Trustee appointed under SIPA, the Trustee has the statutory responsibility of, among other duties, investigating the acts, conduct, property, liabilities and financial condition of BLMIS, recovering and paying out customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its

creditors. The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of

BLMIS's assets is well underway. However, such assets will not be sufficient to reimburse the

customers of BLMIS for the billions of dollars that they invested with BLMIS over the years.

Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue

recovery from BLMIS account holders who received preferences and/or payouts of fictitious

profits to the detriment of other defrauded customers whose money was consumed by the Ponzi

scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims

described in subparagraphs (A) through (D) of § 78fff-2(c)(1).

34.    Pursuant to § 78fff-1(a) of SIPA, the Trustee has the general powers of a

bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by

SIPA. Pursuant to SIPA § 78fff(b), "chapters 1, 3, 5 and subchapters I and II of Chapter 7 of

[the Bankruptcy Code]" are applicable to this case, "to the extent consistent with SIPA."

35.    Pursuant to §§ 78fff-(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be

the date of the filing of the petition within the meanings of §§ 547, 548 of the Bankruptcy Code

and the date of the commencement of the case within the meaning of § 544 of the Bankruptcy

Code.

36.    The Trustee has standing to bring these claims pursuant to § 78fff-1 of SIPA and

the Bankruptcy Code, including § 323(b) and 704(a)(1), because, among other reasons:

a.    Defendants, Defendant NTC and/or FBO Defendants received

"customer property" as defined in § 78*lll*(4);

b.    BLMIS incurred losses as a result of the claims set forth herein;

c.    BLMIS's customers were injured as a result of the conduct detailed

herein;

d.      SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for all of their losses;

e.      the Trustee will not be able to fully satisfy all claims;

f.      the Trustee, as bailee of customer property, can sue on behalf of customer bailors;

g.      the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").   As of the date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against the Defendants, Defendant NTC and/or FBO Defendants and Subsequent Transferee Defendants.   As assignee, the Trustee stands in the shoes of persons who have suffered injury in fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.   The Trustee brings this action on behalf of, among others, those defrauded customers of BLMIS who invested more money in BLMIS than they withdrew;

h.      SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.   SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.      the Trustee has the power and authority to avoid and recover transfers pursuant to §§ 544, 548, 550(a) and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## THE FRAUDULENT PONZI SCHEME

37.     BLMIS was founded in 1959 by Madoff and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York.   Madoff, as

founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, SIPA § 78o(b). By virtue of that registration, BLMIS is a member of SIPC. BLMIS had three business units: the Investment Advisory ("IA") Business, market-making, and proprietary trading.

38.    Outwardly, Madoff ascribed the consistent success of the IA Business to his so-called "split-strike conversion" strategy ("SSC Strategy"). Pursuant to that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the S&P 100 Index – a collection of the 100 largest publicly traded companies. He asserted that he would carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers' funds would, intermittently, be out of the equity markets. While out of the market, those funds were purportedly invested in United States Treasury bills or in mutual funds holding Treasury bills. The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P 100 Index option contracts. Those option contracts functioned as a "collar," limiting both the potential gains and the potential losses. Madoff purported to use proceeds from the sale of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options. Madoff also told IA Business customers, including Mendelow and the other Defendants, that he would enter and exit the market between six and ten times each year.

39.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in such account statements never occurred and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In

fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy.  Madoff's SSC Strategy was entirely fictitious.

40.      At times prior to his arrest, Madoff generally assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC") rather than through an exchange.  Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the options described in customer statements.  The Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of any of the IA Business customers.

41.      Additionally, Madoff periodically wired hundreds of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity substantially owned by Madoff and his family.  There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.

42.      For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options.  Rather, BLMIS used its IA Business customers' deposits to pay redemptions by other customers, and to make other transfers, which are avoidable by the Trustee.  Many of these transfers were to enrich Madoff, his associates, and his family.

43.      The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay investors.  BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

44.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

45.     Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

46.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts, which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, or removed portions of the purportedly available funds, and were paid consistently with the statements they had been receiving.

47.     When payments were made to or on behalf of these investors, including Defendants, Defendant NTC and/or FBO Defendants, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had not invested the investors' principal as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors, such as Defendants, Defendant NTC and/or FBO Defendants, the inflated amounts reflected in the falsified financial statements, including principal and/or fictitious profits.

48.     BLMIS used the funds deposited from new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due

to the siphoning and diversion of new investments to fund payments or redemptions requested by other investors, BLMIS did not have the funds to pay investors. BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

49.     Defendants, Defendant NTC and/or FBO Defendants knew or should have known that the activity purportedly conducted in their BLMIS accounts was patently false on its face, and that their purported returns were the result of fictitious activity. Defendants, Defendant NTC and/or FBO Defendants were beneficiaries of this scheme, receiving $11,435,809 of other people's money since these accounts opened.

50.     In an effort to hinder, delay and defraud authorities from detecting the fraud, BLMIS did not register as an Investment Adviser until August 2006.

51.     In or about January 2008, BLMIS filed with the SEC an Amended Uniform Application for Investment Adviser Registration. The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $68 billion under management.

52.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm located in a strip mall in Rockland County, New York. Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the filing date and who is since deceased. Mendelow, a trained accountant and principal of an established accounting firm where, upon information and belief, he has worked for more than 25 years, should have realized it would be impossible for Friehling & Horowitz to properly audit a business as large as BLMIS.

53.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS.  At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

54.     Defendants, Defendant NTC and/or FBO Defendants knew or should have known that Madoff's IA Business was predicated on fraud, that Defendants, Defendant NTC and/or FBO Defendants were benefitting from fraudulent transactions in their accounts, and that their purported account activity was inconsistent with legitimate trading activity and credible returns.

55.     To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## THE WRONGFUL ACTIVITIES

56.     The Defendants, Defendant NTC and/or FBO Defendants received money stolen from other customers.  Specifically, FBO Defendant S. Mendelow took $4,366,322 of other people's money since his multiple accounts were opened with BLMIS, FBO Defendant N. Mendelow took $1,572,066 of other people's money since her account was opened with BLMIS, C&P Associates took $5,192,421 of other people's money since its account was opened with BLMIS,  Cara Mendelow took $135,000 of other people's money since her account was opened with BLMIS and Pamela Christian took $170,000 of other people's money since her account was opened with BLMIS.

### I.      Mendelow Funneled Money to BLMIS Through Telfran

57.     Upon information and belief, Mendelow and Glantz did not come up with their idea to feed money to BLMIS under the false pretense of accepting "loans" from their "investors" on their own.  Instead, they modeled their scheme of funneling money to BLMIS for profit (with minimal effort on their part) on Avellino & Bienes.

58.     Mendelow had longstanding relationships with Frank Avellino and Michael Bienes, having known each of them since the early 1970s.  Even before the days of Telfran, in or about the late 1970s or early 1980s, Mendelow invested with Avellino & Bienes and he had accounts with Avellino & Bienes in either his name, his wife's name or in the name of a partnership, C&P Associates.

59.     Avellino & Bienes, and its predecessor firms, operated as significant feeder funds for BLMIS from the early 1960s through November 1992 when it was liquidated pursuant to enforcement actions commenced by the SEC.  Avellino & Bienes achieved great success in raising hundreds of millions of dollars for investment with BLMIS while retaining tens of millions of dollars in profits for placing money into the Ponzi scheme.

60.     In order to attract new investors, Avellino & Bienes collected money from individuals and entities by promising a guaranteed rate of return that ranged from 13% - 18% of the original investment.  In an attempt to avoid scrutiny from regulators, Avellino & Bienes termed these investments "loans" and provided letters with the specified rate of return for the particular investor.  Avellino & Bienes successfully raised hundreds of millions of dollars utilizing this methodology, and deposited this money for investment with BLMIS and the Ponzi scheme.

61.     As the operators of one of Madoff's first and oldest sources of proceeds for his Ponzi scheme, Avellino & Bienes enjoyed special access and privileges not available to other investors in BLMIS.  In order to keep the money flowing and the Ponzi scheme operating, Madoff guaranteed significant returns to Avellino & Bienes.  In turn, Avellino & Bienes retained the difference between the returns promised by Madoff and the returns promised to the underlying Avellino & Bienes investors.  For example, there were certain periods where Madoff

promised Avellino & Bienes annual returns of 20%.  Avellino & Bienes would thereafter promise 18% or less to its individual investors, retaining the difference as profits in order to enrich themselves at the expense of their individual investors.

62.    Upon information and belief, Mendelow structured Telfran similarly and issued letters to Telfran's investors.  Telfran then took investor money and gave it to Avellino & Bienes, which, in turn, gave it to Madoff.  Telfran had two accounts with Avellino & Bienes.  In the "payout account," investors received their interest quarterly, while in the "rollover account," investors compounded their interest.

63.    Upon information and belief, Mendelow's responsibilities at Telfran included making deposits with Avellino & Bienes and dealing directly with investors to address their various inquiries.  Also, Mendelow was a part owner of a privately held company, Teledata Financial, that was created to receive a share of the profits from Telfran.  That share varied from $200,000 to $400,000 per year.

64.    This operation to fund Madoff's Ponzi scheme worked until 1992 when the SEC commenced an investigation of Avellino & Bienes and its solicitation of investors.  *See Securities and Exchange Commission v. Avellino & Bienes, Frank J. Avellino and Michael S. Bienes*, 92 Civ. 8314 (JES).

65.    On September 7, 1993, the U.S. District Court issued a Final Judgment of Permanent Injunction and Other Equitable Relief By Consent Against Avellino & Bienes, Frank Avellino and Michael Bienes ordering, among other things, that they be enjoined from violating §§ 5(a) and (c) of the Securities Act of 1933 [§§ 77e(a) and (c)] by selling unregistered securities and § 7 of the Investment Company Act of 1940 [§ 80a-7], by operating an unregistered investment advisory company.

66.    The SEC investigation of Avellino & Bienes led to an investigation of Telfran, as Telfran's only purpose was to invest in BLMIS through Avellino & Bienes.  Like Avellino & Bienes, Telfran and Mendelow were sued by the SEC for sales of unregistered securities by an unregistered investment advisor.  Ultimately, Telfran and Mendelow entered into a consent decree with the SEC by which they were enjoined in the same way as Avellino & Bienes, namely from further violations of §§ 5(a) and 5(c) of the Securities Act of 1933 (selling unregistered securities) and § 7 of the Investment Company Act of 1940 (operating an unregistered investment advisory company).  Telfran paid a civil penalty in the amount of $250,000 while Mendelow paid a civil penalty in the amount of $50,000.

67.    As a result of the SEC investigations, and in an effort to avoid possible exposure to regulators of his own fraudulent operation, Madoff agreed to "return" money to Avellino & Bienes and/or the Court appointed receiver for Avellino & Bienes, which was distributed to its investors, including those invested through Telfran.  Madoff recorded fraudulent trading activity in customer statements to create the appearance of sufficient value in their accounts to cover the Avellino & Bienes/Telfran investors.

68.    Upon information and belief, in or about June 1992, at Madoff's direction, BLMIS employees scrambled to create a fictitious and backdated IA account with account number 1A0053 in the name of Avellino & Bienes.  Unlike the six other Avellino & Bienes accounts which had been in existence for more than a decade, BLMIS records indicate this account did not exist until in or around June 23, 1992.  BLMIS generated fictitious and backdated account statements for this account going back to at least November 1989.

69.    The fictitious account statements for this account were filled with fictitious transactions predetermined to show gains from security and options transactions.    The

transactions in these accounts included dozens of blatantly backdated purchases and sales of securities and options contracts designed to generate the millions of dollars needed to create the appearance that Madoff was holding securities sufficient to meet the distributions required by the investors in Avellino & Bienes.  Even a cursory analysis of this account and these statements would have revealed that these transactions did not and could not have occurred.

70.    For example, some of these statements contained the following blatantly backdated and fictitious transactions:

- the backdated January 1991 statement, which records at BLMIS show was created months later, reflects the purchase of 5,950 "S&P 100 Index – April 335 Calls" contracts which were thereafter reported on the April 1991 statement to have been sold for an approximate gain of $18,019,575;

- the backdated December 1991 statement, which records at BLMIS show as created months later, reflects purchases on December 12, 1991 of 3,500 "S&P 100 Index – January 355 Call" contracts and 3000 "S&P 100 Index – January 250 call contracts.  The January 1992 statement reflected the purported sale of these same call contracts for approximate gains of $10,480,750 and $8,458,500 respectively; and

- the backdated December 1991 statement, which records at BLMIS show was created months later, also reflected the purchase of 550,000 shares of Ford stock, all on margin for approximately $13,181,250.  On June 30, 1992, the 550,000 shares had a fair market value of $25,231,250 translating into an unrealized gain of $12,050,000.

71.    Significantly, a version of the June 30, 1992 account statement recovered from BLMIS reflects that each of the transactions described above was entered into BLMIS systems that generated these phony statements long after the dates the transactions purportedly occurred.

72.    Thereafter, as a result of the SEC investigation upon information and belief, in or about November 1992, Telfran received approximately $89 million dollars from Avellino & Bienes which corresponds to the approximate amount of money Telfran had invested with Avellino & Bienes for investment in BLMIS.

## II.      Mendelow Received Fraudulent Side Payments from BLMIS for Former Telfran Investors

73.      Despite the SEC investigations of Avellino & Bienes and Telfran and the injunctions preventing the further sale of unregistered securities on their part, Madoff continued to reward Mendelow by providing him annually with fraudulent side payments and a guaranteed rate of return on certain Mendelow accounts.

74.      Upon information and belief, by March 31, 1993, approximately $372 million of the $441 million returned to the original Avellino & Bienes investors by Madoff (including those who invested through Telfran) had been reinvested directly with BLMIS.  Of this $372 million, $62 million was attributable to Telfran investors.  The return of their investment was really a charade as, upon information and belief, all Avellino & Bienes and Telfran investors were encouraged to reinvest directly in BLMIS.

75.      Upon information and belief, Mendelow demanded and received fraudulent side payments from Madoff based on the amount of money former Telfran clients reinvested directly in BLMIS after Avellino & Bienes and Telfran were shut down by the SEC.

76.      Upon information and belief, in order to keep the Ponzi scheme afloat, Madoff agreed to compensate Avellino and Bienes an annual 2% fraudulent side payment primarily based on reinvested amounts attributable specifically to them.

77.      Upon information and belief, Mendelow and his Telfran business associates received a combined 1% fraudulent side payment primarily based on reinvested amounts attributable to them.  Of the 1%, 37.5% of those fees went to Mendelow.

78.      Based on this calculation, Mendelow received approximately $232,000 per year. Mendelow also received an additional $200,000 per year on top of his percentage, which was referred to as the "FA+MB contrib."  Upon information and belief, "FA" refers to Frank

Avellino and "MB" refers to Michael Bienes, the partners in Avellino & Bienes. From 1993 through 2001, therefore, Mendelow received fraudulent side payments totaling approximately $430,000 per year.

79.     Based on documents recovered at BLMIS, the fraudulent side payment calculation changed in 2002. The Telfran-related percentage was cut to a combined .5% and stayed at this level until the collapse of BLMIS. This structure resulted in fraudulent side payments to Mendelow of approximately $215,000 per year from 2002 through 2007.

80.     To identify, track and reconcile accounts to ensure the guaranteed rates of return and/or fraudulent side payments to dozens of different customers of BLMIS, BLMIS employees created handwritten schedules that showed the amount of fictitious gains needed to bring the account to the promised rate of return and the calculation of the fraudulent side payment. The schedule used to determine the amounts owed to these customers was referred to internally at BLMIS as either the "Shupt", "Schupt" or "Bingo" number (hereinafter "Schupt").

81.     To compensate for any deficiencies from the guaranteed rates of return and/or fraudulent side payments in the accounts, as set forth in the Schupt schedules, additional value was added to those accounts through fictitious options transactions that would precisely deliver the guaranteed rates of return and/or fraudulent side payments.

82.     In addition to calculating the amount owed, the handwritten Schupt schedules also indicated the type of option and the amount of options contracts that would be "purchased or sold" to create the predetermined gain. An account statement was generated to reflect these purported transactions and the associated gains generated. The balance within these accounts, including the fraudulent side payments, was then available for withdrawal by the accountholder.

83.    Upon information and belief, the ability to create gains each year that matched the expected fraudulent side payment and guaranteed rate of return should have placed Mendelow on notice that these results were not the result of legitimate trading activity.

84.    For example, in or around December 2003, the Schupt schedule contains entries for account 1ZR179, held for the benefit of Mendelow, indicating that the account "NEED[ED]" $215,000, which is consistent with the predetermined fraudulent side payment.    The Schupt schedule also indicated that the gain "NEED[ED]" was "REQ" per the "WHY" column on the schedule.    Upon information and belief, "REQ" is short for required.    The Schupt schedule further indicated that the account was "REQ" to "purchase" units that would have a resulting profit of $215,860.

85.    The December 2003 account statement for Mendelow's 1ZR179 account reflects the purchase and sale of 215 "S&P 100 Index – January 550 Call" and 430 "S&P 100 Index – January 555 Call" contracts, generating $215,860 in proceeds, which is exactly what the Schupt schedule indicated was required for Mendelow's account.

86.    These purported options transactions never actually occurred and could not have occurred at the precise amounts required to generate the gain "NEED[ED]" per the Schupt schedule without the benefit of hindsight, backdating and fraud.

87.    Combined, Mendelow received fraudulent side payments totaling approximately $5,116,000 from BLMIS.

**Mendelow was Guaranteed a Certain Rate of Return**

88.    In addition to Mendelow's lucrative fraudulent side payments, documents recovered from BLMIS indicate that Mendelow received a guaranteed rate of return of 17% on his own BLMIS investments.    This rate of return was guaranteed to Mendelow from at least 1993 through 1996.

89.     The fact that Mendelow received a guaranteed rate of return on his personal investments should have put Mendelow on inquiry notice that Madoff was engaged in fraudulent trading practices.  From 1993 to 2007, Mendelow received consistently high rates of return which would have been impossible to achieve through legitimate investing.

### Allocation of the Fraudulent Side Payment and Guaranteed Rate of Return

90.     Documents recovered from BLMIS indicate that the fraudulent side payments and guaranteed rate of return were allocated across accounts belonging to FBO Defendant S. Mendelow (Account No. 1ZR179), FBO Defendant N. Mendelow (Account No. 1ZR180), and C&P Associates (Account No. 1ZA542).  The total amount of fraudulent side payments and guaranteed rates of returns allocated to each account for the period from 1994 through 2007 was $1,732,896, $1,249,512, and $2,344,742, for accounts 1ZR179, 1ZR180, and 1ZA542, respectively.

91.     Based on records recovered at BLMIS, the fraudulent side payments and guaranteed rates of return across these accounts were created through fictitious options transactions predominately entered into in December of each year.  A chart depicting the unusually consistently high rates of return generated across Mendelow's accounts every December is attached to the Complaint as Exhibit C.  This consistent spike in returns every December should have been apparent on the face of the FBO Defendants' and/or C&P Associates' BLMIS customer statements, putting the FBO Defendants and/or Mendelow on notice of Madoff's fraudulent activities.

92.     Documents recovered from BLMIS indicate that the transactions to be entered and the pricing to be used were chosen by BLMIS with hindsight, picking the optimal times to create the needed results to "pay" Mendelow his fraudulent side payments and guaranteed rate of return.

## **Mendelow Tracked His Fraudulent Side Payments and Guaranteed Returns**

93.    Documents recovered from BLMIS indicate that Mendelow closely monitored his accounts to ensure he received the full amount of his fraudulent side payment and guaranteed returns each year.

94.    Documents recovered from BLMIS indicate that Mendelow calculated what he thought his account balances should be and compared those with what was listed on his Portfolio Management Reports generated by BLMIS.  He then instructed BLMIS to make up any shortfall of the amounts that he calculated he was due. These "corrections" typically occurred at the end of each calendar year through fictitious option transactions.

95.    In tracking this information, Mendelow referred to the fraudulent side payment as either a "vig" or "fee."   Upon information and belief, "vig" is short for "vigorish" which is commonly used by bookies or individuals involved with organized crime to describe the interest, "take" or "juice" on a usurious loan.  Mendelow's use of the word "vig" reveals his awareness of the corrupt trading practices of BLMIS that were used to enrich individuals such as Mendelow.

96.    The fact that Mendelow was able to direct the value of his accounts at BLMIS based upon his own calculations, and to ensure he received specific amounts through fictitious options transactions is indicative of his knowledge of fraudulent trading activity.   Also, Mendelow would have seen this implausible options activity on his BLMIS customer statements which put him on notice of Madoff's fraudulent trading activities.  As a trained accountant and businessman, and based on these factors, Mendelow either knew or should have known that BLMIS was not a legitimate securities trading operation.

97.    When questioned about his involvement in Telfran, his relationship with Avellino & Bienes, his receipt of fraudulent side payments and his receipt of guaranteed rates of return, Mendelow invoked his Fifth Amendment Rights and refused to answer the questions.

## **Other Indicia of Fraud**

98.     Beyond these indicia of fraud in Defendants' own accounts and professional
dealings, Mendelow and the Defendants ignored numerous other indicia of irregularity and fraud
from the general manner in which BLMIS operated.  Among other things, Defendants were on
notice of the following additional indicia of irregularity and fraud but failed to make sufficient
inquiry.

99.     BLMIS, which reputedly ran the world's largest hedge fund, was purportedly
audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom
was semi-retired, with offices located in a strip mall.  No experienced business person, especially
one with 40 years of accounting experience as Mendelow has, could reasonably have believed it
possible for any such firm to have competently audited an entity the size of BLMIS.

100.     Financial industry press reports, including a May 27, 2001 article in Barron's
entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep
mum," and a May, 2001 article in MAR/Hedge, a widely read industry newsletter entitled
"Madoff Tops Charts; Skeptics Ask How," raised serious questions about the legitimacy of
BLMIS and Madoff and their ability to achieve the IA Business returns they purportedly had
achieved using the investment strategy Madoff claimed to employ for most clients.   The
Defendants were invested in BLMIS when these reports were issued.

101.     BLMIS functioned as both investment manager and custodian of securities.  This
arrangement eliminated another frequently utilized check and balance in investment management
by excluding an independent custodian of securities from the process, and thereby furthering the
lack of transparency of BLMIS to other investors, regulators and outside parties.

102.    Despite its immense size in terms of assets under management, BLMIS was substantially a family-run operation, employing many of Madoff's relatives and virtually no outside professionals.

## THE TRANSFERS

103.    According to BLMIS's records, multiple accounts (Nos. 1ZA542, 1ZB336, 1ZB337, 1ZR179, 1ZR180, and 1ZR208) were maintained with BLMIS, as set forth on Exhibit A (collectively, the "Accounts"). Upon information and belief, for each Account, a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements") were executed and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York. At all times relevant hereto, Defendant NTC was the custodian of FBO Defendants' Account.

104.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Accounts were held in New York, New York and Defendants, Defendant NTC and/or FBO Defendants sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #XXXXXXXXXXXX703 (the "BLMIS Bank Account") in New York, New York for application to the Accounts and the conducting of trading activities. Defendants, Defendant NTC and/or FBO Defendants made deposits to BLMIS through checks and/or wire transfers into bank accounts controlled by BLMIS, including the BLMIS Bank Account, and/or received inter-account transfers from other BLMIS accounts.

105.    Prior to the Filing Date, BLMIS made payments or other transfers (collectively, the "Transfers") directly or indirectly to Defendants, Defendant NTC and/or FBO Defendants totaling the amount of $20,250,720.

106.    The Defendants and FBO Defendants willfully turned a blind eye to indicia of BLMIS's fraud based upon the information available to them.  They knew, and were on notice of, irregularities and problems concerning the trades reported by BLMIS, and strategically chose to ignore these concerns in order to continue to enrich themselves through their relationship with Madoff and BLMIS.  Of the Transfers, $11,435,809 constituted non-existent profits supposedly earned in the Accounts ("Fictitious Profits"), and $8,814,911 constituted the return of principal. The Fictitious Profits received by the Defendants, Defendant NTC and/or FBO Defendants came from other people's money.  The Transfers were directly or indirectly made to the Defendants, Defendant NTC and/or FBO Defendants and include, but are not limited to, the Transfers listed on Exhibit B.

107.    The Transfers are avoidable and recoverable under §§ 544, 548, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) and 213(8) (McKinney 2001) and DCL §§ 273-279 (McKinney 2001).

108.    Of the Transfers, BLMIS made payments to Defendants, Defendant NTC and/or FBO Defendants of at least $9,185,000 (the "Six Year Transfers") during the six years prior to the Filing Date, which are avoidable and recoverable under §§ 544, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable provisions of DCL §§ 273-279.  Of these Six Year Transfers, $7,877,066 represented Fictitious Profits from the Ponzi scheme, which constitute other people's money.  Of such fictitious profits, $4,250,000 was received by C&P Associates, $135,000 was received by Cara Mendelow, $170,000 was received by Pamela Christian, $1,750,000 was received by FBO Defendant S. Mendelow, and $1,572,066 was received by FBO Defendant N. Mendelow.

109.    Of the Six Year Transfers, BLMIS made payments to Defendants C&P Associates and Cara Mendelow of at least $825,000 (the "Two Year Transfers") during the two years prior to the Filing Date, which are avoidable and recoverable under §§ 548, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).   All of these Two Year Transfers were Fictitious Profits.   Of the Two Year Transfers, $700,000 was received by C&P Associates, and $125,000 was received by Cara Mendelow.

110.    Upon information and belief, the Transfers to Defendant NTC were subsequently transferred by Defendant NTC to or for the benefit of FBO Defendants and the transfers to C&P Associates were transferred by C&P Associates to or for the benefit of Defendants Mendelow, Nancy Mendelow, Cara Mendelow and Pamela Christian (collectively the "Subsequent Transfers").

111.    The Subsequent Transfers, or the value thereof, are recoverable from FBO Defendants, or Defendants Mendelow, Nancy Mendelow, Cara Mendelow and Pamela Christian pursuant to §550(a) of the Bankruptcy Code.

112.    Additionally, during the 90 days prior to the Filing Date, BLMIS made payments (the "FGLS Preference Period Transfers") totaling the amount of $2,350,000[3] to FGLS, of which Mendelow was the general partner.  These payments were as follows:

> September 19, 2008: withdrawal in the amount of $1,225,000;
>
> October 14, 2008: withdrawal in the amount of $125,000;
>
> October 29, 2008: withdrawal in the amount of $250,000;
>
> October 31, 2008: withdrawal in the amount of $1,200,000; and
>
> November 24, 2008: withdrawal in the amount of $400,00.

---

[3] This amount is net of an investment in the amount of $850,000, made on September 29, 2008.

The FGLS Preference Period Transfers are avoidable, in a separate action, and are recoverable under §§ 547, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).   The Two Year Transfers, Six Year Transfers and FGLS Preference Period Transfers are hereinafter collectively referred to as the "Transfers."

113.    Upon information and belief, some of the FGLS Preference Period Transfers were subsequently transferred ("FGLS Subsequent Transfers") to or for the benefit of Mendelow ("FGLS Subsequent Transferee Defendant").

114.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

115.    The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers, Subsequent Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT ONE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551

116.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

117.    Each of the Two Year Transfers was made on or within two years before the filing date of BLMIS's case.

118.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to § 78fff-2(c)(3) of SIPA.

119.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing or future creditors.

120.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendants C&P Associates and Cara Mendelow pursuant to § 550(a) of the Bankruptcy Code and § 78fff-(2)(c)(3) of SIPA.

121.     As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Defendants C&P Associates and Cara Mendelow: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendants C&P Associates and Cara Mendelow for the benefit of the estate of BLMIS.

**COUNT TWO**
**FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550 AND 551**

122.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

123.     Each of the Two Year Transfers was made on or within two years before the Filing Date.

124.     Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to § 78fff-2(c)(3).

125.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

126.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

127.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

128.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

129.    Each of the Two Year Transfers constitutes fraudulent transfers avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from Defendants C&P Associates and Cara Mendelow pursuant to § 550(a) and § 78fff-(2)(c)(3) of SIPA.

130.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Defendants C&P Associates and Cara Mendelow: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendants C&P Associates and Cara Mendelow for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

131.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

132.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

133.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined under DCL § 270.

134.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Defendants, Defendant NTC and/or FBO Defendants in furtherance of a fraudulent investment scheme.

135.    Each of the Six Year Transfers were received by the Defendants, Defendant NTC and/or FBO Defendants with actual intent to hinder, delay or defraud the creditors of BLMIS at the time of each of the Transfers, and/or future creditors of BLMIS.

136.    As a result of the foregoing, pursuant to DCL §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendants, Defendant NTC and/or FBO Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants, Defendant NTC and/or FBO Defendants.

## COUNT FOUR
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

137.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

138.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

139.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined under DCL § 270.

140.    BLMIS did not receive fair consideration for the Six Year Transfers.

141.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

142.    As a result of the foregoing, pursuant to DCL §§ 273, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendants, Defendant NTC and/or FBO Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS.

**COUNT FIVE**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551**

143.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

144.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

145.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined under DCL§ 270.

146.    BLMIS did not receive fair consideration for the Six Year Transfers.

147.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

148.    As a result of the foregoing, pursuant to DCL §§ 274, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendants, Defendant NTC and/or FBO Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS.

## COUNT SIX
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

149.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

150.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

151.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined under DCL § 270.

152.    BLMIS did not receive fair consideration for the Six Year Transfers.

153.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

154.    As a result of the foregoing, pursuant to DCL § 275, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendants, Defendant NTC and/or FBO Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; and (c)

recovering the Six Year Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS.

## COUNT SEVEN – RECOVERY OF ALL FRAUDULENT TRANSFERS NEW YORK CIVIL PROCEDURE LAW AND RULES §§ 203(g) AND 213(8) AND NEW YORK DEBTOR AND CREDITOR LAW§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

155.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

156.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

157.    At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

158.    Each of the Transfers prior to the six years before the Filing Date constitutes a conveyance by BLMIS as defined under DCL § 270.

159.    Each of the Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the Defendants, Defendant NTC and/or FBO Defendants in furtherance of a fraudulent investment scheme.

160.    Each of the Six Year Transfers were received by the Defendants, Defendant NTC and/or FBO Defendants with actual intent to hinder, delay or defraud the creditors of BLMIS at the time of each of the Transfer, and/or future creditors of BLMIS.

161.    As a result of the foregoing, pursuant to NY CPLR §§ 203(g) and 213(8), DCL §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA §

78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants, Defendant NTC and/or FBO Defendants: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants, Defendant NTC and/or FBO Defendants.

<strong>COUNT EIGHT</strong><br>
<strong>RECOVERY OF SUBSEQUENT TRANSFER FROM DEFENDANT NTC – NEW YORK<br>
DEBTOR AND CREDITOR LAW §§ 273-279 AND 11 U.S.C. §§ 544, 548, 550(a) AND 551</strong>

162.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

163.    Each of the Transfers is avoidable under §§ 544 and 548 of the Bankruptcy Code, DCL §§ 273-279 and § 78fff-2(c)(3) of SIPA.

164.    Upon information and belief, the Defendant NTC Subsequent Transfers were transferred by Defendant NTC to FBO Defendants.  The transfers to Defendant NTC are avoidable and it is those transfers that were transferred to the FBO Defendants.

165.    FBO Defendants are immediate or mediate transferees of the Subsequent Transfers from Defendant NTC.

166.    Each of the Subsequent Transfers by Defendant NTC was made directly or indirectly to or for the benefit of FBO Defendants.

167.    Each of the Subsequent Transfers was received by the FBO Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Subsequent Transfers, and/or future creditors of BLMIS.

168.    As a result of the foregoing, pursuant to DCL §§ 273-279, §§ 544(b), 548(a), 550(a) and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against FBO Defendants: (a) recovering the Subsequent Transfers (made by Defendant

NTC), or the value thereof, from FBO Defendants to or for the benefit of the estate of BLMIS

and (b) recovering attorneys' fees from FBO Defendants.

## COUNT NINE
## RECOVERY OF SUBSEQUENT TRANSFER FROM FGLS TO MENDELOW – NEW YORK DEBTOR AND CREDITOR LAW §§ 273-279 AND 11 U.S.C. §§ 547(b) AND 550

169.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

170.    Each of the FGLS Preference Period Transfers is avoidable under § 78fff-2(c)(3)

of SIPA and § 547(b) of the Bankruptcy Code.   Furthermore, each of the FGLS Preference

Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of

§ 101(54) of the Bankruptcy Code.

171.    At the time of each of the FGLS Preference Period Transfers received within the

90 days prior to the Filing Date, FGLS was a "creditor" of BLMIS within the meaning of §

101(10) of the Bankruptcy Code and pursuant to § 78fff-2(c)(3) of SIPA.

172.    Each of the FGLS Preference Period Transfers was to or for the benefit of FGLS.

173.    Each of the FGLS Preference Period Transfers was made for or on account of an

antecedent debt owed by BLMIS before such transfer was made.

174.    Each of the FGLS Preference Period Transfers was made while BLMIS was

insolvent.

175.    Each of the FGLS Preference Period Transfers was made within 90 days of the

Filing Date.

176.    Each of the FGLS Preference Period Transfers enabled FGLS to receive more

than FGLS would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code,

(ii) the transfers had not been made, and (iii) FGLS received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

177.    Each of the FGLS Preference Period Transfers constituted a preferential transfer avoidable by the Trustee pursuant to § 547(b) of the Bankruptcy Code and recoverable from FGLS pursuant to § 550(a) and § 78fff-2(c)(3) of SIPA.

178.    Upon information and belief, some or all of the FGLS Preference Period Transfers were subsequently transferred by FGLS to Mendelow (as defined earlier, the FGLS Subsequent Transfers).

179.    Each of the FGLS Subsequent Transfers was made directly or indirectly to or for the benefit of Mendelow.

180.    Mendelow is an immediate or mediate transferee of the FGLS Subsequent Transfers from FGLS.

181.    Each of the Subsequent Transfers was received by Mendelow with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Subsequent Transfers, and/or future creditors of BLMIS

182.    As a result of the foregoing, pursuant to §§ 547(b) and 550 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Mendelow (a) recovering the FGLS Subsequent Transfers, or the value thereof, from Mendelow for the benefit of the estate of BLMIS and (b) recovering attorneys' fees from Mendelow.

## COUNT TEN
## RECOVERY OF SUBSEQUENT TRANSFER FROM DEFENDANT C&P ASSOCIATES – NEW YORK DEBTOR AND CREDITOR LAW §§ 273-279 AND 11 U.S.C. §§ 544, 548, AND 550(a)

183.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

184.    Each of the Transfers is avoidable under §§ 544 and 548 of the Bankruptcy Code, DCL §§ 273-279 and § 78fff-2(c)(3) of SIPA.

185.    Upon information and belief, the Subsequent Transfers to Defendant C&P Associates were transferred by C&P Associates to Subsequent Transferee Defendants Mendelow, Nancy Mendelow, Cara Mendelow, or Pamela Christian.

186.    Each of the Subsequent Transfers by C&P Associates was made directly or indirectly to or for the benefit of Subsequent Transferee Defendants Mendelow, Nancy Mendelow, Cara Mendelow, or Pamela Christian.

187.    Each of the Subsequent Transfers was received by Mendelow, Nancy Mendelow, Cara Mendelow, or Pamela Christian with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Subsequent Transfers, and/or future creditors of BLMIS.

188.    Subsequent Transferee Defendants Mendelow, Nancy Mendelow, Cara Mendelow, or Pamela Christian are immediate or mediate transferees of the Subsequent Transfers from C&P Associates.

189.    As a result of the foregoing and the avoidance of the within Transfers, pursuant to DCL §§ 273- 279, §§ 544(b), 548(a), and 550(a) of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Subsequent Transferee Defendants Mendelow, Nancy Mendelow, Cara Mendelow, or Pamela Christian (a) recovering the Subsequent Transfers (made by C&P Associates), or the value thereof, from Subsequent Transferee Defendants Mendelow, Nancy Mendelow, Cara Mendelow, or Pamela Christian for the benefit of the estate of BLMIS and (b) recovering attorneys' fees from Subsequent Transferee Defendants Mendelow, Nancy Mendelow, Cara Mendelow, or Pamela Christian.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

*i.*        On the First Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendants C&P Associates and Cara Mendelow for the benefit of the estate of BLMIS;

*ii.*       On the Second Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendants C&P Associates and Cara Mendelow for the benefit of the estate of BLMIS;

*iii.*      On the Third Claim for Relief, pursuant to DCL §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants, Defendant NTC and/or FBO Defendants;

*iv.*       On the Fourth Claim for Relief, pursuant to DCL §§ 273, 278 and/or 279, §§ 544(b), 550 and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS;

*v.*        On the Fifth Claim for Relief, pursuant to DCL §§ 274, 278 and/or 279, §§ 544(b), 550 and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the state of BLMIS;

*vi.*       On the Sixth Claim for Relief, pursuant to DCL §§ 275, 278 and/or 279, §§ 544(b), 550 and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS;

*vii.*      On the Seventh Claim for Relief, pursuant to NY CPLR 203(g) and 213(8) DCL §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendants, Defendant NTC and/or FBO Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants, Defendant NTC and/or FBO Defendants;

*viii.*     On the Eighth Claim for Relief, pursuant to DCL §§ 273-279, §§ 544(b), 548, and 550(a) of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA recovering (a) the Subsequent Transfers made by Defendant NTC, or the value thereof, from FBO Defendants and (b) recovering attorneys' fees from FBO Defendants;

*ix.*       On the Ninth Claim for Relief, pursuant to DCL §§ 273-279, §§ 547(b) and 550 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA (a) recovering the FGLS Subsequent

Transfers, or the value thereof, from Mendelow for the benefit of the estate of BLMIS and (b) recovering attorneys' fees from Mendelow;

*x.*      On the Tenth Claim for Relief, pursuant to DCL §§ 273-279, §§ 544(b), 548 and 550(a) of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA (a) recovering the Subsequent Transfers made by C&P Associates, or the value thereof, from Subsequent Transferee Defendants Mendelow, Nancy Mendelow, Cara Mendelow and Pamela Christian and (b) recovering attorneys' fees from Subsequent Transferee Defendants Mendelow, Nancy Mendelow, Cara Mendelow and Pamela Christian;

*xi.*      On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

*xii.*      On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

*xiii.*      On all Claims for Relief, assignment of Defendants', Defendant NTC's and/or FBO Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme;

*xiv.*      Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

*xv.*      Granting Plaintiff such other, further, and different relief as the Court deems just,

proper, and equitable.


Date:  November 12, 2010
        New York, New York

Of Counsel:

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Jonathan B. New
Email:  jnew@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Essence Liburd
Email: eliburd@bakerlaw.com

By:  /s/ David J. Sheehan
      /s/ Keith R. Murphy
      /s/ Geraldine E. Ponto
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Geraldine E. Ponto
Email: gponto@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*