------------------------------------------------------------------------x
:
In re: : SIPA LIQUIDATION
:
BERNARD L. MADOFF INVESTMENT SECURITIES : Index No. 08-01789 (BRL)
LLC, :
:
Debtor. :
:
IRVING H. PICARD, Trustee for the Liquidation of : Adv. Pro. No. 10-04283 (BRL)
Bernard L. Madoff Investment Securities LLC, :
:
Plaintiff, :
:
- against - :
:
:
STEVEN B. MENDELOW, NTC & Co. LLP, as former :
custodian of an Individual Retirement Account for the :
benefit of STEVEN B. MENDELOW, NANCY :
MENDELOW, NTC & Co. LLP as former custodian of :
an Individual Retirement Account for the benefit of :
NANCY MENDELOW, CARA MENDELOW, :
PAMELA CHRISTIAN, C&P ASSOCIATES, LTD., :
and C&P ASSOCIATES, INC., :
:
Defendants. :
------------------------------------------------------------------------x

### DEFENDANT STEVEN B. MENDELOW'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR THE ENFORCEMENT OF THE AUTOMATIC STAY AND FOR A PRELIMINARY INJUNCTION

Stanley S. Arkin
Michelle A. Rice
ARKIN KAPLAN RICE LLP
590 Madison Avenue
New York, NY 10022

*Attorneys for Defendant Steven B.*
*Mendelow*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    A.    The SIPA Liquidation Proceeding ...................................................... 3

    B.    The Automatic Stay and the 12/15/08 Protective Order ....................... 4

    C.    The BLMIS Trustee's Proceedings Against Mr. Mendelow And Entities
Allegedly Affiliated With Mr. Mendelow ............................................ 4

        1.    The BLMIS Trustee's Proceeding Against Mr. Mendelow (and Others) -
*Picard v. Mendelow., et al.*, Adv. Pro. No. 10-04283 (BRL) ................... 5

        2.    The BLMIS Trustee's Proceeding Against FGLS -
*Picard v. FGLS Equity LLC*, Adv. Pro. No. 10-05191 (BRL) ................. 5

    D.    The *Warshaw* Action ......................................................................... 7

ARGUMENT .................................................................................................................. 8

I.    THIS COURT SHOULD ENFORCE THE STANDING STAY ORDERS .................... 8

    A.    The *Warshaw* Plaintiffs Seek to Evade and Circumvent the Trustee's Fair and
Equitable Distribution of BLMIS Assets and Undermine the SIPA Liquidation
Process ......................................................................................... 9

    B.    Mr. Mendelow's Alleged Fraudulent Transfers and the FGLS Preferences are
Property of the BLMIS Estate ........................................................... 10

    C.    The *Warshaw* Action Does Not Allege the Requisite Particularized Injury ....... 12

        D.    The *Warshaw* Action Threatens Mr. Mendelow's Fifth Amendment
Rights……………………………………………………………………..14

II.    THE *WARSHAW* ACTION ALSO SHOULD BE ENJOINED...................................... 16

CONCLUSION................................................................................................................. 20

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Adelphia Comm. Corp. v. The America Channel LLC, et al.,*
  2006 WL 1529357 (Bankr. S.D.N.Y. June 5, 2006) ............................................... 17

*Amsave Credit Corp. v. Marceca,*
  131 B.R. 774, 777-78 (SDNY 1991) ...................................................................... 15

*Ashland Oil, Inc. v. Arnett*,
  875 F.2d 1271 ......................................................................................................... 12

*Buena Vista Television, et al., v. Adelphia Comm. Corp.*
  307 B.R. 404 (Bankr. S.D.N.Y. 2004) .................................................................... 18

*Calpine Corp, et al., v. Nevada Power Co.,*
  354 B.R. 45 (Bankr. S.D.N.Y. 2006) ...................................................................... 17

*C&J Clark America, Inc. v. Carol Ruth, Inc.*,
  92 B.R. 87, 92 (Bankr. SDNY 1988) ...................................................................... 17

*Dominguez v. Hartford Financial Services Group, Inc.,,*
  530 F. Supp. 2d 902 (S.D. Tex. 2008) .................................................................... 15

*Federal Deposit Ins. Co., v. Hirsch ,et al.,*
  980 F.2d 125 (2d Cir. 1992) ............................................................................. 11, 13

*Fisher v. Apostolou*,
  155 F.3d 876 (7th Cir. 1998) .................................................................................. 19

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp.*,
  522 F.3d 575 (5th Cir. 2008) .................................................................................. 11

*Johns-Manville Corp., v. Colorado Ins. Guaranty Assoc.,*
  91 B.R. 225 (Bankr. S.D.N.Y. 1988) ...................................................................... 16

*Keene Corp., v. Acstar Ins. Co., et al.,*
  162 B.R. 935 (Bankr. S.D.N.Y. 1994) .................................................................... 17

*Lazarus Burman Assoc. v. National Westminster Bank USA,*
  161 B.R. 891 (Bankr. E.D.N.Y. 1993) .................................................................... 16

*Picard v. FGLS Equity LLC*,
  No. 10-05191 (BRL) (Bankr. S.D.N.Y 2010) ............................................ ……………………5, 6

*Picard v. Fox*,
  429 B.R. 423 (Bankr. S.D.N.Y. 2010) ............................................................. passim

*Picard v. Mendelow, et al.*,
   No. 10-04283 (BRL) (Bankr. S.D.N.Y. 2010)………………………………………………..passim

*Picard v. Stahl*,
   No. 10-03268 (BRL) (Bankr. S.D.N.Y. 2010)……………………………………….…9, 10, 13

*SEC v. Bernard L. Madoff et al.*,
   08-CIV-10791 (LLS) (S.D.N.Y. 2008)…………………………………………………2, 3, 4

*SEC v. Cohmad Secs. Corp.*,
   2010 U.S. Dist. LEXIS 8597 (S.D.N.Y., Feb. 1, 2010)………………………………………15

*The Gourmet Center v. Horace Fox, Jr., et al.*,
   No.04-B-05548, 2006 WL 1722582 (Bankr. N.D. Ill. Apr. 28, 2006) ................................... 12

*United States v. Certain Real Property and Premises Known as*
   *4003-4005 5th Ave., Brooklyn, N.Y.*,
   55 F.3d 78, 83-84 (2d Cir. 1995) ..................................................................... 14

*Vision Metals, Inc. v. SMS Demag, Inc.*,
   311 B.R. 692 (Bankr. D. Del. 2004) ..................................................................... 16

*Warshaw et al. v. Mendelow et al.*
   No. 652173/2010 (N.Y. Sup. Ct., N.Y. County December 3, 2010)……………………..passim

## **Statutes**

11 U.S.C. § 101(5) ................................................................................................ 5, 9

11 U.S.C. § 105 ................................................................................................ 2, 8, 17

11 U.S.C. § 105(a) ................................................................................................ 16

11 U.S.C. § 362 ................................................................................................ 4, 18

11 U.S.C. § 362(a) ................................................................................................ 19

11 U.S.C. § 362(a)(1), (3) ........................................................................................ 4, 19

15 U.S.C. § 78aaa et seq. ........................................................................................ 3

15 U.S.C. § 78eee(b)(3) ........................................................................................ 3

15 U.S.C. § 78ff ................................................................................................ 2

15 U.S.C. § 78fff-1(a) ........................................................................................ 3

15 U.S.C. § 78fff(b) ........................................................................................ 4

15 U.S.C. § 78fff-1(b) ........................................................................................... 3

15 U.S.C. § 78j(b) ................................................................................................. 2

**Regulations**

17 C.F.R. Section 240.10b-5 ................................................................................ 2

<u>**PRELIMINARY STATEMENT**</u>

The trustee (the "BLMIS Trustee") for the liquidation of the Bernard L. Madoff Investment Securities LLC ("BLMIS") estate (the "BLMIS estate") stated in *Picard v. Fox*, Adv. Pro. No. 10-03114 (Bankr. S.D.N.Y. March 31, 2010), that third party actions allowed to proceed in violation of the Automatic Stay "would frustrate the claims administration process established by this Court, allowing those who filed their own separate lawsuits to potentially recover more than other customers, while at the same time, usurping the Trustee's authority and divesting him of his power to marshal customer property for equitable distribution." *See Picard v. Fox,* Adv. Pro. No. 10-03114 (Bankr. S.D.N.Y. March 31, 2010) (hereinafter referred to as "*Fox*"), Dkt. No. 2 (Memorandum of Law In Support of Trustee's Application For Temporary Restraining Order, Enforcement of Automatic Stay and Preliminary Injunction) at 1-2. If *Warshaw et al. v. Mendelow et al.* ("*Warshaw*" or the "*Warshaw* Plaintiffs")[1] is allowed to proceed against defendant Steven B. Mendelow ("Mendelow") (and others), the disruptive and unfair impact Mr. Picard successfully avoided in *Fox* – namely, the preferential treatment of the third party plaintiffs in those actions over similarly aggrieved investors who suffered losses as a result of Madoff's massive Ponzi Scheme and the circumvention of the orderly administration of the liquidation of the business of BLMIS - will surely occur.

More specifically, although the Trustee has determined that only direct investors in BLMIS that are "net losers" are entitled to submit claims for reimbursement, the *Warshaw* Plaintiffs, indirect investors of BLMIS, are seeking relief in New York State court in direct contravention of the Trustee's net equity determination.

Further, the *Warshaw* Complaint contains substantially similar allegations to those articulated by the BLMIS Trustee against Mr. Mendelow in the instant case and fails to allege

---

[1]    No. 652173/2010 (N.Y. Sup. Ct., N.Y. County December 3, 2010) (attached hereto as Exh. A).

the requisite "particularized injury." The *Warshaw* Action does not contain allegations either that the *Warshaw* Plaintiffs suffered a harm that is in any way distinct from other investors in the Madoff Ponzi scheme or, put differently, that the harm allegedly caused by Mr. Mendelow is independent of the harm caused by the Ponzi scheme – a harm that is to be remedied by the actions brought by the Trustee. Nor do the *Warshaw* Plaintiffs seek to recover damages other than those sustained as a result of their investment with BLMIS. Accordingly, the *Warshaw* Action is subject to the automatic stay under *In re Bernard L. Madoff*, Adv. Pro. No. 08-01789 (BRL) pursuant to 11 U.S.C. § 362(a) ("Automatic Stay") and the December 15, 2008 protective order ("12/15/08 Protective Order") of the United States District Court for the Southern District of New York (collectively, the "Stay Orders"), which this Court should enforce for the benefit of all BLMIS customers.[2]

Moreover, the *Warshaw* Action impairs this Court's jurisdiction with respect to the SIPA Liquidation currently before it and threatens to have an adverse impact on the BLMIS estate. As well, the *Warshaw* Action may open the door to a double-recovery of alleged losses. Thus, the *Warshaw* Action should be enjoined pursuant to 11 U.S.C. § 105.

## STATEMENT OF FACTS

On December 11, 2008, Bernard L. Madoff was arrested for running a multi-billion dollar Ponzi scheme and charged with violations of SIPA sections 78j(b) and 78ff, and 17 C.F.R. Section 240.10b-5. Contemporaneously with his arrest, the Securities and Exchange Commission ("SEC") filed a civil complaint in the Southern District of New York, similarly alleging that Madoff and BLMIS were engaged in a Ponzi scheme fraud. *See SEC v. Bernard L.*

---

[2]    The *Warshaw* Action names several defendants other than Mr. Mendelow. This motion seeks application of the Automatic Stay and an injunction only with respect to Mr. Mendelow himself, not as to his co-defendants. All references in this motion to the *Warshaw* Action are meant to refer only to the *Warshaw* Action with respect to Mr. Mendelow alone.

*Madoff et al.*, 08-CIV-10791 (LLS) (S.D.N.Y. 2008), Dkt. No. 1 (Complaint against Bernard L. Madoff, Bernard L. Madoff Investment Securities, LLC).

A.      <u>The SIPA Liquidation Proceeding</u>

On December 15, 2008, the Securities Investment Protection Corporation ("SIPC") filed an application with the United States District Court for the Southern District of New York ("District Court"), alleging that BLMIS was currently unable to meet its obligations to its customers and that these customers therefore needed the protections afforded by the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq*. *SEC*, 08-CIV-10791, Dkt. No. 5 (Motion of the Securities Investor Protection Corporation). On that same day, the District Court granted the SIPC application, issuing the 12/15/08 Protective Order that declared that all "customers of the Defendant, Bernard L. Madoff Investment Securities LLC, are in need of the protection afforded by the Securities Investor Protection Act of 1970." *Id.*, Dkt. No. 4 (Protective Order Issued by Judge Louis L. Stanton) at ¶ I. The District Court also appointed Irving H. Picard as "trustee for the liquidation of the business of [BLMIS]." *Id.* The SIPA liquidation proceeding was then removed to this Court, pursuant to SIPA sections 78eee(b)(3) and (b)(4). *Picard v. Fox*, 429 B.R. 423, 426 (Bankr. S.D.N.Y. 2010).

In addition to the powers granted by SIPA, *see* SIPA §§ 78fff-1(a), 78fff-1(b), the Trustee has the general powers of a bankruptcy trustee, and is "charged with assessing claims, recovering and distributing customer property to BLMIS customers, and liquidating the assets of BLMIS for the benefit of the estate and its creditors." *See Fox*, 429 B.R. at 426. Customer claims, which are filed with the Trustee, are assessed in accordance with this Court's order of December 23, 2008, which sets forth "a systematic framework for the filing, determination and adjudication of claims in accordance with SIPA." *Id.* at 426.

### B. The Automatic Stay and the 12/15/08 Protective Order

In accordance with 11 U.S.C. § 362 of the Bankruptcy Code, the SIPC application for a protective order triggered an automatic stay – applicable to all individuals and entities – of:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;…
>
> (3) *any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate…*

11 U.S.C. § 362(a)(1), (3) (emphasis added); SIPA § 78fff(b) (applying Chapter 3 of Title 11).

Similarly, the 12/15/08 Protective Order expressly stayed all actions, which would have the effect of interfering with the BLMIS estate. Specifically, the 12/15/08 Protective Order provided that:

> *all persons and entities are stayed, enjoined and restrained from directly or indirectly* removing, transferring, setting off, receiving, retaining, changing, selling, pledging, assigning or otherwise disposing of, withdrawing or *interfering with any assets or property owned, controlled or in the possession of [BLMIS],* including but not limited to the books and records of [BLMIS], and customers' securities and credit balances, except for the purpose of effecting possession and control of said property by the trustee.

*SEC v. Bernard L. Madoff*, 08-CIV-10791 (LLS), Dkt. No. 4, at ¶ IV (emphasis added).

### C. The BLMIS Trustee's Proceedings Against Mr. Mendelow And Entities Allegedly Affiliated With Mr. Mendelow

The BLMIS Trustee has initiated two lawsuits seeking recovery of funds allegedly transferred out of the BLMIS estate to Mr. Mendelow or entities affiliated in some respect to Mr. Mendelow. The two lawsuits seek recovery of alleged BLMIS estate assets for the benefit of BLMIS customers.

1. **The BLMIS Trustee's Proceeding Against Mr. Mendelow (and Others) - *Picard v. Mendelow., et al.*, Adv. Pro. No. 10-04283 (BRL)**

On November 24, 2010, the BLMIS Trustee filed an action against Mr. Mendelow, and a number of individuals and companies, asserting claims for fraudulent transfers, preferences, and state law fraudulent conveyances (hereinafter, the "*Mendelow* Action").  *See Picard v. Mendelow, et al.*, Adv. Pro. No. 10-04283 (BRL) (Bankr. S.D.N.Y. 2010), Dkt. No. 1 (Complaint against Mr. Mendelow, et al.) (the "*Mendelow* Complaint").  In the *Mendelow* Action, the Trustee alleges that defendants, including Mr. Mendelow, were part of a network of individuals and entities that were integral to Madoff's scheme because they (i) introduced new investors into BLMIS and (ii) received compensation, based on the net cash value of customer accounts as a result of their alleged participation in the Ponzi scheme.  *Id.* at ¶¶ 73-79, 87.  The *Mendelow* Complaint further alleges that defendants, including Mr. Mendelow, "knew or should have known" about Madoff's fraud because they were on notice of a number of supposed red flags, including alleged "apparent trading irregularities."  *Id.* at ¶ 10.

In total, the Trustee seeks to recover in excess of $20 million from defendants for the BLMIS estate, including all alleged fraudulent transfers made from or to Mr. Mendelow.  *Id* at ¶ 105, "WHEREFORE" Clause.[3]

2. **The BLMIS Trustee's Proceeding Against FGLS – *Picard v. FGLS Equity LLC*, Adv. Pro. No. 10-05191 (BRL)**

The *Warshaw* Plaintiffs were not direct investors in BLMIS; rather, the *Warshaw* Plaintiffs invested in FGLS Equity, LLC ("FGLS"), a New York limited liability company which in turn directly invested in BLMIS.  *Warshaw* Complaint at ¶¶ 6, 10.  FGLS was a "net loser" in BLMIS, and has submitted a Proof of Claim with the BLMIS Trustee pursuant to 11 U.S.C. §

---

[3]     Mr. Mendelow does not concede the BLMIS Trustee's assertion that he is entitled to recover at least $20 million in fraudulent transfers, etc., from defendants, including Mr. Mendelow.

101(5). *See Picard v. FGLS Equity LLC*, Adv. Pro. No. 10-05191 (BRL) (Bankr. S.D.N.Y. 2010), Dkt. No. 1 (Complaint against FGLS) (attached hereto as Exh. B) at ¶ 39 ("On or about June 25, 2009, [FGLS] filed a customer claim with the Trustee which the Trustee has designated as Claim #011505[.]").

FGLS is the subject of a separate action by the BLMIS Trustee for recovery of funds allegedly transferred out of the BLMIS estate. On December 3, 2010, the Trustee filed an action against FGLS (*Picard v. FGLS Equity LLC*, Adv. Pro. No. 10-05191 (BRL) (Bankr. S.D.N.Y. 2010)) (the "*FGLS* Action") asserting a claim for recovery of preferential transfers totaling $2,350,000. *See Id*. The *FGLS* Action also seeks to disallow FGLS' previously-filed Proof of Claim. *See Id*.

Specifically, in the *FGLS* Action, the Trustee asserts that "[w]ithin the 90 days prior to the [BLMIS bankruptcy], [FGLS] received the amount of $2,350,000.00 from BLMIS" and that "[a]s a result of this preference payment, [FGLS] is in a more favorable position than other defrauded customers of BLMIS." *Id*. at ¶ 2. The *FGLS* Action further alleges that "[FGLS]'s Customer Claim should not be allowed pursuant to section 502(d) of the Bankruptcy Code" because "[FGLS] is the recipient of Transfers of BLMIS' property which are avoidable and recoverable under sections 547 and 550 of the Bankruptcy Code, and [FGLS] has not returned the Transfers to the Trustee." *Id*. at ¶52. The *FGLS* Action (and the *Mendelow* Action) are currently outstanding.

Importantly, the *FGLS* Action is inextricably interrelated to the *Mendelow* Action as they concern Mr. Mendelow. Although Mr. Mendelow is not personally named as a defendant in the *FGLS* Action (indeed, no individuals or entities other than FGLS are named defendants in the *FGLS* Action), the Trustee nonetheless seeks recovery of the alleged FGLS preferences from Mr.

Mendelow individually.  Through the allegations in the *Mendelow* Action, the Trustee states a claim that Mr. Mendelow is personally liable for the relevant FGLS preferences, since "during the 90 days prior to the [BLMIS bankruptcy], BLMIS made payments…totaling the amount of $2,350,000 to FGLS, of which Mendelow was the general partner."  *Mendelow* Complaint at ¶ 112.  According to the *Mendelow* Complaint, "[e]ach of the FGLS [preferences] constituted a preferential transfer avoidable…and recoverable from FGLS."  *Id*. at 177.  Count Nine of the *Mendelow* Action states that "some or all of the FGLS [preferences] were subsequently transferred by FGLS to Mendelow" and that "the Trustee is entitled to a judgment against Mendelow [] recovering the FGLS [preferences]."  *Id*. at ¶¶ 178, 182.  Thus, although Mr. Mendelow is not personally named as a defendant in the *FGLS* action, it is clear that the Trustee seeks recovery of the alleged preferences sent to FGLS from Mr. Mendelow himself.[4]

### D.    The *Warshaw* Action

On December 3, 2010, the *Warshaw* Plaintiffs initiated a lawsuit in New York State Supreme Court for the County of New York against Mr. Mendelow (among others) seeking to recover losses incurred as indirect investors in BLMIS that were caused by the fraud perpetrated by Madoff.  Specifically, the *Warshaw* Plaintiffs make allegations of professional malpractice, breach of fiduciary duty, fraud, negligent misrepresentation/omission, and aiding and abetting.

The *Warshaw* Complaint alleges that the *Warshaw* Plaintiffs invested indirectly in BLMIS through FGLS and Mr. Mendelow, whose "failure to engage in any diligence regarding Madoff" given Mr. Mendelow's "knowledge of the aforementioned [red flags]" that, according to the *Warshaw* Plaintiffs, indicated that Madoff was running a Ponzi scheme, and establishes

---

[4]    Further, the *Mendelow* Complaint specifically incorporates by reference the *FGLS* complaint.  The *Mendelow* Complaint states:  "FGLS is or will be the subject of a separate preference action commenced by the Trustee and the allegations contained in the complaint in that action are incorporated herein."  *Mendelow* Complaint at ¶ 9.

Mr. Mendelow's "willful blindness and/or knowledge of the fraud." *Warshaw* Complaint at ¶ 49. The *Warshaw* Plaintiffs assert that Mr. Mendelow's prior "conflicting relationships with Madoff" and profits therefrom, as well as the existence of certain irregularities in BLMIS trading confirmations, constituted red flags that should have put Mr. Mendelow on notice that Madoff was operating a Ponzi scheme. *Id*. at ¶¶ 2, 43. The *Warshaw* Plaintiffs make no allegation that any conduct by Mr. Mendelow, independent of his alleged participation in the Ponzi scheme, or lack of diligence in investigating the Ponzi scheme, harmed them. And, the damages sought by the *Warshaw* Plaintiffs are based entirely on their investments with BLMIS. In other words, the sole injury that the *Warshaw* Plaintiffs seek to redress is an injury that is common to all BLMIS customers.

## ARGUMENT

Defendant Mendelow moves this Court for an order enforcing the Stay Orders because the *Warshaw* Action: (i) seeks to evade and circumvent the Trustee's fair and equitable distribution of BLMIS assets; (ii) seeks property that the Trustee alleges was fraudulently transferred from the BLMIS estate; and (iii) does not allege the requisite particularized injury. In addition, because the *Warshaw* Action is subject to the Stay Orders, Mr. Mendelow further requests that this Court preliminarily enjoin the *Warshaw* Action, pursuant to 11 U.S.C. § 105, because it threatens both this Court's jurisdiction as well as the BLMIS estate.

## I. THIS COURT SHOULD ENFORCE THE STANDING STAY ORDERS

The Stay Orders are applicable to the *Warshaw* Action because the *Warshaw* Plaintiffs indisputably seek to obtain possession of, or otherwise interfere with, property that the BLMIS Trustee claims was fraudulently or preferentially transferred from the BLMIS estate. Like the third party plaintiffs in *Fox*, the *Warshaw* Plaintiffs here "target the same limited pool of funds originating with BLMIS" as the BLMIS Trustee. *See Fox*, 429 B.R. at 435.

A. **The *Warshaw* Plaintiffs Seek to Evade and Circumvent the Trustee's Fair and Equitable Distribution of BLMIS Assets and Undermine the SIPA Liquidation Process**

The *Warshaw* Action violates the Stay Orders because it threatens to circumvent the orderly administration of the BLMIS liquidation via the Claims Procedure Order approved by this Court, and turn the liquidation into a "race to the courthouse." *See supra* at Statement of Facts, Section A. Each of the *Warshaw* Plaintiffs seeks to recover losses allegedly incurred as a result of their investment with BLMIS via FGLS from the same limited pool of funds as the BLMIS Trustee. *Fox*, 429 B.R. at 431. Allowing these claims to proceed will allow the *Warshaw* Plaintiffs to leapfrog other similarly aggrieved investors of the massive fraud perpetrated by Madoff and potentially receive preferential recoveries. *Id*. ("A trustee's exclusive ability to bring causes of action that generally affect all creditors fosters the goals of the automatic stay by promoting orderly resolution of claims and preventing single creditors from achieving preferential recoveries."). As the BLMIS Trustee recently noted in *Picard v. Stahl*, Adv. Pro. No. 10-03268:

> The Third Party Actions constitute nothing more than an attempt by general creditors to leapfrog over other creditors to obtain a greater share of their claims against BLMIS than they would otherwise receive. Their continued prosecution is detrimental to the equitable distribution of customer property mandated by SIPA and this Court.

*Stahl*, Adv. Pro. No. 10-03268 (BRL) (Bankr. S.D.N.Y. 2010), Dkt. No. 2 (Memorandum of Law in Support of Trustee's Motion for Enforcement of Automatic Stay and Preliminary Injunction) at 36.

Based on their investments in FGLS, the *Warshaw* Plaintiffs are believed to have filed individual Proofs of Claim for reimbursement from the BLMIS estate pursuant to 11 U.S.C. § 101(5). Upon information and belief, the Trustee has denied the *Warshaw* Plaintiffs' individual

Proofs of Claim because individual investors in entities like FGLS have been deemed by the Trustee not to be direct investors in BLMIS, and, therefore, not entitled to an individual recovery. Rather, for investment vehicles with accounts at BLMIS, the net equity determination is performed with respect to the account-holder, from which the individual investors may become entitled to a pro-rata recovery.

In contrast, the *Warshaw* Plaintiffs have performed their own net equity determination, one which is inconsistent with the net equity determination performed by the Trustee. The *Warshaw* Action seeks to immediately recover 100% of the *Warshaw* Plaintiffs' alleged losses in FGLS, stating in pertinent part "[the *Warshaw* Plaintiffs] lost a total of $2,676,434 in principal in FGLS. Specifically, [individual *Warshaw* Plaintiff] lost out of pocket a total of at least $894,590.93 based on investments made in FGLS beginning in August 2005 and [other individual *Warshaw* Plaintiff] lost out of pocket a total of at least $1,781,843.48 based on investments made in FGLS beginning in the summer of 2003." *Warshaw* Complaint at ¶ 6. This flies in the face of the Trustee's determination regarding the *Warshaw* Plaintiffs' individual Proofs of Claim, and, further, the Trustee's net equity determination concerning FGLS. As the BLMIS Trustee argued against in *Stahl*, the *Warshaw* Action is exactly the type of "attempt by general creditors to leapfrog over other creditors to obtain a greater share of their claims against BLMIS than they would otherwise receive" and as such must not be permitted. *Stahl*, Adv. Pro. No. 10-03268 at 36.

## B. Mr. Mendelow's Alleged Fraudulent Transfers and the FGLS Preferences are Property of the BLMIS Estate

The *Warshaw* Action also violates the Automatic Stay because it seeks to recover losses from the same limited pool of funds that the BLMIS Trustee alleges was fraudulently transferred from the BLMIS estate. (*Mendelow* Complaint at ¶ 105 ("Prior to Filing Date, BLMIS made

payments or other transfers…directly or indirectly to Defendants [] totaling the amount of $20,250,720"); *Mendelow* Complaint "WHEREFORE" Clause, Sections *i* through *xiv* (seeking monetary and equitable relief for alleged fraudulent transfers)). In *Picard v. Fox*, this Court noted that even if the *Fox* Third Party Plaintiffs had asserted an injury that was significantly different from those suffered by other BLMIS creditors, the claims "would nonetheless be deemed the property of the estate…because they seek to recover fraudulently transferred funds." *Fox*, 429 B.R. at 433 (*quoting Highland Capital Mgmt. LP v. Chesapeake Energy Corp.*, 522 F.3d 575 (5th Cir. 2008) ("some claims that are usually brought by creditors outside of bankruptcy…are nonetheless vested exclusively in the trustee…because they ultimately seek to recover assets of the estate that are not under the debtor's control [] by reason of a fraudulent transfer").[5]

The same conclusion is warranted here. Each of the *Warshaw* Plaintiffs seeks to recover from Mr. Mendelow (and others) the net equity losses allegedly suffered in their FGLS accounts. *See Warshaw* Complaint at ¶ 6, "WHEREFORE" Clause, Sections (1) through (7). At the same time, the BLMIS Trustee currently seeks to recover from Mr. Mendelow (among others) $20,250,720 that he alleges was fraudulently transferred from BLMIS to Mr. Mendelow (among others). *See Mendelow* Complaint at ¶ 105. Furthermore, the BLMIS Trustee seeks to recover the FGLS preferences from Mr. Mendelow individually. *See Mendelow* Complaint at ¶ 177-78, 182. In other words, the *Warshaw* Action seeks to recover from the same limited pool of funds the BLMIS Trustee is currently seeking to recover for the BLMIS estate as a result of alleged fraudulent transfers to Mr. Mendelow and preferences to FGLS.

---

[5]     *See also Federal Deposit Ins. Co., v. Hirsch et al., (In re Colonial Realty Co.)*, 980 F.2d 125, 131-32 (2d Cir. 1992) ("a third-party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1)").

### C.    The *Warshaw* Action Does Not Allege the Requisite Particularized Injury

Additionally, it is clear that the pleading in the *Warshaw* Action does not establish that the *Warshaw* Plaintiffs "have suffered an injury 'significantly different' from the injuries to creditors in general." *See Fox*, 429 B.R. at 431 (*citing The Gourmet Center v. Horace Fox, Jr., et al., (In re Sage Enter., Inc.).*, 2006 WL 1722582, at \*15 (Bankr. N.D.Ill. Apr. 28, 2006)); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989) ("[W]here the creditors' injury, while having some personal elements, overlaps with the injury suffered by other creditors…the question to be answered is whether the injury to the creditor is 'significantly different' from the injuries to other creditors in general.").

*Picard v. Fox*, 429 B.R. 423, is particularly illustrative here.  In *Fox*, Adele Fox and Susanne Stone Marshall (the "*Fox* Third Party Plaintiffs"), customers of BLMIS, brought individual actions against the estate of Jeffrey Picower (the "Picower Defendants"), arising from Picower's alleged involvement in Madoff's Ponzi scheme (the "*Fox* Third Party Actions").[6]  *Id.* at 429.  The *Fox* Third Party Plaintiffs asserted "injuries in the form of lost investment income and returns on their BLMIS investments."  *Id.*  "On March 31, 2010, the [BLMIS] Trustee filed a complaint against the [*Fox* Third Party] Plaintiffs [in this Court] seeking a declaration that the [*Fox* Third Party] Actions violate the automatic stay under section 362(a) of the Code [and] a preliminary injunction pursuant to section 105(a) of the Code enjoining any further prosecution of the [*Fox* Third Party] Actions."  *Id.* at 430.

This Court granted the BLMIS Trustee's motion, holding the *Fox* Third Party Actions were "not seeking to redress a particularized injury," and therefore violative of the Automatic Stay.  *Id.* at 431.  Comparing the allegations contained in the *Fox* Third Party Actions to those in

---

[6]    The *Fox* Third Party Plaintiffs initiated suit in the United States District Court for the Southern District of Florida.

the BLMIS Trustee's Complaint against the Picower Defendants, this Court found that the *Fox* Third Party Actions alleged participation in the Madoff Ponzi scheme generally and that the *Fox* Third Party Plaintiffs were seeking only to redress injuries that were sustained by "all customer claimants in the BLMIS liquidation." *Id.* at 431-32.

As in *Fox*, the Third Party Action should be stayed. Even a cursory review of the Complaint in the *Warshaw* Action indisputably demonstrates that (i) the allegations against Mr. Mendelow and the other *Warshaw* defendants relate to their supposed general participation in the Madoff fraud; (ii) the allegations overlap with the BLMIS Trustee's complaint against Mr. Mendelow; and (iii) the *Warshaw* Plaintiffs are seeking only to recover losses that purportedly have been sustained by all customers of BLMIS stemming from the Ponzi scheme. *Id.*[7] As such, the *Warshaw* Action presents claims that cannot be brought by third party creditors without violating the Stay Orders.

For all of the foregoing reasons, Mr. Mendelow requests that this Court enforce the Stay Orders, declaring the claims asserted by the *Warshaw* Plaintiffs against Mr. Mendelow "are property of the estate, [] violative of the automatic stay" (and the 12/15/08 Protective Order), and void *ab initio*. *See Fox,* 429 B.R. at 433 (*citing In re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992) ("[A]ctions taken in violation of the stay are void and without effect.").

---

[7]     *Picard v. Stahl*, Adv. Pro. No. 10-03268, is also instructive here. In *Stahl*, the BLMIS Trustee seeks to enjoin twelve (12) third party actions directed at multiple Madoff family members because the third party actions "are duplicative or derivative of the Trustee's [ ] actions [against the Madoff family members], all arising out of the Ponzi scheme." *Stahl*, Adv. Pro. No. 10-03268 (BRL) (Bankr. S.D.N.Y. 2010) Dkt. No. 2, at 2. Specifically, the BLMIS Trustee asserts that the Madoff third party actions:

> are completely duplicative of the Trustee's Madoff Complaint. There is not a scintilla of difference in any of them – they all allege that the Madoff Defendants ignored red flags and knew or should have known, based on their roles at BLMIS, of the fraud. This is precisely what the Trustee has pled.

*Id.* at 32. Further, the BLMIS Trustee asserts that the third party actions fail to allege independent conduct by certain Madoff defendants, instead alleging conduct that is "inextricably linked to the Ponzi Scheme." *Id.* at 33. These arguments apply with equal force to the instant motion.

### D. The *Warshaw* Action Threatens Mr. Mendelow's Fifth Amendment Rights

The *Warshaw* Action should also be stayed to avoid unnecessary injury to Mr. Mendelow's Fifth Amendment rights. As is now well known, the Ponzi scheme perpetrated by Bernard L. Madoff for over two decades is one of the largest crimes in the history of the nation. In their Complaint, the *Warshaw* Plaintiffs have essentially alleged that Mr. Mendelow was a participant in this crime, asserting that he knew or should have known of, and/or participated in, Madoff's massive Ponzi scheme. (See *Warshaw* Complaint, generally). Thus, the operative facts underlying the *Warshaw* Action are the same facts at the heart of an ongoing criminal investigation by the United States Department of Justice – as well as a multitude of other government law enforcement agencies – of BLMIS. Although it is our belief that the Department of Justice should not and will not seek to prosecute our client, the *Warshaw* Action now poses a significant threat to Mr. Mendelow's Fifth Amendment rights.

In view of these criminal investigations, Mr. Mendelow may be forced to invoke his Fifth Amendment right not to testify should this Court deny this motion to stay the *Warshaw* Action.[8] The *Warshaw* Plaintiffs may very well intend to attempt to exploit Mr. Mendelow's invocation of his Fifth Amendment rights going forward. Any such attempts should be rebuffed by this Court.

Without a stay, Mr. Mendelow could be forced to choose between foregoing the exercise of his Fifth Amendment right not to testify and potentially losing the *Warshaw* Action as the result of the imposition of a negative inference. The exercise of Mr. Mendelow's Fifth Amendment rights should not be made "unnecessarily costly" in this way. *See United States v.*

---

[8] This is not mere speculation on our part. The Trustee's Complaint against Mr. Mendelow, which is in the public domain, states that Mr. Mendelow invoked the his Fifth Amendment rights, alleging "[w]hen questioned about his involvement with Telfran, his relationship with Avellino & Bienes, his receipt of fraudulent side payments and his receipt of guaranteed rates of return, Mendelow invoked his Fifth Amendment Rights and refused to answer the questions." *Mendelow* Complaint, ¶ 97.

*Certain Real Property and Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83-84 (2d Cir. 1995). Such a result would be particularly problematic where, as here, Mr. Mendelow is justifiably concerned about becoming entangled in the ever-widening web of law enforcement investigations of Madoff and BLMIS. As the Hon. Louis L Stanton recently held.:

> Given the numerous criminal investigations arising from Madoff's fraud, there is a justifiable concern for anyone who did business with B[L]MIS's investment advisory unit, as did [Defendant], that he or she will be hauled into the criminal probe.

*See SEC v. Cohmad Secs. Corp.*, 2010 U.S. Dist. LEXIS 8597, *15 (S.D.N.Y., Feb. 1, 2010).

Instead, this Court should "explore all possible measures in order to select that means which strikes a fair balance…and…accommodates both parties." *Id*. at 84 (internal quotations omitted). Where there is great potential for prejudice to a party's Fifth Amendment right against self-incrimination, a court may, in the name of equity, temporarily adjourn the proceedings in order to avoid such a conflict. *See Amsave Credit Corp. v. Marceca* (*In re Marceca*), 131 B.R. 774, 777-78 (S.D.N.Y. 1991) (granting stay where facts underlying the adversary proceeding and a criminal investigation were "substantially the same" and defense of the adversary proceeding would impair defendant's Fifth Amendment rights); *Dominguez v. Hartford Financial Services Group, Inc.*, 530 F. Supp. 2d 902 (S.D. Tex. 2008) (granting stay where there was, among other things, "substantial overlap of issues in the civil and criminal actions").

In the present case, the balance tips heavily toward Mr. Mendelow. First, Mr. Mendelow stands to be greatly prejudiced if an adjournment is not granted; indeed, there can be no doubt that the threat to Mr. Mendelow's Fifth Amendment rights is now both real and imminent. By contrast, the potential for prejudice to the *Warshaw* Plaintiffs is non-existent.[9] There is no urgency to the *Warshaw* Action as the BLMIS Trustee, the Department of Justice, and the S.E.C.

---

[9]     Mr. Mendelow has not yet answered or made a motion to dismiss the *Warshaw* Complaint.

– each of whom stands ahead of the *Warshaw* Plaintiffs – are currently pursuing lawsuits seeking to recover BLMIS customer property on behalf of *all* Madoff investors who incurred losses as a result of the Madoff Ponzi scheme. Further, the BLMIS Trustee has recently indicated that he has already collected nearly $10 billion for distribution to aggrieved BLMIS investors, and intends to begin distributing funds in the first quarter of 2011.

## II.    THE *WARSHAW* ACTION ALSO SHOULD BE ENJOINED

This Court is empowered to enjoin the *Warshaw* Action under 11 U.S.C. § 105(a) to facilitate the equitable administration of the BLMIS estate. *See, e.g.*, *Fox*, 429 B.R. at 434-37 (granting injunctive relief where third party actions threatened the administration of the BLMIS estate). Section 105(a) of the Bankruptcy Code provides that:

> [t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a); *see Johns-Manville Corp., v. Colorado Ins. Guaranty Assoc., (In re Johns-Manville Corp.)*, 91 B.R. 225, 227 (Bankr. S.D.N.Y. 1988) ("the Code provides the Court with broad equitable powers enabling it to preserve its own jurisdiction"). This section enables the bankruptcy court to issue any order – including orders for injunctive relief against third parties – "to facilitate the implementation of other Bankruptcy Code provisions." *See, e.g.*, *Fox*, 429 B.R. at 434-37; *Lazarus Burman Assoc.* v. *National Westminster Bank USA* (*In re Lazarus Burman Associates*), 161 B.R. 891, 897 (Bankr. E.D.N.Y. 1993) ("When an action by a creditor of a debtor against a non-debtor third party threatens a debtor's reorganization, the creditor's action may be enjoined pursuant to section 105(a)"); *see also Vision Metals, Inc., v. SMS Demag, Inc., (In re Vision Metals, Inc.)*, 311 B.R. 692, 699 (Bankr. D. Del. 2004) (noting that a Bankruptcy

Court can only employ Section 105 in a manner "consistent with the Code"). Importantly, Section 105 "is a broad grant of power which exceeds the limits of the automatic stay." *Keene Corp., v. Acstar Ins. Co., et al., (In re Keene Corp.).*, 162 B.R. 935, 944 (Bankr. S.D.N.Y. 1994).[10]

It is well settled that bankruptcy courts may grant injunctive relief of the type requested here – even against third parties – where either (i) the actions would impair the Bankruptcy Court's jurisdiction with respect to the case before it, or (ii) the actions would have an adverse impact on the debtor's estate. *See, e.g.*, *Calpine Corp, et al., v. Nevada Power Co., (In re Calpine Corp.)*, 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006) ("it is well settled that bankruptcy courts may extend the automatic stay to '*enjoin suits by third parties against third parties* if they threaten to thwart or frustrate the debtor's reorganization efforts'") (emphasis added); *In re Keene Corp.*, 162 B.R. at 944 ("[T]he Court can enjoin an activity that threatens the reorganization process or impairs the court's jurisdiction with respect to a case before it."); *In re Wingspread Corp.*, 92 B.R. at 92 ("A bankruptcy court may enjoin proceedings in other courts when it is satisfied that the proceedings would defeat or impair its jurisdiction with respect to a case before it."). Because both situations apply here, this Court should enjoin the *Warshaw* Action.[11]

---

[10]     Critically, "[s]o broad is the court's power pursuant to section 105(a) that even where the Code states that an issue is to be raised by a party in interest, the statute may not be construed 'to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *C&J Clark America, Inc., v. Carol Ruth, Inc., (In re Wingspread Corp.)*, 92 B.R. 87, 92 (Bankr. S.D.N.Y. 1988).

[11]     This Court has subject matter jurisdiction to enjoin the *Warshaw* Action primarily pursuant to 28 U.S.C. § 1334(b), which provides that Bankruptcy Courts have original jurisdiction over civil proceedings "arising under," "arising in," and "related to" Title 11. *See Adelphia Comm. Corp. v. The America Channel LLC, et al., (In re Adelphia Communications Corp.)*, 2006 WL 1529357, *6 (Bankr. S.D.N.Y. June 5, 2006). "The test in the Second Circuit (like most Circuits) for determining the existence of 'related to' jurisdiction under 28 U.S.C. § 1334 is whether the outcome of a proceeding 'might have any 'conceivable effect' on the bankrupt estate,' or if the proceeding has 'a significant connection' with the bankrupt estate." *Id.* Given that the *Warshaw* Action will impair

Granting an injunction is appropriate here for the very same reasons that this Court should find that the *Warshaw* Action abrogates the Stay Orders. *First*, the *Warshaw* Action threatens to impair this Court's jurisdiction and interfere with the administration of the BLMIS SIPA liquidation. In *Fox*, this Court enjoined the *Fox* Third Party Actions because, like the *Warshaw* Action here, they sought to "recover the very funds sought by the Trustee through his avoidance actions," and thus had "the potential to substantially undermine this Court's jurisdiction, as further prosecution could ultimately result in another court's determining how potential estate funds are distributed among certain BLMIS customers." *See Fox*, 423, B.R. at 437 ("[T]he [*Fox* Third Party] Actions are a disfavored form of litigation strategy that could result in multiple courts arriving at different and inconsistent rulings."). The *Warshaw* Plaintiffs also seek to recover from the same limited pool of funds sought by the Trustee in his avoidance actions, and the *Warshaw* Action will be adjudicated by a separate adjudicative body. Therefore, the *Warshaw* Action has the potential to substantially undermine this Court's jurisdiction by allowing another court to determine how potential BLMIS estate funds are distributed among the BLMIS customer claimants. Further, and as in *Fox*, the *Warshaw* Action increases the possibility of inconsistent judgments. Additionally, allowing the *Warshaw* action to proceed opens the door to possible double-recovery by the *Warshaw* Plaintiffs, for they may be pursuing litigation against Mr. Mendelow for BLMIS-related losses while at the same time awaiting

this Court's jurisdiction with respect to the BLMIS SIPA liquidation and have an adverse impact on the BLMIS estate, this Court has subject matter jurisdiction.

Similarly, this Court has personal jurisdiction over the *Warshaw* Plaintiffs for multiple reasons. First, this Court has personal jurisdiction if the *Warshaw* Plaintiffs have filed customer Claims with the BLMIS Trustee as part of the SIPA liquidation, which is highly likely. *See, e.g., Buena Vista Television, et al., v. Adelphia Comm. Corp. (In re Adelphia Communications Corp.),* 307 B.R. 404, 418 (Bankr. S.D.N.Y. 2004) ("when the Copyright Owners filed proofs of claim in the bankruptcy court, they submitted to the equitable jurisdiction of this Court"). Furthermore, this Court has personal jurisdiction because the *Warshaw* Plaintiffs initiated actions that proceed in violation of the Stay Orders.

administration of a future claim with FGLS for the same BLMIS-related losses. Injunctive relief is warranted on these facts alone. *Id.* Although it is believed that the BLMIS Trustee has already denied the *Warshaw* Plaintiffs' Proofs of Claim with the BLMIS estate, such denial does nothing to prevent the *Warshaw* Plaintiffs from filing a similar claim with FGLS once distribution of any BLMIS assets are made. If the *Warshaw* Plaintiffs are allowed to proceed against Mr. Mendelow, double recovery would become a very real possibility.

*Second*, the *Warshaw* Action presents a serious threat to the BLMIS estate and warrants the extension of Section 362(a). As this Court noted in *Fox*:

> While section 362(a)(1) of the Code typically stays 'proceedings[s] against the debtor,' *courts have consistently utilized section 105 to extend section 362 to third-party actions against non-debtor entities* 'when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.'

*Fox*, 429 B.R. at 434 (emphasis added) (*citing Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) ("[t]he jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include 'suits to which the debtor need not be a party but *which may affect the amount of property in the bankrupt estate[.]*'")(emphasis added)).

Here, both the Trustee and the *Warshaw* Plaintiffs seek to recover from the same limited pool of funds. Therefore, the *Warshaw* Action threatens not only "the [BLMIS] Trustee's ability to collect on any judgment that may be awarded in connection with his pending adversary proceeding, to the detriment of the BLMIS estate,"[12] but also the Trustee's ability to administer the estate in an equitable fashion, by potentially allowing the *Warshaw* Plaintiffs to achieve preferential recoveries over similarly aggrieved investors of Madoff's massive Ponzi Scheme. *See Fox*, 429 B.R. at 435.

---

[12] It is worth noting here that Mr. Mendelow has already been forced to expend significant resources defending himself against the *Warshaw* Action.

Accordingly, the Court should preliminarily enjoin the *Warshaw* Plaintiff's from litigating against defendant Mendelow, pending the completion of the above-captioned action.

## <u>CONCLUSION</u>

For the foregoing reasons, Steven B. Mendelow respectfully requests that this Court (i) enforce the standing Stay Orders; and (ii) preliminarily enjoin the *Warshaw* Plaintiffs from litigating against defendant Mendelow, pending the completion of the above-captioned action.

Dated: New York, NY
      January 18, 2011

ARKIN KAPLAN RICE LLP

By: */s/ Stanley S. Arkin*
     Stanley S. Arkin
     Michelle A. Rice
    590 Madison Avenue
    New York, NY 10022
    (212) 333-0200

*Attorneys for Defendant Steven B. Mendelow*

# EXHIBIT A

*SUPREME COURT OF THE STATE OF NEW YORK*
*COUNTY OF NEW YORK*

| | |
|---|---|
| LARRY WARSHAW AND CAROL WARSHAW AS TRUSTEES FOR CAROL ANN ENTERPRISES, INC. PENSION PLAN, AND SAJUST, LLC,<br><br>      Plaintiff,<br><br> - against -<br><br>STEVEN MENDELOW, KONIGSBERG, WOLF & CO., AND PAUL KONIGSBERG,<br>      Defendants. | Index No.:<br>Date purchased :<br><br>Plaintiff(s) designate(s)<br> **New York**<br>County as the place of trial.<br><br>The basis of the venue is several of the Defendants reside here.<br><br>*SUMMONS* |

To the above named Defendants:

 *You are hereby summoned* to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated, New York, New York
  December 3, 2010

STORCH AMINI & MUNVES PC
Attorneys for Plaintiffs

By _____
  Russell Bogart
  Bijan Amini
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, NY 10017
(212) 490-4100

**Defendants' address:**

Steven Mendelow
Konigsberg, Wolf & Co.
440 Park Avenue South
New York , NY 10016

Konigsberg, Wolf & Co.
440 Park Avenue South
New York, NY 10016

Paul Konigsberg
440 Park Avenue South
New York, NY 10016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x
LARRY WARSHAW AND CAROL WARSHAW          :      Index No.:
AS TRUSTEES FOR CAROL ANN ENTERPRISES, INC.
PENSION PLAN, AND SAJUST, LLC,           :

                                         :      **COMPLAINT**

                    Plaintiffs,          :

         -against-                       :

STEVEN MENDELOW, KONIGSBERG, WOLF & CO.,  :
AND PAUL KONIGSBERG,
                                         :
                    Defendants.          :

------------------------------------------------------------------x

      Plaintiffs Larry Warshaw and Carol Warshaw in their fiduciary capacities as Trustees for

Carol Ann Enterprises, Inc. Pension Plan ("Carol Ann"), and Sajust, LLC ("Sajust") (collectively

"Plaintiffs"), by and through their undersigned counsel, as and for their Complaint against

Defendants Steven Mendelow ("Mendelow"), Paul Konigsberg ("Konigsberg") and Konigsberg,

Wolf & Co. ("KW") (collectively "the Defendants"), allege as follows:

## OVERVIEW

      1.     Defendants are long-term insiders of Bernard Madoff, who was arrested on

December 11, 2008, by federal authorities for operating a $50 billion Ponzi scheme through

Bernard L. Madoff Investment Securities, LLC ("BLMIS"). Madoff, the former non-Executive

Chairman of the NASDAQ stock market, already has pled guilty to operating the largest Ponzi

scheme in history. Madoff and other co-conspirators fraudulently solicited billions of dollars in

investments purportedly to be used to open trading accounts with BLMIS. Madoff represented

that BLMIS generated consistently high returns through a proprietary trading strategy, even

during times of market decline. Yet, BLMIS' Investment Advisory business never purchased

any securities. Instead, Madoff used new investors' funds to support an extravagant lifestyle for

his family and friends and to pay earlier investors' requests for the redemption of fictitious profits. To conceal and further this fraud, BLMIS also forged daily trade ticket confirmations of securities trades and monthly customer statements.

2.    The Defendants' actual knowledge of BLMIS' fraud is demonstrated by their profiting from their conflicting relationships with Madoff despite knowledge of his wrongdoing. As Mendelow, the only Principal at the KW accounting firm, stated with respect to KW's relationship with BLMIS, "We make money the old fashioned way. We sell things and get paid for it."

3.    In other words, Paul Konigsberg, the sole owner and President of KW, along with Mendelow, were significantly enriched by Madoff over decades for referring investors to BLMIS and for providing tax and accounting services to BLMIS' investors. Mendelow pitched Madoff to KW's clients, including the Plaintiffs, even after being sanctioned in 1993 by the Securities and Exchange Commission ("SEC") for originating $89 million in funds for Madoff by selling unregistered securities. Konigsberg, who also referred clients to Madoff, directed BLMIS to pay to his son an annual fee as a kickback for his referral of clients to BLIMS. In return for his services, Konigsberg participated with Madoff as an investor in improperly claiming a $22 million tax deduction from the donation of property to charity. Many parties closely related to Mendelow and Konigsberg were "net winners" from Madoff's Ponzi scheme and/or managed to redeem their investments before Madoff's arrest.

4.    Besides referring clients, Madoff relied on the Defendants as loyal accountants to conceal his Ponzi scheme. Konigsberg for a decade prepared the tax returns for Madoff's family foundation and those portions of Madoff's federal tax returns relating to his ownership of foreign accounts. KW handled the tax and accounting work for hundreds of investors who supposedly

2

received annual returns of 10-17% with BLMIS, while Paul Konigsberg personally prepared the tax returns for Madoff's closest and long-term investors who received returns in the range of 100% in a year. Konigsberg knew that these astronomical returns for Madoff's closest investors were truly disguised kickbacks for the referral of other clients. Yet, Konigsberg prepared false tax returns for these investors which concealed the referral relationship with BLMIS as the true ·source of income.

5.    Additionally, former members of the KW Tax Department repeatedly questioned the legitimacy of the BLMIS statements and returns. The Defendants also knew that BLMIS' management, compliance and audit responsibilities were fulfilled by Madoff's relatives and unqualified individuals.

6.    Defendants exploited Steven Mendelow's relationship as a long time financial advisor and accountant to Larry Warshaw ("Warshaw") to induce Plaintiffs' investments into FGLS Equity, LLC ("FGLS") for the purpose of investing with BLMIS. Upon the advice of Mendelow, Warshaw and several of his relatives formed Sajust for the purpose of investing in FGLS. Sajust, and Carol Ann Enterprises, Inc. Pension Plan ("Carol Ann"), a pension plan for a business owned by Warshaw and his brother, lost a total of $2,676,434 in principal in FGLS. Specifically, Carol Ann lost out of pocket a total of at least $894,590.93 based on investments made in FGLS beginning in August 2005 and Sajust lost out of pocket a total of at least $1,781,843.48 based on investments made in FGLS beginning in the summer of 2003. Mendelow served as the Operating Member of FGLS and KW prepared the tax returns and performed the accounting for FGLS.

3

7.     Accordingly, Plaintiffs bring claims against Defendants for accounting malpractice, breach of fiduciary duty, fraud, negligent misrepresentation and aiding and abetting BLMIS' fraud.

## PARTIES

8.     Sajust, LLC ("Sajust") is a limited liability company formed under the laws of the state of New York.

9.     Carol Ann Enterprises, Inc. Pension Plan ("Carol Ann") is a tax exempt employees' pension trust under the applicable sections of the Internal Revenue Code. Larry Warshaw ("Warshaw"), a Florida resident, and Carol Warshaw, a New Jersey resident, are the Trustees for Carol Ann.

10.     FGLS Equity, LLC ("FGLS") is a New York Limited Liability Company incorporated by the Defendants in March 2003 to allow clients and relatives of Mendelow to invest with Madoff. According to FGLS' Operating Agreement, the principal address of the company is c/o Steven Mendelow, at KW's headquarters located at 440 Park Avenue South, 10th Floor, New York, N.Y. 10016. Mendelow and his wife are the Operating Members of FGLS.

11.     Konigsberg, Wolf & Co. ("KW") is a certified public accounting firm incorporated in the state of New York with its principal place of business at 440 Park Avenue South, N.Y., N.Y. 10016.

12.     Paul Konigsberg ("Konigsberg") is the founder and President of KW. Konigsberg is a certified public accountant and an attorney. He earned his BS degree in accounting from NYU in 1958, his JD from Brooklyn Law School in 1961 and an LLM in taxation from NYU in 1965. Mr. Konigsberg resides at 19 Pinecroft Road, Greenwich, Connecticut.

4

13. Steven Mendelow ("Mendelow") has been a principal with KW since around 1982 when KW acquired the accounting firm of Glantz & Levy ("G&L"). Mendelow had been a principal with G&L since 1972. Mendelow is not currently a certified public accountant. The KW website lists Mendelow as its only principal and not a partner. Mendelow earned a BS degree in business administration from Bucknell University in 1964. Mendelow, upon information and belief, resides in Manhattan, New York.

## FACTUAL BACKGROUND

### A. MADOFF'S PONZI SCHEME

### I. BERNARD L MADOFF INVESTMENT SECURITIES, LLC

14. Bernard Madoff was the owner, founder, chairman and chief executive officer of BLMIS. BLMIS, which was registered with the SEC as a securities broker-dealer under § 15(b) of the Securities Exchange Act of 1934, operated a market-making business, a proprietary trading desk, and an investment advisory ("IA") business.

15. At all relevant times, Madoff Securities International Ltd. ("MSIL") was a corporation incorporated in the United Kingdom. MSIL was an affiliate of BLMIS that purported to engage principally in proprietary trading. BLMIS' monthly statements provided to its IA clients noted the affiliation between BLMIS and MSIL.

16. On March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an eleven (11) count information filed against him by the United States Attorneys' Office for the Southern District of New York. During the plea hearing, Madoff admitted that BLMIS never purchased for its IA clients any of the securities reflected on their account statements at BLMIS. On August 11, 2009, Frank DiPascali, the effective Chief Financial Officer for Madoff's IA business, pled guilty to securities fraud, and admitted that he engaged in a conspiracy with Madoff and others to fabricate account statements, trade

5

confirmations, and books and records. Madoff, DiPascali and other co-conspirators defrauded

investors out of billions of dollars dating back to the 1980s by falsely representing that BLMIS

would achieve high rates of return for them through investing their funds in securities.

## II.    THE SPLIT STRIKE OPTION INVESTMENT STRATEGY

17.    Madoff misrepresented to many of his investors that BLMIS created its returns

through implementing what Madoff described as a "split strike conversion" strategy. In reality,

through an outdated 1993 IBM computer, DiPascali supervised the generation of client account

statements for about 4,900 customer accounts, which showed approximately $64.8 billion of

investments with BLMIS at the time of Madoff's arrest. As the United State's Attorney's Office

explained in a complaint against two of BLMIS' computer programmers:

> Under the direction of Madoff, DiPascali helped to develop a purported investment
> strategy referred to as a "split strike conversion" ("Split Strike") strategy, that Madoff
> used to market the IA business to IA clients and prospective IA clients beginning in or
> about the early 1990s. Current and prospective IA clients were promised that (i) their
> funds would be invested in a basket of approximately 35-50 common stocks within the
> Standards & Poors 100 Index (the "S&P 100"), a collection of the 100 largest publicly
> traded companies in terms of their market capitalization; (ii) that basket of stocks would
> closely mimic the price movements of the S&P 100; (iii) the investments would be
> hedged by using IA Clients' funds to buy and sell option contracts related to those stocks,
> thereby limiting potential losses caused by unpredictable changes in stock prices; (iv)
> Madoff would opportunistically time the entry and exit from the strategy; and (v) when
> the IA Clients' funds were not invested in the basket of stocks and options described
> above, those funds would be invested in money market funds and United States
> Government-issued securities such as United States Treasury bills...

> Madoff, DiPascali, and other co-conspirators knew that the Split Strike strategy was a
> fiction in that the Split Strike Clients' funds were not invested in the securities recorded
> on those clients' account statements. The reported performance of the Split Strike
> strategy was fabricated by Madoff, DiPascali, and other co-conspirators, through a
> process in which transactions were "executed" only on paper, based on historically
> reported prices of securities, for the purpose of producing and sending to Split Strike
> Clients documents that falsely made it appear that BLMIS had achieved the promised
> "returns" of approximately 10 to 17 percent per year.

> On a regular basis, Madoff provided guidance to DiPascali, and through DiPascali, to
> other co-conspirators, about the gains or losses that Madoff wanted to be reflected in the

account statements of the Split Strike Clients. Based on that guidance, DiPascali and other co-conspirators prepared model baskets of S&P 100 stocks based on historical market prices and tracked how those hypothetical baskets would have performed in the actual marketplace to determine whether and when to "enter the market."

See United States of America v. O'Hara and Perez, 09 MAG 2484 (SDNY 2009), ¶¶ 18(a) –(d).

## III.    THE SPECIAL MADOFF ACCOUNTS

18.    Besides the "split-strike" accounts managed by DiPascali, BLMIS maintained, as

of November 30, 2008, an additional 244 active accounts administered by other BLMIS

employees.

19.    A fraud examiner retained by Trustee for the Liquidation of BLMIS, Irving Picard

("Picard"), has declared, after reviewing BLMIS' records, computer systems and records

subpoenaed from third-parties, that:

- a.  "the purported trading strategy executed on behalf of the non-split-strike conversion accounts was equally as fictitious as DiPascali's purported 'split-strike conversion' strategy";
- b.  "the non-split-strike conversion customer accounts included many long time customers of Madoff.... representing approximately 5% of the total active accounts as of November 30, 2008."
- c.  "the non-split-strike accounts reported *unusually high rates of return, often in excess of 100%, in excess of the purported 10-17% that the accounts utilizing the split-strike strategy reported.*"
- d.  "the non-split-strike conversion strategy customer accounts were handled on an account-by-account basis, meaning each of the trades were keyed into the trading system manually";
- e.  "consistent with the above, virtually none of the trades purportedly conducted on behalf of the non-split strike conversion strategy account holders took place."

Declaration of Joseph Looby, pp. 14-15, October 16, 2009, SIPC v. BLMIS, Docket # 524. (emphasis added).

## IV.    THE ROLE OF MADOFF SECURITIES INTERNATIONAL LONDON IN PERPETUATING THE PONZI SCHEME

20.    Both Madoff and DiPascali have pled guilty to charges of money laundering

arising from the transfer of monies between BLMIS and MSIL. To conceal his Ponzi scheme,

Madoff told his IA clients that he was purchasing and selling securities in European markets.

7

Madoff also directed that MSIL forge records of extensive trading and commissions earned by MSIL relating to his IA business and wire transferred substantial funds between the accounts for his IA business and MSIL. Madoff used MSIL to divert to himself, his family members and insiders laundered funds obtained from the Ponzi scheme.

## B. THE DEFENDANTS' INVOLVEMENT WITH MADOFF

### I.     THE KW ACCOUNTING FIRM

21.     KW developed as an accounting firm because of its decades long relations with Madoff. Some clients sought KW's services because KW could provide access to invest with Madoff. Madoff also referred substantial investors of his to KW to handle their tax and accounting work relating to their BLMIS investments.

22.     KW's website represents that the firm is "one of the oldest and most distinguished mid-sized certified public accounting and consulting practices in the New York metropolitan area serving corporate needs in the areas of: capital formation, audit, tax, mergers and acquisitions, strategic and financial planning." KW also claims on its website that it provides its clients with "superior service," has a "strong commitment to client service" and provides to its clients "complete and carefully prepared financial information." KW also assures its clients on its website that the "firm is a member in good standing of both the American Institute of Certified Public Accountants (AICPA) and the New York State Society of CPA's."

### II.    THE SEC SANCTIONED MENDELOW FOR SELLING UNREGISTERED SECURITIES IN CONNECTION WITH BLMIS

23.     In September 1993, Mendelow paid to the SEC a $50,000 fine, and agreed to the entry of permanent injunctive relief against him, concerning his role in selling unregistered securities and operating an unregistered investment company, Telfran Associates, Ltd ("Telfran"). In sum, Telfran, and the accounting firm of Avellino & Bienes ("A&B"), raised

approximately $441 million through unregistered securities offerings, for the purpose of investing the money with BLMIS. The SEC at the time called it one of the largest-ever sales of unregistered securities.

24.     In November 1992, the SEC brought an enforcement action against Frank Avellino and Michael Bienes for selling unregistered securities to 3,200 investors. A&B offered investors notes paying interest rates approximately 15-18% per year. A&B invested the fund of monies raised from the illegal securities offerings in discretionary brokerage accounts with BLMIS. In return, BLMIS regularly paid A&B a return of 20-21% per year, purportedly based on earnings made from investing the monies in the market.

25.     A&B was the successor to Madoff's father-in-law's firm, Alpern & Heller. A&B began fund raising for Madoff in the 1960's while working for Sol Alpern, Madoff's father-in-law, before he retired in 1974. Jerry Horowitz, from the Friehling & Horowitz firm that supposedly audited BLMIS' operations, also worked at Alpern & Heller with A&B. A&B also shared office space for over twenty years with the G&L firm, at which Mendelow was a principal, before joining KW. A&B maintained extensive contact with Madoff as a result of raising nearly a half billion dollars for him.

26.     At the same time, the SEC also brought an enforcement action against Steven Mendelow, Edward Glantz and Telfran for raising approximately $88 million from 800 investors over a period of three years. Mendelow, through his control of Telfran, sold notes to investors with a promised annual return of around 15%. Telfran used the investors' funds to purchase notes with a higher promised annual return from the closely affiliated A&B, who in return received a fixed return from BLMIS. Mendelow and Glantz, for the funds Telfran originated for BLMIS, shared with A&B the spread between the returns A&B received from BLMIS and what

9

Telfran promised to its underlying investors. Consequently, Telfran received millions in profits for originating funds for BLMIS.

27.     The SEC failed to uncover the Madoff Ponzi scheme because Madoff directed DiPascali and others to create fake Depository Trust & Clearing Corporation ("DTC") reports and credible account records to corroborate the purported trading in the accounts. *SEC v. Frank DiPascali, Jr.*, No. 09 Civ. 7085 (LLS)(S.D.N.Y. filed August 11, 2009) at ¶¶ 18-20, 60. Madoff also used funds from other investors to repay all of Telfran and A&B's investors. As the SEC did not uncover any investor losses or missing funds, the SEC only brought actions for violations of the securities registration provisions of the federal securities laws.

28.     As Bienes later *admitted* after Madoff's arrest, Madoff had *explicitly instructed A&B not to register the notes or register as investment advisors*. Upon information and belief, Madoff and A&B instructed Telfran not to register the notes or register as investment advisors as well. If A&B or Telfran had registered the notes or registered as investment advisors, they would have been required to furnish to investors financial statements and annual reports describing how the money was being invested and by whom. Mendelow knew of BLMIS' Ponzi scheme based on Mendelow's engaging in the unlawful sale of unregistered securities at Madoff's direction and the payments Mendelow received for doing so.

29.     KW's reckless disregard of Madoff's fraud is demonstrated by Konigsberg's testimony that he viewed Mendelow's well-publicized involvement in one of the largest-ever sales of unregistered securities as a "side investment" that "had nothing to do with Konigsberg, Wolf, and, therefore, it wasn't my business." Hence, Konigsberg never investigated or addressed Mendelow's unlawful sales of securities committed while advising KW's clients as a principal of KW and from KW's offices. Rather, Mendelow, as a principal of KW, continued to solicit funds

10

for Madoff, operated FGLS, and assisted KW in its other operations relating to Madoff until the time of Madoff's arrest.

### III. PAUL KONIGSBERG'S CLOSE RELATIONS TO MADOFF EVIDENCE HIS KNOWLEDGE OF THE FRAUD

30.     As described by the New York Times, Konigsberg was the "most prominent accountant in Mr. Madoff's inner circle." Konigsberg, served as accountant for the Madoff family foundation and signed the Federal Tax forms for the Madoff family foundation from 1998 through 2007. During the same time, Konigsberg prepared for Madoff's personal tax returns the Form TD-F 90-22.1 concerning his interest in financial accounts. Tax payers having a financial interest in, or signature or other authority over, any foreign financial account with an aggregate value exceeding $10,000 at any time during the calendar year must report such relationship and the approximate value of each such account by filing form TD F 90-22.1. Thus, Konigsberg prepared those portions of Madoff's returns relating to MSIL's foreign accounts.

31.     Konigsberg held a small ownership interest in MSIL. All of the other shareholders in MSIL were Madoff's family members. KW's clients alone, who constituted just a fraction of Madoff's total Investment Advisory activities, purportedly earned more than a billion dollar profit through investing in BLMIS. Thus, MSIL, over the course of decades, should have earned commissions on billions of dollars of securities trades on behalf of BLMIS' investment advisory business along with its market-making business and proprietary trading desk.

32.     In 2000, Madoff consulted with Konigsberg about converting his sole proprietorship, Bernard L. Madoff Investment Securities, to Bernard L. Madoff Investment Securities, LLC.

11

33. A number of entities and parties controlled by or closely affiliated with Konigsberg were substantial "net winners" in Madoff's Ponzi – i.e., they withdrew significantly more capital than invested. For instance, Konigsberg formed and owned SJK Investors for the purpose of investing with BLMIS. Konigsberg closed out SJK in 2005 – three years before the Ponzi collapsed, and with a profit of $1.6 million. Additionally, Konigsberg's relatives, foundation, and KW's pension plan uniformly were all "net winners" as well from Madoff's Ponzi scheme.

34. Konigsberg agreed with Madoff that BLMIS would pay Konigsberg's son approximately $22,500 per year, which was calculated as a percentage of investments of certain clients that Konigsberg referred to BLMIS in the early 1990s. Konigsberg structured the payments in such a manner to circumvent ethical restrictions against an accountant and lawyer receiving undisclosed referral fees. Obviously conscious of the implications of his conduct, Konigsberg testified at a deposition in a federal action that "I received no outside funds from Madoff" and that he "wasn't in the business of introducing people to Bernard Madoff." Kongisberg further testified that he "*made no money with regard to these referrals*" and "*received no other form of compensation either directly or indirectly*" from Madoff for these referrals. Konigsberg subsequently corrected his testimony to concede that he arranged for BLMIS to make the payments to his son.

35. Konigsberg and Madoff, along with Ed Blumenfeld – a Madoff investor and KW client- purchased a leasehold in California in the amount of $3 million in 2003 through an entity called Brea and then donated the property to charity at the fraudulently inflated value of $25 million less than two years later. When New York State challenged the size of the tax deduction claimed, Madoff, Konigsberg and Blumenfeld agreed that the proper valuation was less than half

12

the $25 million originally claimed as the basis for their tax deductions. David Friehling, who ultimately pled guilty to preparing false audit reports to cover BLMIS' fraud and obstructing the Internal Revenue laws, met with Konigsberg and Madoff's sons to provide tax advice on the transaction. Upon information and belief, Friehling's obstruction of the Internal Revenue laws on behalf of Madoff encompassed his tax preparation work on the Brea transaction.

## IV. KW'S PROVISION OF ACCOUNTING AND TAX PREPARATION SERVICES TO MADOFF'S CLIENTS EVIDENCES ITS KNOWLEDGE OF MADOFF'S FRAUD

36. KW appeared hundreds of times on the list of Madoff's victims because Madoff often referred his split-strike accountholders to the firm for tax preparation services. Often, KW acted as an intermediary between Madoff and his investors, including handling withdrawals and advances to the Madoff accounts on behalf of investors and receiving monthly statements on their behalf regarding their alleged investments. Besides Mendelow and Konigsberg, a number of KW's employees invested with BLMIS.

37. Madoff also referred to KW to handle the tax preparation and accounting work for some of his closest investors who held non-split strike accounts. As reported by Vanity Fair, among Madoff's investors "were his closest friends, including two tycoons he loved as surrogate fathers: the late Norman Levy... [and] Carl Shapiro" – both of whom were KW's clients and upon information and belief held non-split strike accounts. Madoff desired that the tax and accounting work for his non-split strike accountholders be handled by accountants and financial advisors loyal to him to avoid questions being raised by sophisticated outsiders about the anomalous returns. KW served as accountants for the following Madoff investors:

      a. Madoff referred Carl Shapiro to KW for tax and accounting services relating to his investments with BLMIS. Carl Shapiro was one of Madoff's earliest investors. As alleged by Picard, "Mr. Shaprio and his family received more than $1 billion of fictitious profit – i.e., other investors' money – over the course of

their dealings with Madoff, rendering them among the largest beneficiaries of Madoff's Ponzi scheme." Picard has asserted that "Mr. Shapiro's accounts enjoyed, among other things, unrealistically and consistently purported high rates of return and remarkable purported trading success."

b. Upon the referral of Bernard Madoff, KW provided tax preparation and accounting services to Norman Levy and later his Estate, for which Madoff served as executor. Levy maintained 20 separate accounts with BLMIS. During the last six years before Madoff's arrest, Levy withdrew $305 million more than he invested in BLMIS. KW created a separate department within the firm devoted to perform the accounting work for the Levy investments with BLMIS in a locked room that was sealed off from the rest of the firm. According to public reports, there were billions of dollars in checks transmitted back and forth between Levy and Madoff.

c. Madoff referred Michael Engler to KW as a client. Besides being a substantial investor with Madoff, Engler, through his firm, Engler & Budd Securities, was responsible for introducing tens of millions of dollars in investments to BLMIS from the Minneapolis area.

d. Ed Blumenfeld purchased a private jet with Madoff for $24 million in the Spring of 2008. Upon information and belief, Blumenfeld, his family members, foundations and companies held more than 40 separate accounts with Madoff, valued at more than $100 million in BLMIS' statements. As set forth above, Blumenfeld, Konigsberg and Madoff invested in the Brea transaction together. Blumenfeld was a client of KW and KW handled the tax and accounting work for Blumenfeld's investments with BLMIS.

e. Madoff referred Stanley Shapiro, a wealthy investor who reportedly later maintained an office at BLMIS and appeared on its list of employees, to KW for tax and accounting services.

f. Madoff also referred to KW the Luria account. Bernard and Peter Madoff acted as the co-Executors to the Gladys Luria Estate. During the six years before Madoff's arrest, BLMIS transferred in excess of $20 million in fictitious profits to Gladys Luria and/or her Estate. BLMIS also fraudulently transferred nearly $2 million in fictitious profits to Gladys Luria's grandchildren, Robert and Amy Luria. Entities controlled by Robert and Amy Luria even withdrew hundreds of thousands of dollars from BLMIS despite never advancing any principal. Instead, BLMIS purported to transfer funds into these entities from accounts held in the name of Gladys Luria which had no actual principal at the time of the transfers. See Picard, et. al. v. Amy J. Luria, et. al., Adv. Pro. No. 10-3222 (BRL) and Picard et al v. Robert A. Luria, et. al., Adv. Pro. No. 10-3223 (BRL).

38.     Marshall Zeises, a Senior Audit Partner with KW, testified that he was aware of at least one client of KW who received returns from Madoff substantially higher than 100% in a particular year, and regularly received returns from Madoff substantially higher than what was earned by the split-strike accounts. Konigsberg explained to Zeises that "this client had referred other investors to Madoff and that, quote-unquote, *he was giving his client these extra rates of return than all the other people were getting. That was the manner in which Madoff was paying him for referring this business.*" Zeises, who handled the tax preparation work for the split strike accounts, testified that Konigsberg personally handled the tax and accounting work for other non-split strike accounts as well.

39.     By disguising the kickbacks as investment returns, the non-split strike account holder concealed on his tax returns the referral relationship with BLMIS as the true source of income. Thus, Konigsberg illegally facilitated the filing of false income tax returns in violation of 26 U.S.C. § 7206 and the making of false statements under oath in violation of 18 U.S.C. § 1001. Moreover, upon information and belief, the non-split strike account holder evaded income taxes through the mischaracterization of the income.

40.     Thus, Konigsberg *actually* knew that Madoff fabricated the investment returns reflected on the non-split strike account statements. Moreover, Konigsberg knew that disclosure of the Madoff kick-backs consisting of 100% returns to certain investors for referrals would expose Madoff's Ponzi scheme. After all, if BLMIS genuinely instituted a foolproof investment strategy, Madoff would not need to pay such exorbitant kickbacks.

41.     At no point did the Defendants disclose to Plaintiffs that BLMIS fabricated such extraordinary returns for the non-split strike accounts.

15

## C. MENDELOW OPERATED FGLS IN VIOLATION OF FGLS' OPERATING AGREEMENT AND MENDELOW'S FIDUCIARY DUTIES OWED TO FGLS

42. Mendelow operated FGLS out of his KW office and KW served as accountants and tax preparers for FGLS and its members. The Defendants caused all of FGLS' capital to be invested with BLMIS. As an Operating Member, Mendelow, under FGLS' Operating Agreement ("Operating Agreement"), was furnished with all rights and powers necessary to "maximize Company profits." Mendelow was required to cause FGLS to maintain "complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company," and "in accordance with sound accounting practices and principals applied in a consistent manner."

43. FGLS' books and records do not contain any trade ticket confirmations relating to BLMIS' fictitious securities trades. A review of BLMIS' trade tickets and monthly statements for FGLS would have revealed trades occurring outside of the daily trading ranges or on days that the market was closed. A review of FGLS' monthly statements showed substantial investments in Fidelity Brokerage Services LLC's "Fidelity Spartan U.S. Treasury Money Market Fund" – even though participation in any such money market fund for investment was not offered during that time.

44. BLMIS sent to KW a bundle of paper trade ticket confirmations for individual securities trades pertaining to KW's clients "once a month, sometimes not at all." Zeises discarded the bundle of tickets upon receipt under the purported rationale that he only needed to rely only on the monthly statements for the tax preparation work. KW's discarding of the trade confirmations pertaining to FGLS violated Mendelow's fiduciary obligations owed to FGLS. Mendelow's failure to review the trade ticket confirmations for losses or volatility in BLMIS'

16

trading during the dramatic market decline beginning in the fall of 2007 evidences his knowledge
that Madoff was providing fixed returns.

## D.    THE DEFENDANTS' KNOWLEDGE OF BLMIS' FRAUD

45.    KW accountants *actually* raised concerns with the Defendants concerning the
apparent warning signals for fraud associated with the BLMIS investments. For instance,
Andrew Muhlstock, a Wharton Graduate and certified financial planner, pointed out to KW that
a BLMIS year-end statement was "highly unusual" in that it did not contain the information
necessary to prepare a federal tax return. RJ Speranza, the former head of KW's tax department,
also raised concerns as to why the BLMIS statements were so incomprehensible.

46.    Speranza testified that KW's Tax Department discussed regularly the
implausibility of BLMIS' returns of 20% per year in a down market, despite repeatedly moving
into Treasuries, which required earning higher rates of returns on Madoff's other investments.
Speranza also testified that it was "always a joke" in the KW Tax Department "that Levy is
making so much money and he's going to wind up some day without any because of Madoff."
Indeed, the Defendants knew that BLMIS claimed abnormally high and consistent returns since
the early 1970s based on Mendelow's involvement with A&B.

47.    Speranza also testified that it "was common knowledge among the tax
department" within KW that KW was receiving improper referral fees for recommending to
clients to invest with Madoff. Speranza testified that Mendelow told him that *"we make money
the old fashioned way. We sell things and we get paid for it."* Mendelow also told Speranza that
we *need to persuade a client to invest with Madoff "so we can make some money."* Speranza's
testimony is corroborated by *Konigsberg's admission* that BLMIS paid a kickback for referrals

17

to his son and *Zeises's admission* that BLMIS provided a client with returns of 100% in a year as a disguised kickback for referring other clients.

48.    BLMIS' sending to KW *paper* trade confirmations of individual securities trades on behalf of a number of KW's clients *once a month* instead of on a *daily basis* further put KW on notice that Madoff was fabricating the trade confirmations for his split-strike accounts. The Defendants knew that BLMIS' delivery of paper trade ticket confirmations once a month was highly inconsistent with the practices of other securities firms and Madoff's alleged sophisticated computer trading. In such circumstances, KW's purported failure to discern a number of the anomalies with respect to the BLMIS statements, such as trades occurring on days the markets were closed or outside of the trading ranges for the day, evidences KW's knowledge or conscious avoidance of BLMIS' fraud. The Defendants' bad faith is further evidenced by their concealing of these irregularities from the Plaintiffs.

49.    The Defendants' failure to engage in any diligence regarding Madoff, given their sophistication and access to Madoff, and knowledge of the aforementioned circumstances, establishes their willful blindness and/or knowledge of his fraud. The Defendants, under the circumstances, should have, if acting in good faith, questioned Madoff regarding BLMIS' lack of an independent custodian to verify the existence and value of the securities purportedly held by it. Additionally, the Defendants, if acting in good faith in light of their knowledge and connections to Madoff, should have discerned and investigated BLMIS' consistent evading of SEC filing disclosures by converting its securities holdings to cash or United States Treasury bonds right before the end of a reporting period. Instead, the Defendants turned a blind eye towards BLMIS' fraud while being substantially enriched by Madoff for decades.

18

**E.    THE DEFENDANTS KNEW THAT BLMIS' MANAGEMENT, COMPLIANCE
        AND AUDIT RESPONSIBILITIES WERE PERFORMED BY MADOFF
        RELATIVES AND UNQUALIFIED INDIVIDUALS**

50.    The Defendants knew that BLMIS' management, compliance and audit
responsibilities were undertaken by Madoff's relatives and unqualified individuals. In light of
the Defendants' sophistication, these management and audit deficiencies should have
significantly heightened their concerns of fraud.

51.    Madoff's brother, two sons and niece ("Madoff family members") acted as
principals of BLMIS and served as securities regulatory compliance managers. Peter Madoff,
Bernard Madoff's brother, served as the Company's Senior Managing Director and Chief
Compliance Officer. Bernard Madoff's sons served as the Co-Directors of Trading at BLMIS
and as the Controller and Directors of MSIL. Shana Madoff, Bernard's niece and Peter's
daughter, acted as Compliance Counsel, in-house counsel, and Compliance Director of BLMIS.
Konigsberg knew the roles that Madoff's family members served for BLMIS by virtue of his
socializing with Bernard and Peter Madoff.

52.    The Defendants knew the principals of the three-person Friehling and Horowitz
("F&H") accounting firm which purported to audit BLMIS' billion dollar operation from their
office located in New City, New York. David Friehling, BLMIS' auditor from 1991 through
2008, pled guilty in the United States District Court for the Southern District of New York in
November 2009 for securities fraud, investment advisor fraud, making false filings with the SEC
and obstructing or impeding the administration of the Internal Revenue laws. Friehling admitted
when pleading guilty that he failed to independently verify the assets of BLMIS or ensure that
his bank account records or lists of the purchases of securities were accurate. The other

19

employees of F&H consisted of Friehling's secretary, and his retired father-in-law, Jerome Horowitz. The Defendants knew at all times of F&H's unsuitability to act as BLMIS' auditor.

53. The Defendants also knew that DiPascali, who held only a high school education, was plainly unqualified to act as BLMIS' CFO and that BLMIS used an in-house comptroller based in Bermuda.

## F. DEFENDANTS INDUCE PLAINTIFFS TO INVEST IN FGLS

54. For more than twenty years, Mendelow had acted as a long time and trusted financial advisor and accountant to Warshaw. In forming this relationship of trust with Mendelow, Warshaw relied on Mendelow's status as a principal at the prestigious KW firm. KW's website indicates that Mendelow "specializes in unique transactions, family wealth building and generational matters, and financial restructuring." According to the testimony of R.J. Speranza, Mendelow functioned as "a pitchman who sold things for the benefit of himself and the firm" and for which the firm received back improper "gratuities."

55. Before either Sajust or Carol Ann invested in FGLS, Mendelow actively promoted Madoff's IA services to Warshaw as providing a safe investment that has consistently produced positive returns. Mendelow advised Warshaw that Madoff utilized "state of the art computer programs" to "arbitrage" the purchase and sale of securities. Mendelow also informed Warshaw that Madoff held prestigious positions with national securities exchanges and received numerous accolades and awards. Mendelow never provided any negative information about Madoff to Warshaw or the Plaintiffs. Nor did Mendelow disclose to Plaintiffs the Defendants' financial interests with Madoff.

56. Mendelow served as the primary point of contact between Plaintiffs, on the one hand, and FGLS and KW, on the other hand. Mendelow issued to Plaintiffs many of the critical misrepresentations regarding the suitability of their investments in FGLS, as described below.

20

As an Operating Member, Mendelow directly controlled the affairs and accounts of FGLS, while acting in his capacity as a principal of KW. Konigsberg, as the owner and President of KW, controlled KW and managed the relationship between KW, FGLS and BLMIS. Konigsberg knew that KW and Mendelow fraudulently induced Plaintiffs' investments as described herein.

57. In 2003, Mendelow advised Warshaw and his relatives to form Sajust to invest in FGLS which invested in BLMIS directly. Based on Mendelow's advice, in June 2003, Sajust was formed and made the first of several investments in FGLS between 2003 and December 2008. In June 2005, Mendelow advised Warshaw to amend the Carol Ann Pension Plan to facilitate investments in FGLS. Based on Mendelow's advice, in June 2005, Carol Ann amended its Pension Plan, and made investments in FGLS between August 2005 and December 2008.

58. In advising Plaintiffs to invest in FGLS, which advices Plaintiffs relied on, Defendants misrepresented the legitimacy and risk of Plaintiffs' investment in BLMIS through FGLS, and fraudulently omitted and concealed from Plaintiffs, among other things:

  a. The existence of the non-split-strike accounts generating returns of 100% in a year;

  b. That the astronomical returns purportedly generated by the non-split-strike accounts were in reality disguised kickbacks to the client from BLMIS for the referral of other investors;

  c. The circumstances of Mendelow's involvement in selling $89 million in unregistered securities to raise funds for BLMIS;

  d. The unsuitability of F&H as BLMIS' auditor;

  e. Konigsberg's direction to BLMIS to pay his son an annual fee in return for Konigsberg's referral of clients to BLMIS;

21

f.  Konigsberg and Mendelow's financial interests with Madoff, including
Konigsberg's participation with Madoff in the Brea transaction;

g.  BLMIS only sent to KW paper copies of the daily security trade confirmations
once a month if at all, and that Mendelow on behalf of FGLS did not review the
confirmations;

h.  The concerns about the legitimacy of BLMIS' operations raised by KW's own
Tax Department.

59.  The Defendants also misrepresented that they had engaged in due diligence of
BLMIS and that they would monitor FGLS' investments with BLMIS.

60.  The Defendants also misrepresented the value of the Plaintiffs' investments in
FGLS on a monthly and annual basis up until the end of November 2008. On a monthly basis,
the Defendants, on behalf of FGLS, received statements from BLMIS. The Defendants
forwarded the monthly BLMIS statements to the Plaintiffs along with their analysis of FGLS'
performance for the month. The Defendants knew that these statements were false as shown
above. Plaintiffs relied on the statements, had no reason to know they were false, and held the
investments as a result thereof.

61.  The Defendants advised the Plaintiffs that as of November 30, 2008 Sajust's
account was valued at $3,269,544.56 and Carol Ann's Account was valued at $1,259,244.43,
whereas, in fact, as a result of the wrongdoing, Sajust's lost principal amounted to at least
$1,781,843.48 and Carol Ann's amounted to at least $894,590.93.

## H.  MADOFF'S PONZI SCHEME COLLAPSES

62.  In December 2008, after the drastic downturn in the market, BLMIS received
requests to redeem billions of dollars in investments. On December 11, 2008, Madoff was

arrested by federal agents and confessed to his fraud. Plaintiffs first learned of Madoff's fraud from the extensive news media reports about Madoff's arrest.

63.     A number of entities closely related with Mendelow made significant withdrawals from FGLS before Madoff's arrest. For example, in 2008, Tele Data P/S Plan withdrew its *total* balance of $137,662 before Madoff's arrest. Moreover, *after* November 1, 2008, entities relating to Mendelow made the following withdrawals from FGLS: i) MAJ Partners withdrew $427,500 out of $427,956.29; ii) C&P Assoc. Money Purchase withdrew its *entire* investment of $160,627.35; and iii) C&P Assoc. Defined Benefit withdrew its *entire* balance of $56,576.

## LEGAL CLAIMS
## FIRST CAUSE OF ACTION – PROFESSIONAL MALPRACTICE
### (As Against Mendelow and KW)

64.     Plaintiffs incorporate by reference all preceding paragraphs.

65.     Mendelow and KW owed Plaintiffs a duty of professional care with respect to their recommendation that Plaintiffs invest in FGLS and retain that investment.

66.     KW assures on its website that the firm is a member in good standing of the American Institute of Certified Public Accountants (AICPA), which promulgates professional and ethical standards applicable to accountants. Rule 201 of the AICPA Code of Professional Conduct provides that accountants shall "obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed." The AICPA extends to the provision of financial planning and investment advice.

67.     Mendelow and KW breached their duty of professional care and were grossly negligent in providing these services. Mendelow and KW never engaged in any diligence regarding BLMIS and the performance of any such diligence would have revealed the unsuitability of the investment.

23

68.     Mendelow and KW assured Plaintiffs that they would continue to monitor their investments by operating the FGLS entity, handling the tax and accounting work for the entity, interacting with BLMIS and continuing to advise them on the suitability of their investments in BLMIS. Thus, a mutual understanding existed between Plaintiffs and Mendelow and KW that Mendelow and KW would continue to represent Plaintiffs on the subject matter of the investment advice provided.

69.     Mendelow and KW also furnished to Plaintiffs on a continuous basis false and misleading statements regarding the profitability of their investments in FGLS. Plaintiffs relied on Defendants' recommendations and assurances. Had the true facts been disclosed to Plaintiffs, Plaintiffs would have instituted action against the Mendelow and KW earlier. Further, Mendelow and KW had the fiduciary obligation, as discussed further below, to inform Plaintiffs of all warning signs of Madoff's fraud known to them.

70.     By reason of the above, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial, but believed to be in excess of $2,676,434.

## SECOND CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY
### (As Against Mendelow and KW)

71.     Plaintiffs incorporate by reference all preceding paragraphs.

72.     Mendelow owed Plaintiffs the fiduciary duties of trust, loyalty, care and good faith as he had acted as an investment advisor to Warshaw for years, and advised Sajust and Carol Ann to invest with Madoff through FGLS. KW owed Plaintiffs the same fiduciary duties as did Mendelow because he was acting in his capacity as a Principal of KW and in furtherance of KW's ordinary business when advising Plaintiffs. Thus, Mendelow and KW owed Plaintiffs the duty, when providing investment and financial planning advice, to use due care, including

24

reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under the circumstances.

73.     Plaintiffs and Warshaw placed their trust and confidence in the integrity and fidelity of Mendelow and KW's investment and financial planning advice thereby creating a fiduciary relationship between Mendelow and KW and Plaintiffs. KW held itself and Mendelow out to the public as experts in the areas of "strategic and financial planning."

74.     Mendelow and KW breached their fiduciary duties by failing to perform due diligence regarding the Plaintiffs' investments and to monitor them and concealing from Plaintiffs their financial interests with Madoff and their knowledge of red flags of BLMIS' fraud.

75.     By reason of the above, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial, but believed to be in excess of $2,676,434.

### THIRD CAUSE OF ACTION – FRAUD
### (As Against All Defendants)

76.     Plaintiffs incorporate by reference all preceding paragraphs.

77.     The Defendants fraudulently induced Plaintiffs' investments into FGLS for the purpose of advancing their financial interests with BLMIS. The Defendants also induced Plaintiffs to retain their investments in FGLS by concealing the fraud after the investments were made and by continuing to make misrepresentations and material omissions through the monthly statements.

78.     The Defendants knowingly made false affirmative misrepresentations and intentional omissions of material fact to induce Plaintiffs' investments in FGLS. The Defendants had a duty to disclose the material facts concealed from Plaintiffs because each of the Defendants: i) had superior knowledge with respect to Plaintiffs' investments and BLMIS; ii) knew that their representations to Plaintiffs about their investments in FGLS were materially

25

misleading absent the omitted information and iii) owed the Plaintiffs a fiduciary duty.
Konigsberg and Mendelow were insiders of KW with direct involvement in KW's dealings with
Madoff and each bears responsibility for all of the affirmative misrepresentations and omissions
of material fact identified herein. Moreover, Mendelow made each of the misrepresentations and
omissions identified herein in his capacity as a principal of KW.

79. The Defendants' actual knowledge of BLMIS' fraud is demonstrated by their
profiting from their relationship with Madoff and their knowledge of serious warning signs of
Madoff's fraud. The Defendants enjoyed access to additional information about BLMIS which
contradicted their representations to Plaintiffs about their investments and failed to review
information, in violation of their duties, which evidenced the fraud.

80. The Defendants made material misrepresentations and omissions of facts to
Plaintiffs which were reckless as to their veracity, were made with gross disregard as to
Plaintiffs' reliance on them and Plaintiffs did in fact justifiably rely on them. Defendants'
refusal to see the obvious, or their reckless failure to investigate the doubtful, was sufficiently
gross to furnish evidence leading to an inference of fraud so as to impose liability.

81. Plaintiffs reasonably relied on these misrepresentations and omissions in making
the decision to invest. Plaintiffs' reliance was justified since Plaintiffs were unaware of the true
facts. Plaintiffs would not have invested in FGLS if the Defendants had informed them of the
true facts and would have redeemed their investments if Defendants had informed them of the
numerous warning signs of the fraud. Plaintiffs' reliance on the misrepresentations and omitted
material information was a substantial factor in their investment decisions.

26

82.     By reason of the above, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial, but believed to be in excess of $2,676,434. The aforementioned acts of Defendants were done maliciously, oppressively, and with intent to defraud, and Plaintiffs are entitled to punitive and exemplary damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION
### (As Against Mendelow and KW)

83.     Plaintiffs incorporate by reference all preceding paragraphs.

84.     Mendelow was careless and negligent in imparting to Warshaw and Plaintiffs the advice to invest in BLMIS. Mendelow expected Plaintiffs to rely upon his advice to invest in FGLS because of his close relationship of trust with Warshaw and with Plaintiffs, and Plaintiffs did so rely.

85.     Mendelow, by virtue of serving as long-term accountant and financial advisor to Warshaw, had a special relationship of trust with Plaintiffs and with Warshaw. Moreover, Mendelow advertised that he possessed, unique and specialized knowledge regarding financial planning generally. Mendelow possessed unique and specialized knowledge with respect to BLMIS. In contrast, Plaintiffs were relatively unsophisticated regarding investments and their only interaction with BLMIS was through Mendelow. Mendelow furnished to Plaintiffs the advice to invest in BLMIS through FGLS in his capacity as a Principal of KW and in furtherance of KW's substantial business relations with BLMIS.

86.     By reason of the above, Plaintiffs are entitled to an award of compensatory damages against Defendants in an amount to be determined at trial, but believed to be in excess of $2,676,434.

## FIFTH CAUSE OF ACTION – AIDING AND ABETTING BLMIS' FRAUD
### (As Against All Defendants)

87.    Plaintiffs incorporate by reference all preceding paragraphs.

88.    The Defendants aided and abetted BLMIS' $50 billion Ponzi scheme by obtaining investors to provide funds for Madoff's scheme. The Defendants had actual knowledge of BLMIS' fraud. By acting and failing to act as described herein, KW and Mendelow substantially aided and abetted BLMIS in defrauding Plaintiffs of $2,676,434.

89.    The Defendants' aiding and abetting this fraud was a substantial factor in bringing about the injury and loss discussed above, exclusive of interest, costs and attorneys' fees. The Defendants' conduct in aiding and abetting BLMIS' fraud was intentional, malicious and undertaken in willful and conscious disregard for Plaintiffs' rights.

**WHEREFORE,** Plaintiffs demand judgment against the defendants, as follows:

(1)    On the First Claim for Relief in the amount of not less than $2,676,434 or in such greater amount as is proven at the time of trial; and

(2)    On the Second Claim for Relief in the amount of not less than $2,676,434 or in such greater amount as is proven at the time of trial; and

(3)    On the Third Claim for Relief in the amount of not less than $2,676,434 or in such greater amount as is proven at the time of trial; and

(4)    On the Fourth Claim for Relief in the amount of not less than $2,676,434 or in such greater amount as is proven at the time of trial; and

(5)    On the Fifth Claim for Relief in the amount of not less than $2,676,434 or in such greater amount as is proven at the time of trial; and

(6) Providing for punitive damages on the Third and Fifth Claims for relief;

(7) Providing for interest on the aforesaid sums, reasonable attorneys' fees, costs, disbursements of this action and such other relief as the Court may deem just.

Dated: New York, New York
December 3, 2010

STORCH AMINI & MUNVES, P.C.

By: _____

Russell Bogart
Bijan Amini
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
*Attorneys for Plaintiffs*

# EXHIBIT B

**MARC BOGATIN**
ATTORNEY AT LAW
277 Broadway
Suite 900
New York, NY 10007

TELEPHONE
212-406-9065
FAX
212-406-1560

TO:   FGLS Equity LLC Members                    December 16, 2010

Re:   Bernard L. Madoff Investment
Securities LLC ("Madoff") Claim

Dear Members:

Enclosed is a copy of the trustee's complaint filed against FGLS. We are in the process of preparing a response to the complaint, and will keep you advised.

Very truly yours,

**MARC BOGATIN**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Marc E. Hirschfield
Richard J. Bernard
Geraldine E. Ponto
Marc Skapof

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-_____ (BRL) |
| Plaintiff, | |
| v. | |
| FGLS Equity LLC | |
| Defendant. | |

## COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff individually ("Madoff"), by and through his undersigned counsel, for his complaint (the "Complaint"), states as follows:

## **NATURE OF PROCEEDING**

1.     This adversary proceeding arises from the massive Ponzi scheme perpetrated by Madoff. Over the course of the scheme, there were more than 8,000 client accounts at BLMIS. In early December 2008, BLMIS generated client account statements for its approximately 4,900 open client accounts. When added together, these statements purport that clients of BLMIS had approximately $65 bill on invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison. The within defendant FGLS Equities LLC ("Defendant") received avoidable transfers from BLMIS.

2.     Within the 90 days prior to the Filing Date (defined below), Defendant received the amount of $2,350,000.00 from BLMIS. As a result of this preference payment, Defendant is in a more favorable position than other defrauded customers of BLMIS.

3.     This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and 78fff-2(c)(3) of SIPA, sections 105(a), 502(d), 544, 547, 550(a) and 551 of title 11 of the United States Code (the "Bankruptcy Code") and other applicable law, for avoidance of preferential

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

transfers in connection with certain transfers of property by BLMIS to or for the benefit of Defendant. The Trustee seeks to set aside such transfers and preserve and recover the property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

4.      This is an adversary proceeding commenced before the same Court before whom the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (F) and (O).

6.      Venue in this district is proper under 28 U.S.C. § 1409.

## DEFENDANT

7.      Defendant FGLS Equity LLC is a limited liability corporation that was formed under the laws of the state of New York. Its principal place of business is located at 440 Park Avenue South, 10th Floor, New York, New York 10016. Defendant holds a BLMIS account in the name, "FGLS Equity LLC," with the account address reported as c/o Marc Bogatin, Esq., 277 Broadway, Suite 900, New York, New York 10007.

## BACKGROUND, THE TRUSTEE AND STANDING

8.    On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

9.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

10.    On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

11.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

  a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding

-4-

     b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

     c.     removed the case to this Court pursuant to section 78eee(b)(4) of SIPA. By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

12.      By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

13.      At a Plea Hearing on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

14.      On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS since at least the 1980s. Plea Allocution of Frank

---

was commenced." 15 U.S.C. § 78*lll*(7)(B). Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

15. As the Trustee appointed under SIPA, the Trustee is charged with recovering and paying out customer property to BLMIS' customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

16. Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA section 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

17. Pursuant to sections 78fff(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 547 of the Bankruptcy Code.

The Trustee has standing to bring these claims pursuant to section 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.     the Defendants received "Customer Property" as defined in 15 U.S.C.

§78*lll*(4);

b.     BLMIS incurred losses as a result of the claims set forth herein;

c.     BLMIS' customers were injured as a result of the conduct detailed herein;

d.     SIPC has not reimbursed, and statutorily cannot fully reimburse, all

customers for all of their losses;

e.     the Trustee will not be able to fully satisfy all claims;

f.     the Trustee, as bailee of customer property, can sue on behalf of the

customer bailors; and

g.     The Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers,

collectively, "Accountholders"). As of the date hereof, the Trustee has received multiple express

unconditional assignments of the applicable Accountholders' causes of action, which actions

could have been asserted against Defendant. As assignee, the Trustee stands in the shoes of

persons who have suffered injury in fact and a distinct and palpable loss for which the Trustee is

entitled to reimbursement in the form of monetary damages. The Trustee brings this action on

behalf of, among others, those defrauded customers of BLMIS who invested more money in

BLMIS than they withdrew; and

h.     SIPC is the subrogee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly conferred upon

the Trustee enforcement of its rights of subrogation with respect to payments it has made and is

making to customers of BLMIS from SIPC funds.

## THE FRAUDULENT PONZI SCHEME

18.     Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and later, effective January 2001, formed as a New York limited liability company wholly owned by Madoff. Since in or about 1986, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, proprietor, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees. BLMIS was registered with the SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By that registration, BLMIS is a member of SIPC. BLMIS had three business units: investment advisory (the "IA Business"), market making and proprietary trading.

19.     For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses. For example, the strategy was executed by either purporting to purchase small groups of securities near lows and then purporting to sell those same securities at highs, or by purporting to short-sell securities near highs and then purporting to repurchase those securities near lows.

20.     For other accounts, Madoff described the IA Business' strategy as a "split-strike conversion" strategy. Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies. The basket of stocks would be intended to mimic the movement of the S&P 100 Index. Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market, at which times they would purportedly be invested in U.S. issued securities and money market funds. The second part of the split-strike conversion strategy was the hedge of such purchases

-8-

21.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious. At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. *See* Plea Allocution of Bernard L. Madoff at 3, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients other than Defendant, there is no record of BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions.

22.     Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours. To bolster that lie, Madoff periodically wired tens of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity substantially owned by Madoff and his family. There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.

23.     Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased and sold.

24.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay or defraud other current and prospective customers of BLMIS. The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to – or payments on behalf of – other investors. The money sent to BLMIS for investment, in short, was simply used to keep the scheme going and to enrich Madoff, his associates and others, including Defendant, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

25.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

26.     During the scheme, certain investors requested and received distributions of the so-called "profits" listed for their accounts which were nothing more than fictitious profits. Other investors, from time to time, redeemed or closed their accounts, or removed portions of purportedly available funds, and were paid consistently with the statements they had been receiving. Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

-10-

27.     When payments were made to or on behalf of these investors, including

Defendant, the falsified monthly statements of accounts reported that the accounts of such

investors included substantial gains. In reality, BLMIS had not invested the investors' principal

as reflected in customer statements. In an attempt to conceal the ongoing fraud and thereby

hinder, delay or defraud other current and prospective investors, BLMIS paid to or on behalf of

certain investors the inflated amounts reflected in the falsified financial statements, including

principal and/or fictitious profits.

28.     BLMIS used the funds deposited from new investments to continue operations

and pay redemption proceeds to or on behalf of other investors and to make other transfers. Due

to the siphoning and diversion of new investments to fund redemptions requested by other

investors, BLMIS did not have the funds to pay investors on account of their new investments.

BLMIS was able to stay afloat only by using the principal invested by some clients to pay other

investors or their designees.

29.     In an effort to hinder, delay or defraud authorities from detecting the fraud,

BLMIS did not register as an Investment Advisor until September 2006.

30.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for

Investment Adviser Registration. The application represented, *inter alia*, that BLMIS had 23

customer accounts and assets under management of approximately $17.1 billion. In fact, in

January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of

approximately $65 billion under management.

31.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports

"prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New

32.    At all t mes relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE TRANSFERS

33.    According to BLMIS' records, an account (No. 1F0178) was maintained with BLMIS as set forth on Exhibit A (the "Account"). Upon information and belief, for the Account, Defendant executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements"), and delivered such documents to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

34.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Account was held in New York, New York, and Defendant sent funds to BLMIS and/or to BLMIS' account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Account and the purported conducting of trading activities. Between the date the account was opened and the Filing Date, Defendant made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

-12-

35.     During the 90 days prior to the Filing Date, BLMIS made payments (collectively, the "Transfers") totaling the amount of $2,350,000.00 to the Defendant. The Transfers were made to or for the benefit of the Defendant and are set forth on Exhibit B annexed hereto.

36.     The Transfers represent the return of principal received during the 90 days prior to the Filing Date, and are avoidable and recoverable under sections 544, 547, 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).

37.     The Trustee's investigation is ongoing and the Trustee reserves the right to (i) supplement the information regarding the Transfers, and any additional transfers and (ii) seek recovery of such additional transfers.

38.     To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## CUSTOMER CLAIMS

39.     On or about June 25, 2009, Defendant filed a customer claim with the Trustee which the Trustee has designated as Claim # 011505 (the "Customer Claim").

## COUNT ONE
## PREFERENTIAL TRANSFER - 11 U.S.C. §§ 547(b), 550 AND 551

40.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

41.     At the time of each of the Preference Period Transfers received within the 90 days prior to the Filing Date, Defendant was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

42.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

43.    Each o. the Preference Period Transfers was to or for the benefit of Defendant.

44.    Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

45.    Each of the Preference Period Transfers was made while BLMIS was insolvent.

46.    Each of the Preference Period Transfers was made within 90 days of the Filing Date.

47.    Each of the Preference Period Transfers enabled Defendant to receive more than the Defendant would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

48.    Each of the Preference Period Transfers constituted a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Defendant pursuant to section 550(a) and section 78fff-2(c)(3) of SIPA.

49.    As a result of the foregoing, pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendant: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside and (c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## DISALLOWANCE OF DEFENDANT'S SIPA CLAIM

50.     To the extent applicable, the Trustee incorporates by reference the allegations
contained in the previous paragraphs of this Complaint as if fully rewritten herein.

51.     On or about June 25, 2009, Defendant filed a Customer Claim in the SIPA
proceeding.

52.     Defendant's Customer Claim should not be allowed pursuant to section 502(d) of
the Bankruptcy Code. Defendant is the recipient of Transfers of BLMIS' property which are
avoidable and recoverable under sections 547 and 550 of the Bankruptcy Code, and Defendant
has not returned the Transfers to the Trustee.

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor
of the Trustee and against Defendant as follows:

i.      On the First Claim for Relief, pursuant to sections 547, 550(a) and 551 of the
Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Preference
Period Transfers, (b) directing that the Preference Period Transfers be set aside, and
(c) recovering the Preference Period Transfers, or the value thereof, from Defendant for the
benefit of the estate of BLMIS;

ii.     On the Second Claim for Relief, the Defendant's Customer Claim should not be
allowed pursuant to section 502(d) of the Bankruptcy Code unless and until the Transfers are
paid or turned over;

iii.    On all Claims for Relief, pursuant to federal common law awarding the Trustee
prejudgment interest from the date on which the Transfers were received;

iv.     On all Claims for Relief, establishment of a constructive trust over the proceeds of
the Transfers in favor of the Trustee for the benefit of BLMIS' estate;

-15-

v.      On all Claims for Relief, awarding the Trustee all applicable interest, costs, and

disbursements of this action; and

vi.    On all Claims for Relief, granting Plaintiff such other, further, and different relief

as the Court deems just, proper and equitable.


Date:  November 12, 2010
       New York, New York

Of Counsel:                                    By: /s/ Marc E. Hirschfield
                                                   /s/ Richard J. Bernard
**BAKER & HOSTETLER LLP**                          /s/ Geraldine E. Ponto
PNC Center                                         /s/ Marc Skapof
1900 East 9th Street, Suite 3200               **BAKER & HOSTETLER LLP**
Cleveland, OH 44114-3482                        45 Rockefeller Plaza
Mary M. Bittence                               New York, New York 10111
E-mail:mbittence@bakerlaw.com                  Telephone: (212) 589-4200
Brian A. Bash                                  Facsimile: (212) 589-4201
Email: bbash@bakerlaw.com                      David J. Sheehan
Thomas M. Wearsch                              Email:  dsheehan@bakerlaw.com
Email: twearsh@bakerlaw.com                    Marc E. Hirschfield
Telephone:  (216) 621-0200                     Email:  mhirschfield@bakerlaw.com
Fax:  (216) 696-0740                           Richard J. Bernard
                                               Email: rbernard@bakerlaw.com
                                               Geraldine E. Ponto
                                               Email: gponto@bakerlaw.com
                                               Marc Skapof
                                               Email: mskapof@bakerlaw.com

                                               *Attorneys for Irving H. Picard, Trustee for the*
                                               *Substantively Consolidated SIPA Liquidation*
                                               *of Bernard L. Madoff Investment Securities*
                                               *LLC and Bernard L. Madoff*

**Exhibit A**



| FGLS EQUITY LLC  C/O STEVEN MENDELOW | 1F0178 |

MADC1228_00000001

Exhibit 3

BLMIS ACCOUNT NO. 1F0178 - FGLS EQUITY LLC C/O STEVEN MENDELOW

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Preferential Transfers | 6-Year Fraudulent Conveyance |

MADC1228_00000002

BLMIS ACCOUNT NO. 1FN078 - FGLS EQUITY LLC C/O STEVEN MENDELOW

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported on Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |

MADC1228 00000003

Exhibit B

## BLMIS ACCOUNT NO. 1F0178 - FGLS EQUITY LLC C/O STEVEN MENDELOW

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90 Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conversions |
| 11/26/2008 | CHECK | (400,000) | | (400,000) | | | 3,430,000 | (400,000) | | |
| 12/05/2008 | CHECK RETURN-CHECK NOT HONORED BY | 400,000 | | 400,000 | | | 3,830,000 | 400,000 | | |
| 4/15/2009 | CANCEL CHECK NOT FUNDED PER TRUSTEE | 300,000 | | 300,000 | | | 3,450,000 | | | |
| | **Total:** | | $ 13,445,000 | $ (14,195,000) | $ - | $ - | $ 3,450,000 | $ (2,350,000) | $ - | $ - |

[1] Although BLMIS statements reflect that funds were transferred into this account on this date, those funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

MADC1228 00000004