**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

Hearing Date:  June 24, 2015
(10:00 a.m. EST)
Response Due: June 16, 2015
(5:00 p.m. EST)

-----------------------------------------------------------------------x

|   |   |   |
|---|---|---|
| In re: | : | SIPA LIQUIDATION |
|  | : |  |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : | Index No. 08-01789 |
|  | : | (SMB) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | : | Adv. Pro. No. 10-04283 |
|  | : | (SMB) |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| - against - | : |  |
|  | : |  |
|  | : |  |
| STEVEN B. MENDELOW, NTC & Co. LLP, as former custodian of an Individual Retirement Account for the benefit of STEVEN B. MENDELOW, NANCY MENDELOW, NTC & Co. LLP as former custodian of an Individual Retirement Account for the benefit of NANCY MENDELOW, CARA MENDELOW, PAMELA CHRISTIAN, C&P ASSOCIATES, LTD., and C&P ASSOCIATES, INC., | : | |
|  | : |  |
| Defendants. | : |  |

-----------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT
ON THE PLEADINGS FILED BY DEFENDANTS STEVEN B. MENDELOW,
NANCY MENDELOW, CARA MENDELOW, PAMELA CHRISTIAN,
C&P ASSOCIATES, LTD., AND C&P ASSOCIATES, INC.**

Stanley S. Arkin (SA-1373)
ARKIN SOLBAKKEN LLP
590 Madison Avenue, 35th Floor
New York, New York 10022
*Attorneys for Defendants Steven B.
Mendelow, Nancy Mendelow, Cara
Mendelow, Pamela Christian, C&P*

*Associates, Ltd., and C&P Associates, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

RELEVANT BACKGROUND .................................................................................................. 2

    A.    The Defendants ..................................................................................... 2

    B.    Allegations as to Avellino & Bienes and Telfran ................................... 3

    C.    Fees Based on Reinvestments Attributable to Mendelow ...................... 4

    D.    BLMIS's "Schupt Schedules"................................................................. 5

    E.    Allegations that Data as to BLMIS's Purported Options Transactions "Should Have" Placed Defendants on Notice of Madoff's Fraud .......... 6

    F.    Allegations That Mendelow Was Aware of Madoff's Fraud ................. 7

    G.    Allegations as to "Other Indicia of Fraud" ............................................ 7

    H.    The Transfers ....................................................................................... 8

ARGUMENT ............................................................................................................................ 9

I.     APPLICABLE LEGAL STANDARD UNDER RULE 12(C) ....................................... 10

II.    ALL CLAIMS EXCEPT THOSE UNDER SECTION 548(a)(1)(A) MUST BE DISMISSED AS A MATTER OF LAW ........................................................................ 11

III.   THE REMAINING CLAIM SHOULD BE DISMISSED TO THE EXTENT IT SEEKS RECOVERY OF TRANSFERS "FOR VALUE" ............................................. 12

    A.    The "Good Faith" Defense of Section 548(c)....................................... 12

    B.    The Complaint Fails to Raise an Inference of Actual Knowledge ........ 13

    C.    Insufficient Allegations of Willful Blindness ....................................... 17

IV.   DISMISSAL SHOULD BE WITHOUT LEAVE TO AMEND ..................................... 19

CONCLUSION......................................................................................................................... 22

(i)

# TABLE OF AUTHORITIES

## Cases

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ........................................................................................ 14, 16

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ................................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................................... 11

*Fahs Constr. Group., Inc. v. Gray*,
   2012 WL 2873532 (N.D.N.Y. July 12, 2012), *aff'd*, 725 F.3d 289 (2d Cir. 2013) ................ 22

*In re Teligent, Inc.*,
   346 B.R. 73 (Bankr. S.D.N.Y. 2006) .................................................................. 19, 20, 21

*Johnson v. Rowley*,
   569 F.3d 40 (2d Cir. 2009) ...................................................................................... 10, 11

*Picard v. Avellino*,
   469 B.R. 408 (S.D.N.Y. 2012) ............................................................................... 12, 20

*Picard v. Ida Fishman Revocable Trust*,
   773 F.3d 411 (2d Cir. 2014) ................................................................................. passim

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y.2011) .................................................................. 9, 12, 17, 20, 21

*Picard v. Merkin*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................................... passim

*Ruotolo v. City of N.Y.*,
   2006 WL 2372236 (S.D.N.Y. Aug. 16, 2006),
    *aff'd*, 514 F.3d 184 (2d Cir. 2008) ................................................................. 19, 20, 21, 22

*Sellers v. M.C. Floor Crafters, Inc.*,
   842 F.2d 639 (2d Cir. 1988) .......................................................................................... 10

*SIPC v. BLMIS*,
   513 B.R. 437 (S.D.N.Y. 2014) ........................................................................................ 9

*SIPC v. BLMIS ("Good Faith Decision")*,
   516 B.R. 18 (S.D.N.Y. 2014) .................................................... 12, 15, 16, 19, 20, 21

*Starter Corp. v. Converse, Inc.*,
   1996 WL 684165 (S.D.N.Y. Nov. 26, 1996) .............................................................. 20

## <u>Other Authorities</u>

11 U.S.C. § 546 ........................................................................................................ 9

11 U.S.C. § 548 ................................................................................................... 10, 12

15 U.S.C. § 78aaa .................................................................................................... 9

15 U.S.C. § 78fff-2 .................................................................................................. 9

Fed. R. Bankr. P. 7007 ......................................................................................... 10

Fed. R. Bankr. P. 7009 ......................................................................................... 11

Fed. R. Bankr. P. 7012 ......................................................................................... 10

Fed. R. Bankr. P. 7015 ......................................................................................... 19

Fed. R. Civ. P. 7 ..................................................................................................... 10

Fed. R. Civ. P. 9 ......................................................................................... 11, 13, 14

Fed. R. Civ. P. 12 ............................................................................................. 10, 11

Fed. R. Civ. P. 15 ................................................................................................... 19

Steven B. Mendelow, Nancy Mendelow, Cara Mendelow, Pamela Christian, C&P Associates, Ltd., and C&P Associates, Inc. (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion under Rule 12(c) of the Federal Rules of Civil Procedure, as incorporated by Rule 7012 of the Federal Rules of Bankruptcy Procedure, for a judgment on the pleadings dismissing Counts Two through Ten, and dismissing Count One to the extent that it seeks the return of transfers taken for value (*i.e.*, to the extent it seeks the return of transfers beyond the $825,000 that are alleged to have consisted of fictitious profits).

## PRELIMINARY STATEMENT

This motion follows a recent Second Circuit decision in the Bernard L. Madoff Investment Securities LLC ("BLMIS") matter, which confirmed that – except in the case of actual fraud under Section 548(a)(1)(A) – payments received by BLMIS customers were shielded from avoidance by Section 546(e) of the Bankruptcy Code. *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411 (2d Cir. 2014) (referred to herein as "*Ida Fishman*"). In this decision (which consolidated pending actions by the Trustee raising the Section 546(e) issue), the Second Circuit held that the district court had properly dismissed all clawback claims, with the exception of claims invoking Section 548(a)(1)(A) for transfers within the two-year period preceding the BLMIS filing date.

The same result follows here. Most of the Trustee's claims in this action are premised not on Section 548(a)(1)(A), but on theories of constructive fraud, on New York State law, and/or on transfers not within the relevant two-year period. Accordingly, even accepting every allegation in the Complaint as true, *Ida Fishman* requires dismissal of all such claims in this action as a matter of law – *i.e.*, all claims except Count One (which seeks recovery of transfers under § 548(a)(1)(A) that were made within two years of the BLMIS filing date).

The remaining claims, moreover, are subject to the "good faith" defense of Section 548(c) and should also be dismissed to the extent they seek the return of transfers taken "for value." The Trustee's allegations as to Steven Mendelow's state of mind do no more than suggest that, as an objective matter, he was on "inquiry notice" of the Madoff fraud – and, as a matter of law, fail to allege a "lack of good faith" sufficient to avoid application of Section 548(c). These claims should therefore be dismissed as well.

For all these reasons, Defendants respectfully request that the Court grant their motion under Rule 12(c) and Bankruptcy Rule 7012 for judgment on the pleadings as to (i) all claims except Count 1, and (ii) Count 1 to the extent it can be read to seek the return of transfers taken "for value" – *i.e.*, any transfers beyond the $825,000 that are alleged to have consisted of fictitious profits.[1] Further, as it has been years since the commencement of this action (and years since the Trustee learned of the specific pleading requirements for these claims), Defendants respectfully request that such dismissal be with prejudice and without leave to amend.

## RELEVANT BACKGROUND

The following facts are set forth as alleged in the Complaint.

### A.    The Defendants

Defendant Steven B. Mendelow ("Mendelow") is a principal at Konigsberg Wolf & Co., P.C. ("KW"). The Complaint refers to Mendelow, his wife Nancy Mendelow, his daughters Cara Mendelow and Pamela Christian, and C&P Associates,[2] collectively, as "Defendants." (Compl. ¶ 6.) Defendants are all alleged to have had accounts with BLMIS.

---

[1]    In an effort to expedite resolution of this action, Defendants are serving on the Plaintiff, concurrently with the present motion, an offer of judgment for this amount (as well as costs accrued) pursuant to Rule 68 of the Federal Rules of Civil Procedure and Rule 7068 of the Federal Rules of Bankruptcy Procedure.

[2]    Consistent with the Complaint, C&P Associates, Ltd. and C&P Associates Inc. are collectively referred to as "C&P Associates."

NTC & Co. LL ("Defendant NTC"), as former custodian of the Individual Retirement
Account for the benefit of Mendelow, and also as former custodian of the Individual Retirement
Account for the benefit of Nancy Mendelow, is alleged to be either an initial transferee of certain
transfers or a conduit of such transfers for the benefit of Mendelow or his wife (collectively
"FBO Defendants").  According to the Complaint, if NTC is the initial transferee, then FBO
Defendants are the subsequent transferees.  However, "[t]o the extent Defendant NTC served as
a conduit for the funds withdrawn for the benefit of FBO Defendants, FBO Defendants are initial
transferees of the Transfers for whose benefit such Transfers were made for purposes of this
Complaint."  (Compl. ¶ 7.)

The Complaint alleges that Defendants, Defendant NTC, and/or FBO Defendants were
beneficiaries of Madoff's Ponzi scheme and received avoidable transfers from BMLIS.  (*Id.* ¶ 8.)
It further alleges that Mendelow, Nancy Mendelow, Cara Mendelow, and Pamela Christian are
also "Subsequent Transferee Defendants," as they received subsequent transfers of avoidable
transfers from C&P Associates.  (*Id.* ¶ 9.)  Finally, the Complaint alleges that Mendelow is also a
subsequent transferee of FGLS Equity LLC ("FGLS"), an "investment vehicle operated by
Mendelow through which he invested other people's money in BLMIS."  (*Id.*)

**B.      Allegations as to Avellino & Bienes and Telfran**

By way of background, the Trustee alleges that an accounting firm known as Avellino &
Bienes and its predecessor firms operated as "significant feeder funds for BLMIS from the early
1960s through November 1992, when it was liquidated pursuant to enforcement actions
commenced by the SEC."  (Compl. ¶ 59.)  Avellino & Bienes would promise investors a
guaranteed rate of return, would label such investments "loans" in order to avoid scrutiny from
regulators, and would provide letters with the specified rate of return for the particular investor.
(*Id.* ¶ 60.)  Madoff would guarantee significant returns to Avellino & Bienes, which (in turn)

3

would retain the "difference between the returns promised by Madoff and the returns promised to the underlying Avellino & Bienes investors." (*Id.* ¶ 61.)

In 1989, the Complaint alleges, Mendelow and an individual named Edward Glantz started Telfran Associates Ltd., which had as its general partner Telfran Associates Corp., an entity owned by Mendelow and Glantz. (The Complaint refers to the two entities collectively as "Telfran.") (*Id.* ¶ 3.) Mendelow allegedly structured Telfran "similarly" to Avellino & Bienes and issued letters to Telfran's investors. (*Id.* ¶ 62.) Telfran would then give investor money to Avellino & Bienes, which then gave it to Madoff. (*Id.*)

In 1992, the SEC commenced an investigation of Avellino & Bienes, which in turn led to an investigation of Telfran. (*Id.* ¶¶ 64-66.) The SEC sued Telfran and Mendelow for sales of unregistered securities by an unregistered investment advisor. (*Id.* ¶ 66.) Ultimately, Telfran and Mendelow entered into a consent decree which enjoined them from selling unregistered securities or operating an unregistered investment advisory company. (*Id.*)

As a result of these investigations, Madoff agreed to "return" money to be distributed to its investors, including those invested through Telfran. (*Id.* ¶ 67; *see id.* ¶ 72 (Telfran received approximately $89 million from Avellino & Bienes, corresponding to amounts Telfran had invested).) The Complaint alleges that Madoff "recorded fraudulent trading activity in customer statements to create the appearance of sufficient value in their accounts to cover [these] investors." (*Id.* ¶¶ 67-71.)

### C.    <u>Fees Based on Reinvestments Attributable to Mendelow</u>

According to the Complaint, the original Telfran investors were encouraged to reinvest in BLMIS, with the result that approximately $62 million of the $89 million returned to the Telfran investors was reinvested directly in BLMIS. (*Id.* ¶ 74.) The Trustee alleges, upon information and belief, that Mendelow received fees from Madoff based on the amount of money reinvested

4

by former Telfran clients, which the Trustee refers to (without explanation) as "fraudulent side

payments." (*Id.* ¶¶ 75-79.)  The amount of these payments remained constant from 1993 through

2001, and then continued at a lower rate from 2002 through 2007.  (*Id.*)

Despite the Trustee's use of the term "fraudulent side payments," the Complaint does not

allege any facts indicating that these payments reflect Mendelow's knowledge of any facts that

might suggest BLMIS was a Ponzi scheme.[3]  (*See id.* ¶¶ 73-87.)  Rather, the Complaint suggests

that such fees were essentially commissions for Telfran clients whom Mendelow referred to

Madoff, as they are calculated as a fixed percentage of "reinvested amounts attributable" to

Mendelow.  (*Id.* ¶¶ 75-77.)

### D.    BLMIS's "Schupt Schedules"

BLMIS employees allegedly created handwritten schedules (which the Complaint refers

to as "Schupt schedules") to "identify, track, and reconcile accounts to ensure the guaranteed

rates of returns and/or fraudulent side payments" to numerous BLMIS customers.  (*Id.* ¶ 80.)  To

compensate for any deficiencies, "additional value was added to those accounts through fictitious

options transactions that would precisely deliver the guaranteed rates of return and/or fraudulent

side payments."  (*Id.* ¶ 81.)  The Schupt schedules "also indicated the type of option and the

amount of options contracts that would be 'purchased or sold' to create the predetermined gain,"

and "an account statement was generated to reflect these purported transactions and the

associated gains generated."  (*Id.* ¶ 82; *see also id.* ¶¶ 84-86 (providing example).)

The Complaint does not allege that Mendelow, or any of the other Defendants, ever saw

these Schupt schedules or even knew of their existence.  However, it alleges upon information

---

[3]      Indeed, the Trustee's own allegations suggest that, to the extent Mendelow recognized any potential
problem with such payments, it related to whether such referral fees were consistent with the SEC consent decree
relating to Telfran – a concern that does not indicate knowledge of any facts that might suggest BLMIS was a Ponzi
scheme. *Supra* at 4.

and belief that the "ability to create gains each year that matched the expected fraudulent side

payment and guaranteed rate of return *should have placed Mendelow on notice* that these results

were not the result of legitimate trading activity." (*Id.* ¶ 83 (emphasis added).)

The Complaint also does not reconcile this assertion with its allegations that the

"fraudulent side payment" was calculated as a fixed percentage of investments originally referred

to BLMIS by Mendelow. (*Id.* ¶¶ 75, 77-79.) That is, if this fee was merely a percentage of

"reinvested amounts attributable to [Mendelow]" (*id.*), then it is unclear why payment of such

fee would place Mendelow on notice that BLMIS's trading results were fraudulent.

E.    **Allegations that Data as to BLMIS's Purported Options Transactions
      "Should Have" Placed Defendants on Notice of Madoff's Fraud**

The Complaint alleges, based on documents recovered from BLMIS, that the "fraudulent

side payments and the guaranteed rate of return" were allocated across accounts belonging to

FBO Defendant Mendelow, FBO Defendant Nancy Mendelow, and C&P Associates. (*Id.* ¶ 90.)

Based on documents recovered from BLMIS, the Complaint alleges that these payments and

rates of return were "created through fictitious options transactions predominately entered into

December of each year." (*Id.* ¶ 91.) The Complaint refers to a graph depicting these returns

(attached as Exhibit C to the Complaint), and alleges that this "consistent spike in returns every

December should have been apparent on the face of the FBO Defendants' and/or C&P

Associates' BLMIS customer statements, putting the FBO Defendants and/or Mendelow on

notice of Madoff's fraudulent activites." (*Id.*)

The Complaint does not suggest that any of these defendants had any knowledge of the

"documents recovered from BLMIS" on which these allegations are based, or of the chart

attached by the Trustee as Exhibit C to its Complaint. (*See id.* ¶¶ 90-92.)

6

F.    **Allegations That Mendelow Was Aware of Madoff's Fraud**

The Complaint alleges, based on "documents recovered from BLMIS," that Mendelow "closely monitored his accounts to ensure he received the full amount of his fraudulent side payment and guaranteed returns each year" and that he "instructed BLMIS to make up any shortfall of the amounts that he calculated he was due." (*Id.* ¶¶ 93-95 (referring to the use of the terms "vig" or "fee," and speculating that it is short for "vigorish," a term that is allegedly "commonly used by bookies or individuals involved with organized crime").) The Complaint provides no information as to the "documents" upon which such allegations are based.

The Complaint does not reconcile these assertions with the allegations already described, which indicate that BLMIS employees independently created schedules in order to "identify, track and reconcile accounts to ensure the guaranteed rates of return and/or fraudulent side payments to dozens of different customers of BLMIS." (*Id.* ¶¶ 80-82 (alleging that it was the BLMIS employees who identified deficiencies and calculated amounts needed to cover them).) Nor does it explain how the term "vig" or "fee" indicates knowledge of Madoff's Ponzi scheme.

In any event, the Complaint alleges that Mendelow's purported ability to "direct the value of his accounts at BLMIS based upon his own calculations . . . is indicative of his knowledge of fraudulent trading activity." (*Id.* ¶ 96.) It also alleges that he "*would have seen* this implausible options activity on his BLMIS customer statements which put him *on notice* of Madoff's fraudulent trading activities." (*Id.* (emphasis added).) Finally, it alleges that as a "trained accountant and businessman, . . . Mendelow *either knew or should have known* that BLMIS was not a legitimate securities trading operation." (*Id.* (emphasis added).)

G.    **Allegations as to "Other Indicia of Fraud"**

Finally, the Complaint identifies certain "additional indicia of irregularity and fraud" that Mendelow and the Defendants "ignored" (*id.* ¶ 98):

7

- The fact that BLMIS was purportedly audited by a small accounting firm with only three employees (*id.* ¶ 99);

- Articles in various financial industry publications raising "serious questions about the legitimacy of BLMIS and Madoff and their ability to achieve [their purported business returns]" (*id.* ¶ 100);

- The fact that BLMIS functioned as both investment manager and custodian of securities (*id.* ¶ 101); *and*

- The fact that BLMIS was "substantially a family-run operation, employing many of Madoff's relatives and virtually no outside professionals" (*id.* ¶ 102).

The Complaint does not allege that any of these defendants had actual knowledge of these "indicia of irregularity" (or of the underlying fraud); rather, the Complaint alleges generally that Defendants were "on notice" but "failed to make sufficient inquiry." (*Id.*)

H.    **The Transfers**

Because *Ida Fishman* bars, as a matter of law, all the Trustee's clawback claims except those under Section 548(a)(1)(A), the purported amounts and mechanics of most of the alleged BLMIS transfers are not reproduced in detail herein. (*Id.* ¶¶103-15.) Rather, for purposes of this motion, it is sufficient to note that the Trustee's Section 548(a)(1)(A) claim seeks recovery only of the "Two Year Transfers," which the Complaint defines as transfers of approximately $825,000 in "fictitious profits" during the two years prior to the Filing Date. (*Id.* ¶¶ 109, 117-21.)

In describing the various BLMIS transfers, the Complaint asserts that the "the Defendants and FBO Defendants willfully turned a blind eye to indicia of BLMIS's fraud based upon the information available to them" and "knew, and were on notice of, irregularities and problems concerning the trades reported by BLMIS, and strategically chose to ignore these concerns." (*Id.* ¶ 106 (emphasis added)). Notably, while the Complaint refers to "indicia," "irregularities," and "available" information, it does not allege that any of these Defendants actually knew of, or

8

willfully blinded themselves to, the fraud itself.  (*Id.*)  Further, as this paragraph does not set

forth any facts to support these conclusory statements as to Defendants' state of mind, such

statements appear to be based on the allegations previously described.

## ARGUMENT

Under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), "a

trustee is empowered to 'recover' (or claw back) money paid out by the debtor, as long as the

money 'would have been customer property' had the payment not occurred, and the transfers

could be avoided under the Bankruptcy Code." *Ida Fishman*, 773 F.3d at 414 (citing 15 U.S.C.

§ 78fff–2(c)(3).  However, Section 546(e) of the Bankruptcy Code creates a "safe harbor" that

limits the trustee's clawback powers.  *See* 11 U.S.C. § 546(e).  As the Second Circuit describes

it, "Section 546(e) provides generally that certain securities-related payments, such as transfers

made by a stockbroker 'in connection with a securities contract,' or 'settlement payment[s]'

cannot be avoided in bankruptcy." *Ida Fishman*, 773 F.3d at 414.  Although this safe harbor is

"expressly inapplicable to claims of actual fraud brought under [Section] 548(a)(1)(A)," it

otherwise covers a "very broad range of securities-related transfers." *Id.* at 416, 423.

Prior to *Ida Fishman*, the District Court for the Southern District of New York  had

consistently held that Section 546(e) applied to payments from BMLIS to its customers and, on

that basis, had dismissed all clawback claims except those under Section 548(a)(1)(A). *See, e.g.*,

*Picard v. Katz*, 462 B.R. 447 (S.D.N.Y.2011), *abrogated on other grounds by SIPC  v. BLMIS*,

513 B.R. 437 (S.D.N.Y. 2014).  The Trustee, however, sought appellate review of this issue,

arguing that the underlying Ponzi scheme rendered the Section 546(e) safe harbor unavailable in

the BLMIS context.  *Ida Fishman*, 773 F.3d at 417-23 (noting that the Trustee eventually agreed

to a limited consolidation of all pending actions raising the same question).

9

In *Ida Fishman*, the Second Circuit rejected the Trustee's arguments and confirmed – as the lower court had repeatedly held – that the Section 546(e) safe harbor applied to payments from BLMIS to its customers. *Id.* at 415, 417-23. Accordingly, the Court affirmed the dismissal, for failure to state a claim, of all clawback claims except those alleging actual fraud under Section 548(a)(1)(A) with respect to payments made within two years of the filing date.

Finally, even as to claims brought under Section 548(a)(1)(A), Section 548(c) provides a defense to the extent a transferee "takes for value and in good faith." 11 U.S.C. § 548(c); *see also, e.g.*, *Picard v. Merkin*, 515 B.R. 117, 138 (Bankr. S.D.N.Y. 2014). It is the Trustee's burden to "plead and prove the transferee's lack of good faith" to prevent application of this defense. *Id.* at 139.

## I.    APPLICABLE LEGAL STANDARD UNDER RULE 12(C)

Under Rule 12(c), made applicable to this adversary proceeding by Bankruptcy Rule 7012, a party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c); *see* Fed. R. Civ. P. 12(h)(2) (after pleadings are closed, a motion to dismiss for failure to state a claim may be brought as a motion for judgment on the pleadings); *see generally* Fed. R. Bankr. P. 7012(b). The pleadings are closed when, as here, the plaintiff has filed a complaint and the defendants have filed answers. Fed. R. Civ. P. 7(a); *see* Fed. R. Bankr. P. 7007. Rule 12(i) further provides that "a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial." Fed. R. Civ. P. 12(i). Where the Rule 12(c) motion does not involve any disputed factual issue, there is no reason to defer decision until trial. *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) ("Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings.").

10

In deciding a Rule 12(c) motion, the court should employ the "same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)." *Johnson v. Rowley*, 569 F.3d 40, 43-44 (2d Cir. 2009) (internal quotation marks and citation omitted). Accordingly, to survive a Rule 12(c) motion, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Further, as to any allegations sounding in fraud, the complaint must satisfy the particularity requirements of Rule 9(b), made applicable to adversary proceedings by Bankruptcy Rule 7009. Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009.

## II.    ALL CLAIMS EXCEPT THOSE UNDER SECTION 548(a)(1)(A) MUST BE DISMISSED AS A MATTER OF LAW

As the Second Circuit has recently confirmed, the "safe harbor" provision of Section 546(e) applies to payments made by BLMIS to its customers, requiring dismissal of all clawback claims except those for actual fraud under Section 548(a)(1)(A). *Ida Fishman*, 773 F.3d at 423. For this reason, claims alleging constructive fraud, all claims under New York's Debtor & Creditor Law, and all claims based on transfers outside the relevant two-year period must be dismissed for failure to state a claim. *See id.* at 415-23.

Most of the Trustee's claims in this action fall into one or more of these categories (Compl. ¶¶ 122-89 (Counts 2 through 10)) – and are therefore barred *as a matter of law* by Section 546(e). *See Ida Fishman*, 773 F.3d at 415-23. As these claims fail to state a claim upon which relief can be granted, Defendants respectfully request that this Court grant their Motion for Judgment on the Pleadings and dismiss each of these claims.

11

III.     **THE REMAINING CLAIM SHOULD BE DISMISSED TO THE EXTENT IT
         SEEKS RECOVERY OF TRANSFERS "FOR VALUE"**

Count One – the sole claim asserted under Section 548(a)(1)(A) – is subject to the

defense set forth in Section 548(c), and should therefore be dismissed to the extent it seeks

recovery of principal.  As the Trustee defines the "Two Year Transfers" as transfers of

approximately $825,000 in "fictitious profits" during the two years prior to the Filing Date (and

as no other transfers within that period are alleged to have been profit rather than principal),

Section 548(c) precludes recovery of any transfers in excess of that amount.

A.     **The "Good Faith" Defense of Section 548(c)**

Section 548(c) provides a defense to a fraudulent transfer claim brought under Section

548(a) to the extent the transferee "takes for value and in good faith."  11 U.S.C. § 548(c).

Specifically, Section 548(c) provides that

> a transferee or obligee of such a transfer or obligation that takes for value
> and in good faith...may retain any interest transferred or may enforce any
> obligation incurred, as the case may be, to the extent that such transferee
> or obligee gave value to the debtor in exchange for such transfer or
> obligation.

*Id.*; *see also Katz*, 462 B.R. at 453.

In the case of BMLIS, the District Court has modified the good faith defense in two

ways.  First, it is the Trustee's burden to "plead and prove the transferee's lack of good faith" to

prevent application of the defense.  *Merkin*, 515 B.R. at 139 (citing *SIPC v. BLMIS*, 516 B.R. 18

(S.D.N.Y. 2014) ("*Good Faith Decision*").  Second, "the 'good faith' standard is subjective

rather than objective," ***and cannot be defeated by allegations of inquiry notice***.  *Id.* (explaining

that  "the securities laws do not ordinarily impose any duty on investors to investigate their

brokers, [and] those laws foreclose any interpretation of 'good faith' that creates liability for a

negligent failure to so inquire" (citation omitted)).

"[T]o establish a lack of 'good faith' on the part of securities customers under § 548(c) in

the context of a SIPA bankruptcy, the trustee must show that the customer either ***actually knew***

of the broker's fraud or '***willfully blinded***' himself to it."[4]  *Picard v. Avellino*, 469 B.R. 408, 412

(S.D.N.Y. 2012) (emphasis added); *Merkin*, 515 B.R. at 139 (same).  These allegations are

subject to the strict particularity requirements of Rule 9(b).  *Good Faith Decision*, 516 B.R at 24

(Trustee "cannot make a plausible claim" to recover transfers absent "particularized allegations

that the [transferees] either knew of [BLMIS's] fraud or willfully blinded themselves to it").

**B.    The Complaint Fails to Raise an Inference of Actual Knowledge**

The courts have defined "actual knowledge" as "direct and clear knowledge, as

distinguished from constructive knowledge" – implying a "high level of certainty and absence of

any substantial doubt regarding the existence of a fact."  *Merkin*, 515 B.R. at 139 (citing Black's

Law Dictionary 950 (9th ed. 2009)).

Here, the Complaint wholly fails to allege that Mendelow had "actual knowledge" of the

Ponzi scheme.  That is, while the Trustee generally alleges that Mendelow "knew or should have

known" that BLMIS was not a legitimate securities trading operation (*see, e.g.*, Compl. ¶ 96), the

Complaint *nowhere alleges facts* indicating that he had "direct and clear knowledge" of

Madoff's fraud, "as distinguished from constructive knowledge."  *Merkin*, 515 B.R. at 139.

To the contrary, the Trustee's allegations as to Mendelow's state of mind are *expressly*

*framed as a matter of inquiry notice*.  The Complaint alleges, for example, that BLMIS's

purported options activity and predictable returns "should have placed Mendelow on notice" of

some underlying fraud (*id.* ¶¶ 83, 91, 96); that the rate of return on Mendelow's personal

investments "should have put [him] on inquiry notice" of fraud (*id.* ¶¶ 89); and that Mendelow

---

[4]    As Judge Rakoff has noted, the same standards apply to subsequent transferees under both Section 548(c)
and Section 550(b).  *Good Faith Decision*, 516 B.R at 22-23.

was "on notice" of certain "indicia of irregularity and fraud but failed to make sufficient inquiry" (*id.* ¶¶ 98-102; *see id.* ¶ 91 (stating that suspicious "spike(s) in returns every December *should have been apparent* on the face of the . . . BLMIS customer statements" (emphasis added)).

Indeed, the only suggestions that Mendelow may have actually known any information evidencing BLMIS's fraud are speculative and conclusory *on their face*, and cannot sustain a claim sounding in fraud. First, the Trustee alleges (without reference to any supporting facts) that Mendelow "instructed BLMIS to make up any shortfall of the amounts that he calculated he was due" with respect to his "fraudulent side payment and guaranteed returns," and that this purported ability to "direct" the value of his accounts was "indicative of his knowledge of fraudulent trading activity."[5] (Compl. ¶¶ 94, 96.) Second, the Trustee refers to the terms "vig" or "fee," and suggests that they somehow "reveal[] [Mendelow's] awareness of the corrupt trading practices of BMLIS."[6] (*Id.*)

But both of these allegations are based on speculation and conclusory leaps in logic and cannot sustain a claim sounding in fraud. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations'"). Indeed, the Complaint makes clear that these so-called "side payments" were

---

[5]     As already noted, these conclusory assertions are inconsistent with (i) the Trustee's detailed allegations that BLMIS employees independently prepared schedules to track accounts, calculate the amount needed to bring these accounts to the promised rate of return, and create fictitious transactions to deliver those returns; (ii) express allegations that Mendelow was, at best, on inquiry notice of some unspecified impropriety at BLMIS; and (iii) allegations that the so-called "fraudulent side payments" were calculated as a *fixed percentage of investments originally referred to BLMIS by Mendelow and did not depend on BLMIS's trading results*. *See supra* at 4-8, 13.

[6]     The Trustee suggests (on information and belief) that "vig" may stand for "vigorish" – which the Trustee defines as a term "commonly used by bookies or individuals involved with organized crime to describe the interest, 'take' or 'juice' on a usurious loan." (Compl. ¶ 95.) However, other sources suggest that "vig" is sometimes informally used to describe transaction costs or expenses, such as commissions or advisory fees. *See, e.g.*, http://assetbuilder.com/scott_burns/what_las_vegas_can_teach_us_about_mutual_fund_investing (using "vig" to describe expense ratio in context of mutual fund investing); http://en.wikipedia.org/wiki/Vigorish (noting that, in the investment banking context, "'vig' is sometimes used to describe profits from advisory and other activities").

calculated as a *fixed percentage of investments originally referred to BLMIS by Mendelow and did not depend on BLMIS's trading results*.  (Compl. ¶¶ 75-77.)  Nothing in the Complaint connects the payment of such referral fees (whether labeled "fees," "vigs," or anything else) with any awareness of some massive underlying fraud.  (*Id.* ¶¶ 74-87.)  To the contrary:  the Trustee's own allegations suggest that, to the extent Mendelow recognized any impropriety in these payments, such concerns related to whether such fees were consistent with the SEC consent decrees in the Telfran matter – concerns that do not suggest knowledge of any facts that might suggest BLMIS was a Ponzi scheme.  (*Id.* ¶¶ 64-66, 75-77; *see supra* at 4-5.)

In other words, *even if the factual premise of each allegation is accepted as true* (that is, even if Mendelow instructed BLMIS to make full payment of amounts due or used the term "vig"), neither raises an inference that he "actually knew" of the underlying Ponzi scheme.  *See Merkin*, 515 B.R. at 139-41 (defendant's knowledge that Madoff's results were "impossible" and admission that BLMIS was likely a Ponzi scheme did not raise inference of "actual knowledge"); *Good Faith Decision*, 516 B.R. at 24 ("Without particularized allegations that the [transferees] either knew of [BLMIS's] fraud or willfully blinded themselves to it, the Trustee's complaints here cannot make out a plausible claim [under either Section 548(a)(1)(A) or 550(a)].").

Indeed, this Court has found "actual knowledge" insufficiently pled even on allegations far more specific and direct than these – including where the defendant ***repeatedly and openly admitted*** that he suspected Madoff was operating a massive Ponzi scheme.  *Merkin*, 515 B.R. at 139-40.  In *Merkin,* defendant was alleged to have expressly stated that BLMIS appeared to be a fraud, and to have specifically recognized numerous "red flags" suggesting fraud.  *Id.* at 129-30, 139-41.  Among other things, third-party evidence indicated that Merkin

- "*openly admitted* that Madoff appeared to be operating a Ponzi scheme";

15

- stated "that Madoff's scheme was bigger than Ponzi, and 'Charles Ponze [sic] would lose out because it would be called the 'Madoff Scheme'";

- received warnings that BLMIS's performance was "impossible" and "could be a Ponzi scheme";

- *admitted* that he knew "the options markets lacked the volume necessary to sustain BLMIS' option trading";

- maintained a folder of "documents and analyses noting the lack of correlation between the performances of BLMIS' investments and the S&P 500";

- warned others "of the dangers of investing significant amounts for the long term with BLMIS and to '[n]ever go long in a big way'";

- "articulated concerns about fraud to Madoff"; *and*

- "*specifically acknowledged* a list of his concerns with BLMIS . . . , including the lack of separation between BLMIS' investment advisory and market making/proprietary trading businesses, lack of overnight exposure, self-clearing, moving funds to Treasury bonds in a way that was inconsistent with its purported investment strategy, and that BLMIS' trades were at times outside the daily trade price range."

*Id.* (emphasis added).  In short, the Trustee's allegations against Merkin (*unlike the allegations against Mendelow*) set forth facts suggesting actual notice of numerous indicia of fraud.  *Id.*

As specific and substantiated as the Merkin allegations were, however, this Court nonetheless held that they *did "not imply the level of certainty or absence of substantial doubt associated with actual knowledge"* – and thus that the Merkin complaint "fail[ed] to plausibly allege that Merkin had actual knowledge of Madoff's Ponzi scheme." *Id.* at 141.

The same result follows here.  Here, the Trustee has not even attempted to set forth facts suggesting that Mendelow actually knew BLMIS was running a massive Ponzi scheme.  *Supra* at 13-15.  Rather, the Trustee sets forth speculation, conclusory statements, and unsupported leaps in logic – allegations that wholly fail to raise any inference that Mendelow had "direct and clear

16

knowledge" of Madoff's fraud.[7]  *Id.* at 139-41.  Such allegations are plainly insufficient.  *See, e.g.*, *Good Faith Decision*, 516 B.R. at 24 (no plausible claim absent "particularized allegations that the defendants here either knew of [Madoff's fraud] or blinded themselves to it"); *Acito*, 47 F.3d at 52 (fraud-based claims cannot rest on "speculation and conclusory allegations").

### C.    Insufficient Allegations of Willful Blindness

The Trustee similarly fails to allege facts raising an inference of "willful blindness."

"Willful blindness" exists where defendant intentionally chooses to blind himself to the truth, and "involves two elements":

> (1) the defendant must subjectively believe that there is a *high probability* that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  If a person who is not under an independent duty to investigate "nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of good faith."

*Merkin*, 515 B.R. at 139-40 (internal citations omitted).  "Thus, willful blindness connotes strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire actual knowledge of its existence."  *Id.*

Critically, "willful blindness" is not established by allegations that, as an objective matter, defendant was on "inquiry notice" of Madoff's fraud.  *Katz*, 462 B.R. at 455 (rejecting argument that "lack of good faith" is established by allegations that defendants were on "inquiry notice of the fraud but failed to diligently investigate [BLMIS]").  That is, it is not enough to allege that the transferee had information that "would have caused a reasonable [person] in [the transferee's] position to investigate the matter further."  *Id.* (internal quotation marks omitted).  Rather, the Trustee must allege facts showing that defendant was *actually aware* of "red flags" suggesting a high probability of fraud but took "deliberate actions" to avoid learning the truth.

---

[7]      Indeed, the Trustee dose not even attempt to allege that Mendelow had "direct and clear knowledge" of the underlying Ponzi scheme.  *See supra* at 13-15.

*Merkin*, 515 B.R. at 139-40 (no "willful blindness" unless defendant "subjectively believes that

there is a high probability that [the fraud] exists"); *Katz*, 462 B.R. at 455.

The Trustee utterly fails to meet this standard – as its allegations are expressly framed

using an objective "inquiry notice" approach.  (*Supra* at 13-14; *see also id.* at 6-8.)  That is, the

Complaint alleges (often in wholly conclusory terms) that certain facts "*should have placed*

*Mendelow on inquiry notice*" (*see, e.g.*, Compl. ¶ 89), but alleges no facts raising an inference of

"willful blindness."  Specifically, the Complaint alleges that:

- The alleged "guaranteed rate of return" on Mendelow's BLMIS
  investments during the period 1993 through 1996 "*should have put*
  *Mendelow on inquiry notice that Madoff was engaged in fraudulent*
  *trading practices*" (*id.* ¶ 89);

- BLMIS's alleged ability to make the "fraudulent side payment and
  guaranteed rate of return [each year] *should have placed Mendelow on*
  *notice that these results were not the result of legitimate trading activity*")
  (*id.* ¶ 83);

- The "consistent spike" in BLMIS's returns every December "*should have*
  *been apparent* on the face of the FBO Defendants' and/or C&P
  Associates' BLMIS customer statements, *putting the FBO Defendants*
  *and/or Mendelow on notice* of Madoff's fraudulent activities."  (*id.* ¶ 91);
  *and*

- The implausible options activity on the BLMIS customer statements
  would have "*put him on notice*" of Madoff's fraud – and as a trained
  accountant, Mendelow either *knew or should have known* that BLMIS was
  not a legitimate securities trading operation" (*id.* ¶ 96).

(*Id.* ¶¶ 83, 89, 91, 96 (emphasis added)).  The Complaint also describes various "additional

indicia of irregularity and fraud" as to which Defendants "failed to make sufficient inquiry":

- The fact that BLMIS was audited by a three-person accounting firm with
  offices located in a strip mall;

- Articles in the financial industry press apparently raising questions about
  legitimacy of BLMIS returns;

- The fact that BLMIS was both investment manager and custodian of
  securities; *and*

- The fact that BLMIS was basically a family-run operation with virtually no outside professionals.

(*Id.* ¶¶ 99-102.)

Finally, while the Complaint ultimately recites language approximating the definition of "willful blindness" (*id.* ¶ 106), this recitation is wholly conclusory and appears to be premised on the "inquiry notice" allegations detailed above. But here, again, the Trustee conflates utterly distinct concepts. Being "on notice of indicia of irregularity" (*id.* ¶ 99) is not the same as "subjectively believ[ing] that there is a *high probability*" of fraud. *Merkin*, 515 B.R. at 139. Likewise, the "fail[ure] to make sufficient inquiry" into such indicia of irregularity (Compl. ¶ 98) is *not* the same as taking "deliberate action to avoid learning [that a fraud exists]." *Merkin*, 515 B.R. at 139.

In short, the Trustee fails to set forth any particularized, non-speculative facts suggesting that Mendelow "subjectively believe[d] that there [was] a high probability" that BLMIS was a fraud; or that he took "deliberate action" to avoid learning the truth. *See id.* at 139. For this reason, the Complaint does not state a plausible claim under Section 548(a)(1)(A) for recovery of any transfers taken for value. *See Good Faith Decision*, 516 B.R. at 23-24.

## IV.    DISMISSAL SHOULD BE WITHOUT LEAVE TO AMEND

Finally, Mendelow respectfully requests that the Court dismiss the Complaint with prejudice and without leave to amend – in light of the many years that have passed not only since the filing of the Complaint, but since numerous decisions informing the Trustee of both (i) the need to affirmatively plead lack of good faith in order to state a claim under Section 548(a)(1)(A) for recovery of principal; and (ii) the fact that allegations of "inquiry notice" are insufficient.

Federal Rule of Civil Procedure 15, applicable here through Bankruptcy Rule 7015, governs requests for leave to amend pleadings. *See In re Teligent, Inc.*, 346 B.R. 73, 76 (Bankr.

S.D.N.Y. 2006) (Bernstein, J.).  A court may deny leave to amend in instances of "undue delay, bad faith, dilatory motive, undue prejudice to the opposing party or futility."  *Id.*; *see also, e.g.*, *Ruotolo v. City of N.Y.*, 2006 WL 2372236, at *2-3 (S.D.N.Y. Aug. 16, 2006), *aff'd*, 514 F.3d 184 (2d Cir. 2008).  "While delay alone is insufficient, a court may deny leave to amend where 'after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant.'"  *In re Teligent*, 346 B.R. at 76 (citation omitted). "The longer the period of unexplained delay, the less will be required of the non-moving party to show prejudice."  *Id.*

Courts will rarely find an explanation for a delay "satisfactory" where the movant knew of the underlying facts but declined earlier opportunities to include them in its pleading.  *See, e.g.*, *In re Teligent*, 346 B.R. at 76 (denying leave to amend where plaintiff had "known the facts on which she now relies for over two years" and could have included them earlier); *Ruotolo*, 2006 WL 2372236, at *3 (denying leave to amend five years after original complaint, where facts were "available to him from the beginning of the litigation"); *Starter Corp. v. Converse, Inc.*, 1996 WL 684165, at *2-3 (S.D.N.Y. Nov. 26, 1996) (denying leave to amend, and noting that proffered case law granting leave to amend after "delays as long as two or three years" depended largely on the discovery of "previously unknown" facts or events).

Here, to the extent the Trustee does seek leave to amend, there can be no dispute that the delay is substantial, with the Complaint in this action filed in 2010.  Further, it is hard to imagine a satisfactory explanation for this nearly five-year delay – especially as the Trustee has known since 2011 of key deficiencies in its Complaint.  That is, in 2011, Judge Rakoff confirmed that the Section 546(e) "safe harbor" barred all BLMIS clawback claims except those asserted under Section 548(a)(1)(A) – and that even claims under Section 548(a)(1)(A) for recovery of principal

20

would fail absent allegations that the transferee *actually knew of, or willfully blinded themselves to*, Madoff's fraud. *Katz*, 462 B.R. at 422, 455.[8] Judge Rakoff has also repeatedly indicated that it is the *Trustee's burden* to plead "willful blindness" in order to state a claim for relief. *Id.* at 455-56; *Good Faith Decision*, 516 B.R. at 23-24.

In short, there is no dispute that the Trustee knew, no later than 2011, both (i) that all claims except those invoking Section 548(a)(1)(A) were barred, and (ii) that a failure to allege 'willful blindness" would result in the dismissal of any remaining claims against Mendelow for the return of principal. But the Trustee nonetheless declined to amend its claims against Mendelow to address these issues. Indeed, in January 2015 – well after the Second Circuit decision in *Ida Fishman* – the Trustee filed a Proposed Case Management Plan in this matter stating that it "[did] not contemplate any amendments to the pleadings," which this Court So Ordered. *See* Proposed Case Management Plant, Signed January 23, 2015, Docket No. 69.

Finally, Defendants would suffer clear prejudice from any proposed amendment at this stage. Among other things, the proof needed to disprove allegations of *subjective willful blindness* would be entirely different from the evidence required for allegations of *objective inquiry notice.* That is, while inquiry notice relates to information that was generally available to persons in Defendants' position, willful blindness relates to Defendants' actual state of mind during the relevant time. *See, e.g.*, *Katz*, 462 B.R. at 455; *Merkin*, 515 B.R. at 139-40. As the task of disproving state-of-mind allegations increases in difficulty the more time goes by, Defendants would face substantial difficulty and expense should they suddenly be forced – five years into this litigation – to mount such a defense.

---

[8]       As already discussed, these holdings have been repeatedly confirmed in the years since. *See, e.g.*, *Avellino*, 469 B.R. at 411-12 (trustee must show transferee "actually knew of the broker's fraud or 'willfully blinded' himself to it"); *Good Faith Decision*, 516 B.R. at 21-22 (again rejecting an "objective standard of inquiry notice"); *Ida Fishman*, 773 F.3d at 415-23 (affirming *Katz*).

For all these reasons, Mendelow respectfully requests that dismissal of the Trustee's claims be with prejudice and without leave to amend. *See, e.g.*, *In re Teligent*, 346 B.R. at 76 (denying leave to amend where plaintiff had "known the facts on which she now relies for over two years" and could have included them earlier); *Ruotolo*, 2006 WL 2372236, at 3 (denying leave to amend five years after original complaint, where facts were "available to him from the beginning of the litigation"); *Fahs Constr. Group., Inc. v. Gray*, 2012 WL 2873532, at *5-6 (N.D.N.Y. July 12, 2012) (denying leave to amend where plaintiff could have amended previously and failed to set forth the proposed amendments, defendants had incurred the time and expense of twice moving to dismiss and would thus be unduly prejudiced, and more than eight years had passed as to some of the underlying events), *aff'd*, 725 F.3d 289 (2d Cir. 2013).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Judgment on the Pleadings so as to dismiss Counts Two through Ten outright, and to dismiss Count One to the extent it seeks the return of amounts beyond the alleged $825,000 in fictitious profits, as well as any different or additional relief that is just and proper. Defendants further respectfully request that such dismissal be with prejudice and without leave to amend.

Dated:  New York, New York
        May 14, 2015

                    ARKIN SOLBAKKEN LLP

                    By: */s/ Stanley S. Arkin*
                    Stanley S. Arkin (SA-1373)
                    Arkin Solbakken LLP
                    590 Madison Avenue, 35th Floor
                    New York, New York 10022
                    (212) 333-0200
                    *Attorneys for Defendants*

22