# EXHIBIT 1

**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Jonathan B. New
Robertson D. Beckerlegge
Robyn M. Feldstein

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-04283 (SMB) |
| v. | |
| STEVEN B. MENDELOW, NANCY MENDELOW, CARA MENDELOW, PAMELA CHRISTIAN, C&P ASSOCIATES, LTD., and C&P ASSOCIATES, INC., | **AMENDED COMPLAINT** |
| Defendants. | |

Irving H. Picard, (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff, individually ("Madoff"), by and through his undersigned counsel, for his Complaint, states as follows:

## INTRODUCTION

1.    This adversary proceeding arises from Madoff's now infamous Ponzi scheme. Defendant Steven B. Mendelow ("Mendelow"), a sophisticated and experienced accountant, financial advisor and investor, played an instrumental role in the growth, maintenance, and concealment of Madoff's scheme.  For the better part of 30 years, Mendelow steered investors to BLMIS and created feeder funds which fueled the growth of the Ponzi scheme. Mendelow profited directly from Madoff's fraud all the while knowing that those profits were not the result of actual securities trading.

2.    Mendelow exploited his position as a trusted financial advisor to his clients and his close relationship with Madoff to reap tremendous financial rewards.  In the early years of his involvement with BLMIS, Mendelow set up a feeder fund, Telfran Associates Ltd. ("Telfran") that funneled money to BLMIS through the accounting firm Avellino & Bienes ("A&B"). Telfran solicited approximately 800 clients, who invested approximately $89 million, promising them a guaranteed return on their original investment.  In an unsuccessful effort to avoid scrutiny from securities regulators, Telfran called these investments "loans" and provided letters promising investors a fixed return.  Telfran, in turn, received a higher guaranteed return on these investors' funds from A&B, which simply deposited the funds in accounts at BLMIS. Mendelow profited from the difference between the higher return provided by A&B and the

lower return offered by Telfran. Mendelow knew that Telfran's investor funds were ultimately invested with BLMIS and that the notion of a guaranteed return would not be possible if actual securities were being traded.

3.      When Telfran came under investigation and was shut down by the Securities and Exchange Commission ("SEC") in 1992, Madoff agreed to a new financial arrangement with Mendelow.   In return for Mendelow's substantial assistance in corralling former Telfran investors and ensuring that they opened direct accounts with BLMIS, Madoff personally assured Mendelow that he would continue to receive the financial benefits he previously received through A&B.   Thereafter, Mendelow effectively transferred his personal accounts at A&B to BLMIS.   Madoff promised Mendelow that he would receive a double benefit in those accounts – a guaranteed return on his IRA BLMIS accounts, Nancy Mendelow's IRA BLMIS account and C&P Associates' BLMIS account, and additional annual increases to the value of certain designated accounts through fictitious, speculative options transactions ("Extra P&L").   This "Extra P&L" took the place of the profits Telfran had previously earned by placing investor money into BLMIS through A&B.

4.      For years, at Mendelow's direction, BLMIS boosted the balances on Mendelow's designated account statements by recording fictitious options transactions that yielded the predetermined amount of Extra P&L, thus making available for Mendelow's withdrawal millions of dollars of fictitious profits.   Mendelow knew that this arrangement with Madoff was impossible to execute in a securities trading account subject to market fluctuations and that BLMIS was not engaged in actual securities trading in his accounts.

5.      In the first few years that BLMIS implemented this new financial arrangement, Mendelow coordinated with Madoff's chief lieutenant, Frank DiPascali ("DiPascali"), to work

out the mechanics of the Extra P&L and guaranteed returns and to ensure that Mendelow received the full amount he demanded.

6.     In various handwritten notes and worksheets Mendelow calculated his expected account balances based on the guaranteed return and Extra P&L and compared them with his actual account balances.   In his calculations, Mendelow repeatedly referred to guaranteed "interest" and "yield" on his accounts, treating his BLMIS accounts as if they were a fixed-income investment because he knew that BLMIS was not actually trading securities in his accounts.

7.     Mendelow continued to closely monitor his accounts and track his expected returns until the collapse of the fraud.   Every December, Mendelow contacted DiPascali and instructed him on the allocation of the Extra P&L among three BLMIS accounts under Mendelow's control. When Mendelow called DiPascali he would say something to the effect of "on that thing you do, I want 115 for me, 115 for my wife." Based on his dealings with Madoff and the nature of the options transactions reported on his BLMIS account statements, Mendelow knew that DiPascali entered fictitious options transactions in those accounts every December to generate the Extra P&L and ensure the guaranteed return.

8.     In order to further exploit Madoff's fraud, Mendelow created additional investment vehicles to funnel money into BLMIS.  He operated C&P Associates, Ltd. as a mini-Telfran, accepting "loans" from "investors" and guaranteeing them a set return, even though he told investors their money was in investment advisory accounts at BLMIS.  Mendelow later transferred many of the C&P investors to a new feeder entity only invested in BLMIS, FGLS. As the managing member of FGLS he assumed fiduciary duties towards the investors.

Mendelow told at least one FGLS investor that he performed due diligence on and audits of BLMIS.

9.      C&P Associates Ltd., Mendelow, Nancy Mendelow, and their daughters, Cara Mendelow and Pamela Christian (collectively the "Defendants"), all had accounts with BLMIS that were created, managed and/or controlled by Mendelow.  His knowledge is imputed to all Defendants.

10.     Defendants were beneficiaries of Madoff's Ponzi scheme and received avoidable transfers from BLMIS.  Since the opening of these various accounts, Defendants withdrew the $20,250,720 from BLMIS,  $11,435,809 of which was fictitious profit from the Ponzi scheme in that Defendants withdrew more than they invested in their BLMIS accounts.

## NATURE OF PROCEEDING

11.     This adversary proceeding is brought pursuant to §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), §§ 105(a), 544, 548(a), 550(a) and 551 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debtor & Creditor § 270, *et seq*. (McKinney 2001) ("DCL")), NY CPLR 203(g) and 213(8), and other applicable law, and the avoidance and recovery of fraudulent conveyances, or their value, made by BLMIS to or for the benefit of Defendants, which shall be preserved for the benefit of BLMIS's defrauded customers.

## JURISDICTION AND VENUE

12.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred

to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§ 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

13.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H) and (O). The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

14.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

15.    This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3), 11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 548(a), 550(a) and 551, the

New York Fraudulent Conveyance Act (N.Y. Debt & Cred. § 270 *et seq.* (McKinney 2001)), the

New York Civil Practice Law and Rules (Mckinney 2003) ("N.Y. C.P.L.R."), and other

applicable law.

## DEFENDANTS

16.    Defendant Steven B. Mendelow resides in New York, New York. He is an

accountant and financial advisor. He was a principal at Konigsberg Wolf & Co. P.C.,

("Konigsberg Wolf"), and was a partner in, and officer of, numerous other companies that he

formed to profit from the fraud at BLMIS, including Telfran Associates Corp. and Telfran

Associates, Ltd., C&P Associates Ltd. and FGLS.

17.    Mendelow held BLMIS account 1ZR179, in the name, "NTC & Co. FBO Steven

B. Mendelow," with the account address reported as P.O. Box 173859 Denver, Colorado 80217.

This was an Individual Retirement Account, ("IRA"). Duplicate statements were sent to

Mendelow's residence at 88 Central Park West, New York, New York 10023. Mendelow also

held BLMIS account 1ZR208 in the name "NTC & Co. FBO Steven Mendelow." This account was also an IRA and was liquidated by January 12, 1995.

18.     Defendant Nancy Mendelow resides in New York, New York. Nancy Mendelow is married to Defendant Steven Mendelow. Nancy Mendelow held BLMIS account 1ZR180 in the name, "NTC & Co. FBO Nancy Mendelow," with the account address reported as P.O. Box 173859 Denver, Colorado 80217. This was an IRA. Duplicate account statements were sent to Mendelow's residence at 88 Central Park West, New York, New York 10023. Mendelow directed that the Extra P&L be added to Nancy Mendelow's account statements.

19.     Defendant Cara Mendelow resides in New York, New York. Cara Mendelow is the daughter of Defendants Steven and Nancy Mendelow. Cara Mendelow held BLMIS account 1ZB336 in the name, "Cara Mendelow," with the account address reported in New York, New York. At all times, Mendelow managed Cara Mendelow's account at BLMIS. Mendelow opened BLMIS account 1ZB336 for her with a check drawn on C&P Associates' bank account which he signed. Mendelow also directed subsequent contributions and withdrawals into her BLMIS account and communicated with BLMIS on her behalf.

20.     Defendant Pamela Christian resides in Ridgewood, New Jersey. Pamela Christian is the daughter of Defendants Steven and Nancy Mendelow. Pamela Christian held BLMIS account 1ZB337 in the name, "Pamela Mendelow," with the account address reported in Ridgewood, New Jersey. At all times, Mendelow managed Pamela Christian's account at BLMIS. Mendelow opened her BLMIS account, directed contributions and withdrawals and communicated with BLMIS on her behalf.

21.     C&P Associates, Inc. is a Florida corporation incorporated on January 8, 1988. The address of its current principal place of business is Mendelow's residence at 88 Central Park

West, New York, New York 10023. Previously, from January 8, 1988 to January 9, 2012, C&P Associates, Inc.'s principal address was 440 Park Avenue South, 10th Floor, New York, New York 10016, which is the same address as Mendelow's previous employer, Konigsberg Wolf. Defendants Steven Mendelow and Nancy Mendelow are the only officers of C&P Associates, Inc. Mendelow is the president and a director of C&P Associates, Inc. Nancy Mendelow is the secretary and a director of C&P Associates, Inc.

22.     C&P Associates, Ltd. ("C&P Associates") is a Florida limited partnership formed on January 15, 1988. The principal address of C&P Associates is care of Steven Mendelow at 88 Central Park West, New York, New York 10023. That is the same address as Mendelow's residence. Previously, from January 15, 1988 to March 1, 2005, C&P Associate's principal address was 440 Park Avenue South, 10th Floor, New York, New York 10016, which is the same address as Mendelow's previous employer, Konigsberg Wolf. The general partner of C&P Associates is C&P Associates, Inc. Steven Mendelow initially formed C&P Associates as an investment partnership for the benefit of his children, Defendants Cara Mendelow and Pamela Christian, who are the limited partners of C&P Associates. C&P Associates held BLMIS account 1ZA542 in the name "C&P Associates" with an account address reported in New York, New York. Mendelow opened the BLMIS account for C&P Associates, directed contributions and withdrawals and communicated with BLMIS on its behalf.

23.     With the Defendants' knowledge and consent Mendelow handled communications with BLMIS related to the Defendants' accounts. Mendelow's actions included opening the accounts, depositing funds into the accounts, and receiving and reviewing BLMIS account documents.

## BACKGROUND, THE TRUSTEE AND STANDING

24.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the SEC commenced the District Court Proceeding.

25.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

26.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

      a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

      b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

      c.    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

27.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

28.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

29.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

30.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

31.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

32.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

33.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its

creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

34.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

35.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## THE PONZI SCHEME

36.    Madoff founded BLMIS in or about 1960 as a sole proprietorship.  On January 1, 2001, Madoff continued BLMIS as a sole member limited liability company under the laws of the State of New York.  BLMIS's ownership and control did not change since its formation in 1960.  During that time, BLMIS had been continually registered with the SEC, and remained a SIPC member since its formation in late 1970.  For most of its existence, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members

and other employees, including DiPascali and David Kugel, who pleaded guilty to helping Madoff carry out the fraudulent scheme.

37.     During the early 1970s through the early 1990s, Madoff claimed to invest customer funds using a "convertible arbitrage investment strategy," by which investors would gain profits from a change in the expectations for the stock or convertible security over time.

38.     Beginning in the 1990s, Madoff outwardly ascribed the consistent investment success of BLMIS's IA Business to the "split-strike conversion" ("SSC") investment strategy. Madoff claimed his strategy would produce steady returns without the volatility in the stock market or other high return investment strategies. Madoff generally indicated that investors' funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as determined by Standard & Poor's Index Committee.  The basket of stocks was designed to correlate to the movement of the S&P 100 Index.  The second part of the SSC strategy involved purporting to sell call options and buy put options on the S&P 100 Index; this is commonly referred to as a "collar."  Madoff purported to purchase and sell option contracts to control the downside risk of price changes in the basket of stocks correlated to the performance of the S&P 100 Index.  All options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

39.     BLMIS commingled all of the funds received from IA Business investors in a single BLMIS account maintained at JPMorgan Chase Bank.

40.     Because Madoff claimed that he would carefully time purchases and sales to maximize value, customer funds would intermittently be out of the market.  During those times, Madoff claimed that the funds were invested in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.  There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

41.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements.

42.     Madoff operated the IA Business as a Ponzi scheme.  The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers.  The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments.  The Ponzi scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

43.     Since at least the 1970s, BLMIS fraudulently claimed to engage in securities trades for IA Business customers that did not occur.  Basic market data reveals that those purported trades did not, and could not, have taken place as reported on BLMIS customer statements.  For example, there are many instances where the total number of securities purportedly traded by BLMIS significantly exceeded the entire reported market volume for that particular security on that particular day.  Even where BLMIS purportedly traded securities within normal market volumes, there are many instances where the prices of those trades were

outside the daily market price range for that security.  In many other examples, BLMIS account statements reported trades of a particular security when actual market reports show that particular security simply did not change hands in the market on that reported date.

44.     Since at least 1983, BLMIS financial reports filed with the SEC fraudulently omitted the existence of the billions of dollars of customer funds held by BLMIS.

45.     BLMIS did not register as an investment adviser with the SEC until August 2006. At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts and assets under management of $11.7 billion.  Thereafter, BLMIS filed a Form ADV annually with the SEC, the latest of which was filed in January 2008.  It represented that BLMIS had 23 customer accounts with assets under management of $17.1 billion.  In fact, at that time BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion under management.

46.     Contrary to standard practice in the investment advisory industry, BLMIS did not charge the IA Business customers a fee for investment advisory services.  Madoff knew others that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged hundreds of millions of dollars for investment advisory services attributed to BLMIS.  Instead of investment advisory fees, BLMIS purported to accept commissions for the purported trades, as reflected in the fraudulent IA Business customer statements.

47.     BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York.  Of the three employees at the firm, one employee was an administrative assistant and one was a semi-retired accountant living in Florida.  On or about November 3, 2009, David Friehling, the sole

proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

48.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

### MENDELOW WAS A SOPHISTICATED INVESTOR WHO PROFITED FROM HIS LONGSTANDING RELATIONSHIP WITH MADOFF AND KNEW THAT BLMIS WAS NOT TRADING ACTUAL SECURITIES

### I.     MENDELOW WAS A TRAINED ACCOUNTANT AND SOPHISTICATED INVESTOR

49.     Mendelow, an accountant since 1964, was a sophisticated investor and financial advisor throughout his involvement with BLMIS.

50.     From 1972 to 1983, Mendelow was a principal at Glantz & Levey, P.C. ("Glantz & Levey"), an accounting firm operated by Edward Glantz ("Glantz") and Aaron Levey ("Levey"). Glantz & Levey merged with Konigsberg Wolf in 1983.

51.     For over 20 years, Glantz & Levey shared an office suite with A&B, the successor to Madoff's father-in-law's firm, Alpern & Heller, in New York.  In or around the 1960s, in addition to operating an accounting business, Alpern & Avellino (the immediate successor to Alpern & Heller) began operating BLMIS's first "feeder fund," pooling their customers' capital and providing it to Madoff for purported discretionary investment in securities.  In and around the early 1970s, the firm was renamed Avellino & Bienes and it continued to raise hundreds of millions of dollars for investment with BLMIS, while retaining tens of millions of dollars in profits, until November 1992 when its operations were shut down after an SEC investigation.

52.     Glantz & Levey and A&B shared common office areas and expenses.  Bienes stated that the two firms were "always eating out of each other's pot," and strategically had each

individual accountants' name on the office door, rather than the firms' respective names, to give the appearance that that each respective firm had larger operations than it actually had.

53.    Mendelow held himself out on the Konigsberg Wolf website as an accountant who "specializes in unique transactions, family wealth building, and generational matters and financial restructuring.  He served as advisor to the chairman of a New York Stock Exchange company, and also as advisor to the chairman of an American Stock Exchange company."  The website further stated that he served on the boards of directors of several public and privately-held companies and served as treasurer of his co-op board for more than ten years.  Mendelow has served on and/or been chairman of the audit committee of the boards of several publicly traded companies.

54.    Mendelow opened accounts at BLMIS for himself, his wife, his two daughters, and formed two funds, in addition to Telfran, FGLS Equity, LLC ("FGLS") and C&P Associates in order to funnel money into Madoff.  Mendelow received account statements for all of the Defendants' BLMIS accounts.

55.    Mendelow also received customer account statements for numerous other BLMIS customers.  Most of these customers were referred to BLMIS by Mendelow and/or they were Mendelow's accounting clients.  This gave Mendelow access to far more information about BLMIS's purported trading practices, and the anomalies therein, than the average BLMIS investor.

56.    Mendelow acted not only as an accountant, but as a financial advisor to wealthy individuals, many of whom were invested with BLMIS.  Mendelow's clients regularly came to him with questions and concerns regarding their investments, including their investments with

BLMIS.  Due to his knowledge and expertise, Mendelow would accompany his clients on meetings related to potential investments and counseled them on their investment decisions.

## II.   MENDELOW HAD A CLOSE, LONGSTANDING RELATIONSHIP WITH MADOFF THAT HE TOOK ADVANTAGE OF TO BENEFIT FROM THE FRAUD

57.   Mendelow's relationship with Madoff spanned multiple decades.  Mendelow's name and phone number were in Madoff's personal address book and there are records of numerous calls between Mendelow and BLMIS.

58.   In addition to the gains made in his own BLMIS accounts, Mendelow profited from BLMIS by serving as accountant and/or financial advisor to numerous Madoff customers. BLMIS did not provide its customers with the customary and basic year-end reporting information necessary for tax preparation and as a result many accountants had difficulty completing tax returns for BLMIS customers.  Konigsberg Wolf, where Mendelow was a "principal," promoted its expertise in preparing tax returns for BLMIS customers, and BLMIS customers approached Mendelow asking for assistance.

59.   Mendelow's relationship with Madoff allowed him to help friends, colleagues and co-workers open BLMIS accounts when they otherwise would not have been able.  He served as an intermediary for hundreds of investors into BLMIS, either directly or indirectly through his entities.

60.   Mendelow was close enough to Madoff to know when Madoff would not accept new "investors" and was able to obtain exceptions from Madoff for his family, friends and colleagues on multiple occasions.

61.   For example, on March 4, 1994, Mendelow wrote, "Dear Bernie, I'm enclosing a check from one of Paul's [Konigsberg] and my partner, [ ].  I know you told me that you're not

accepting any new a/c's, But I'd appreciate your making an exception for our partner.  Thanks, Steve."   As a result of Mendelow's request, his partner was able to open a BLMIS account.

62.    On a different occasion, Mendelow wrote, "<u>BLM</u> Enclosed is a check to add to my C+P A/C $70,000.  Also enclosed is a check from my pal's Brother-in-law. Yyou [sic] can open a new A/C for him.  If possible I'd appreciate it.  You can send the A/C papers directly to him  Thanks. Steve  I'll call you next week".

63.    Mendelow's close relationship with Madoff was not a secret, and people would often come to Mendelow with questions regarding Madoff and BLMIS.  For example, on July 1, 2008, a business associate sent Mendelow an email with the subject "Madoff."  The email said, "Steve, Thought about what you said – would he take $500,000 from me and $500,000 from my pension?"

64.    On October 5, 2008, Mendelow's client and a BLMIS investor, e-mailed him and said, "How do you think Madoff did for September?  He's still the only investment we have that isn't down!!!  Someone said that he can't be doing well now beca[use] a lot of his strategy depends on shorting which he can no longer do.  Is that true??..." Mendelow responded, "Call me today in the office I will be out after 3PM. Steve".

## III.    MENDELOW OWNED AND OPERATED TELFRAN, ONE OF THE EARLIEST FEEDER FUNDS INTO MADOFF

65.    Mendelow's involvement with Madoff's fraud started in the 1980s with the creation of the entities, Telfran Corp. and Telfran Associates Ltd., together with his longtime accounting colleagues Glantz and Aaron Levey.  Telfran was a sub-feeder of one of the first feeder funds into BLMIS, run by accountants Avellino and Bienes.  Mendelow, Glantz and Levey modeled Telfran on the structure of A&B.

66.    Mendelow had longstanding relationships with Avellino and Bienes, having known each of them since the early 1970s.  Even before the days of Telfran, in or about the late 1970s or early 1980s, Mendelow opened investments with A&B in his name, his wife's name and/or in the name of C&P Associates.

67.    A&B and its predecessor firms, operated as significant feeder funds for BLMIS from the early 1960s through November 1992 when A&B's operations were shut down pursuant to an enforcement action commenced by the SEC.  A&B achieved great success in raising hundreds of millions of dollars for investment with BLMIS while retaining tens of millions of dollars in profits for placing money into the Ponzi scheme.

68.    To attract new investors, A&B collected money from individuals and entities by promising an annual guaranteed return that generally ranged from approximately 13% to 18% of the original investment.  In an attempt to avoid scrutiny from securities regulators, A&B termed these investments "loans" and issued letters to investors that specified the return for each purported "loan."  These "loans" were "invested" with BLMIS through several accounts in A&B's name.

69.    In order to keep the money flowing and the Ponzi scheme operating, Madoff guaranteed significant returns to A&B on the money it deposited with BLMIS.  In turn, A&B retained the difference between the returns promised by Madoff and the returns promised to the underlying A&B investors.  For example, there were certain periods where Madoff promised A&B annual returns of 20%.  A&B would thereafter promise 18% or less to its individual investors, retaining the difference as profits in order to enrich themselves.

70.    The principals of Telfran, Mendelow, Glantz and Levey, saw that A&B was raising money for Madoff and inquired as to what A&B was doing.  After the Telfran members

inquired, Avellino suggested to Mendelow and his partners that they start a similar operation through A&B.  Avellino showed the Telfran members how to set up their operation "accounting wise."

71.    Mendelow, along with Glantz, Levey and Joel Levey, operated Telfran as a sub-feeder to A&B's feeder fund.  From as early as 1982, Telfran Corp. accepted loans from clients and in turn loaned that money to A&B.

72.    Until 1992, Telfran operated as an unregistered investment company, selling unregistered securities to the public.  Telfran solicited approximately 800 clients, who "invested" approximately $89 million, by promising them a guaranteed return.  Through Telfran, Mendelow and his partners began feeding money into BLMIS by giving that money to A&B to "invest" with BLMIS.

73.    Like A&B, Telfran termed these investments "loans" and issued letters to investors that specified the return for each purported "loan."

74.    Telfran profited by retaining the difference between the return Telfran received from A&B and the return Telfran paid to its investors.

75.    For example, from 1989 through September 1992, A&B provided Telfran interest on deposited money at an annual return of approximately 19%.  From 1989 through September 1992, Telfran provided interest to its depositors at the annual return of approximately 14% to 15%.

76.    As early as the 1980s, Mendelow was aware that the transactions conducted by BLMIS were fraudulent because no legitimate securities trading operation could guarantee a specific return.

77.     Mendelow, Glantz, Levey and/or Joel Levey were at all times the sole owners, officers and directors of Telfran.

78.     Mendelow's responsibilities at Telfran included making deposits with A&B, dealing directly with investors to address their various inquiries. He also prepared Telfran's tax returns for at least one year.

79.     Mendelow received his distribution of Telfran's profits through Teledata Financial Corp., a closely-held corporation of which Mendelow was president and 50% owner. It was created to receive a share of the profits from Telfran.  That share varied from $200,000 to $400,000 per year.

## IV.    THE SEC SHUT DOWN TELFRAN FOR VIOLATING SECURITIES LAWS

80.     This operation to fund Madoff's Ponzi scheme worked until 1992 when the SEC commenced an investigation of A&B and its solicitation of investors.

81.     On November 18, 1992, the U.S. District Court issued an Order of Preliminary Injunction and Other Equitable Relief on Consent against Avellino, Bienes, and A&B, that appointed a trustee to oversee the liquidation of A&B whereby all funds would be returned to A&B investors by November 24, 1992.  On September 7, 1993, the U.S. District Court issued a Final Judgment of Permanent Injunction and Other Equitable Relief By Consent Against A&B, Frank Avellino and Michael Bienes ordering, among other things, that they be enjoined from violating §§ 5(a) and (c) of the Securities Act of 1933 [§§ 77e(a) and (c)] by selling unregistered securities and § 7 of the Investment Company Act of 1940 [§ 80a-7], by operating an unregistered investment advisory company.

82.     The SEC investigation of A&B led to an investigation of Telfran, as Telfran's only purpose was to invest in BLMIS through A&B.  Like A&B, Telfran and Mendelow were

sued by the SEC for sales of unregistered securities by an unregistered investment advisor.  On

November 25, 1992, the U.S. District Court issued an Order of Preliminary Injunction and Other

Equitable Relief on Consent against Telfran, Mendelow and Glantz that, among other things,

also appointed a trustee to oversee the liquidation of Telfran whereby all funds would be

returned to investors.

83.     As part of the preliminary injunction, the District Court also ordered an audit of

Telfran's financial statements. Price Waterhouse, the accounting firm conducting the audit,

found that "many of the necessary books, records and financial statements, customarily available

to an auditor to carry out an audit in a timely and efficient manner, were lacking."  Furthermore,

Price Waterhouse learned that Telfran, whose partners were all accountants, "had no financial

statement prepared in accordance with generally accepted accounting principles or any audit

report for any period of time covered by the order."  Despite the fact that Telfran handled

approximately more than $89 million in customer funds, it lacked financial statements,

investment ledgers, individual noteholder files, and certain bank statements.

84.     Ultimately, Telfran and Mendelow entered into a consent decree with the SEC by

which they were enjoined in the same way as A&B, namely from further violations of §§ 5(a)

and 5(c) of the Securities Act of 1933 (selling unregistered securities) and § 7 of the Investment

Company Act of 1940 (operating an unregistered investment advisory company).  Telfran paid a

civil penalty in the amount of $250,000 while Mendelow paid a civil penalty in the amount of

$50,000.

85.     As a result of the SEC investigations, and in an effort to avoid possible exposure

to regulators of his own fraudulent operation, Madoff agreed to "return" money to A&B and/or

the Court-appointed trustee for A&B, which was distributed to its investors, including those

invested through Telfran.  Madoff recorded fraudulent trading activity in customer statements to create the appearance of sufficient value in their accounts to cover the A&B/Telfran investors.

86.    In or about June 1992, at Madoff's direction, BLMIS employees scrambled to create a fictitious and backdated IA account with account number 1A0053 in the name of A&B. Unlike the six other A&B accounts which had been in existence for more than a decade, BLMIS records indicate this account did not exist until in or around June 23, 1992.  BLMIS generated fictitious and backdated account statements for this account going back to at least November 1989.

87.    The fictitious account statements included dozens of blatantly backdated purchases and sales of securities and options contracts designed to generate the millions of dollars needed to create the appearance that Madoff was holding securities sufficient to meet the distributions required by the investors in A&B.

88.    Thereafter, as a result of the SEC investigation, in or about November 1992, Telfran received approximately $89 million dollars from A&B which corresponds to the approximate amount of money Telfran had invested with A&B for investment in BLMIS.  In turn, Telfran distributed these funds to its own investors.

89.    Mendelow knew as early as the 1980s that BLMIS was not actually trading securities because he knew of, and relied on, the guaranteed return promised by Madoff to A&B, and, in turn, Telfran.  As an accountant and sophisticated financial advisor, Mendelow knew that it was impossible for BLMIS to guarantee a return if it was engaged in actual securities trading.

## V.    UNDETERRED BY THE SEC INVESTIGATION AND INJUNCTION, MENDELOW CONTINUED TO EXPLOIT THE FRAUD AT BLMIS FOR HIS OWN GAIN

90.    Despite the SEC investigations of A&B and Telfran and the resulting penalties and injunctions preventing the further sale of unregistered securities, Mendelow was unfazed and arranged with Madoff to continue reaping substantial profits from the fraud at BLMIS.

91.    As A&B and Telfran were shutting down, Madoff personally contacted Mendelow to ensure his continued participation with BLMIS. In return for Mendelow encouraging former Telfran investors to invest directly with BLMIS, Madoff promised Mendelow financial bonuses similar to the profits he had received through his arrangements with A&B.

92.    Avellino met with Madoff on behalf of Mendelow to negotiate the details of a new payment structure.  Madoff agreed that BLMIS would provide Mendelow with financial rewards that mimicked the profit structure of A&B and Telfran.  Similar to the interest Mendelow received on his personal accounts at A&B, Madoff guaranteed Mendelow a return of at least 17% in Mendelow's new BLMIS accounts.

93.    In addition, Madoff gave Mendelow an Extra P&L boost in certain of his accounts, based on the amount of money former Telfran clients reinvested directly with BLMIS. Upon information and belief, this Extra P&L made up for the profits Mendelow lost when Telfran closed, which were based upon the difference between the amount it paid to its investors and the interest it received from A&B.

94.    Mendelow opened an account at BLMIS in the name of C&P Associates in December 1992.  C&P Associates had been an investor in A&B.  Mendelow and Nancy Mendelow rolled over their IRAs from A&B to new accounts at BLMIS in February 1993.

95.     Throughout the life of Mendelow's IRA account at BLMIS, Mendelow made only one additional deposit of $5,765 while withdrawing $5,548,990.  Throughout the life of Nancy Mendelow's IRA account at BLMIS, she made only one additional deposit of $4,477, while withdrawing $1,750,000.

96.     When Mendelow opened his BLMIS accounts, he signed customer agreements in which he purported to authorize BLMIS to purchase, sell and trade in securities in his accounts. However, from the moment he opened these accounts, Mendelow knew that BLMIS would not be engaging in actual securities transactions with the money deposited.  He expected and understood that regardless of the purported trades shown on the account statements, the accounts would yield a guaranteed 17% return and, in addition, BLMIS would boost one or more of his account balances by the predetermined amount of the Extra P&L.

**A.      Mendelow Continued to Funnel Money into BLMIS by Encouraging Telfran Investors to Reinvest with BLMIS**

97.     Mendelow was instrumental in funneling Telfran investors' money back into BLMIS.

98.     For certain former Telfran investors, Mendelow contacted Madoff directly.  For example, on March 22, 1993, Mendelow wrote, "Dear Bernie: Enclosed herein is a check in the amount of $110,000.00, to open an account for [], who formally was in Telfran."

99.     In other cases, the investors contacted BLMIS directly at Mendelow's instruction. For example, on December 8, 1992, a former Telfran investor wrote Dear Ms. Nadoff [sic]: I am enclosing my check number…Please acknowledge receipt of this money for the purpose of opening an account on my behalf pursuant to the arrangements worked out between you and Steve Mendelow."

100.    Another investor sent a letter to Madoff stating, "At the suggestion of Steve Mendelow and as a former investor in Telfran Associates, Ltd., I am herewith enclosing my check to open a trading account with your company."

101.    By March 31, 1993, approximately $372 million of the $441 million returned to the original A&B investors by Madoff (including those who invested through Telfran) had been reinvested directly with BLMIS.  Of this $372 million, $62 million was attributable to Telfran investors.

**B.    Madoff Provided Mendelow With a Guaranteed Return and Extra P&L**

**1.    *Mendelow Received a Guaranteed Return on Certain of his BLMIS Accounts***

102.    From 1993 through at least 1996, Mendelow received a guaranteed return of 17% on the purported value of three BLMIS accounts he opened in the aftermath of the A&B liquidation – his IRA account, Nancy Mendelow's IRA account, and the C&P Associates account.  He also received a guaranteed return on a second IRA account through the end of 1994.  From 1997 to 1999, Mendelow continued to receive a return of over 17% on the three other BLMIS accounts.

103.    As an accountant, sophisticated investor and financial advisor, who touted that he conducted due diligence on Madoff, Mendelow knew that it was impossible for Madoff to guarantee and consistently deliver a pre-determined return if he was actually trading securities.

104.    Near the end of every year, DiPascali examined the accounts in which Madoff had promised a guaranteed return, including Mendelow's accounts, to see if they had hit their mark.

105.    In order for BLMIS to achieve the guaranteed return promised to Mendelow, any shortfall in these accounts would be made up through the use of fictitious options transactions predominately entered into in December of each year.

    **2.**    *Madoff Agreed to Provide Mendelow With Extra P&L in His Accounts Based on the Amount of Telfran Investors' Money Reinvested with BLMIS*

106.    Each year after 1993, BLMIS increased the value of Mendelow's designated BLMIS accounts by a set amount in addition to the return they otherwise received on their purported investments.

107.    Madoff rewarded Mendelow with this Extra P&L to compensate Mendelow for the clients he had originally brought into Telfran and A&B who transferred to BLMIS. Previously, Mendelow had been paid for bringing investors into A&B through the difference in "interest" paid by A&B and Telfran. Madoff agreed that Mendelow should continue to receive profits when those same investors put their money directly into BLMIS accounts. BLMIS calculated the amounts of Mendelow's Extra P&L boost based on the $62 million returned to BLMIS by former Telfran investors.

108.    BLMIS provided Extra P&L to the former owners of Telfran in an amount approximating 1% of this $62 million figure. As part owner of Telfran, Mendelow received a 37.5% share of the amount attributed to Telfran. Mendelow thus received annual increases to the value of certain of his BLMIS accounts in the amount of $232,500 as part of his Extra P&L.

109.    Mendelow also received an additional $200,000 per year on top of his share, which he referred to as the "FA+MB contrib." Upon information and belief, "FA" refers to Frank Avellino and "MB" refers to Michael Bienes, the partners in A&B.

110.    In total, from 1994 through 2001, Mendelow received Extra P&L in the amount of approximately $432,000 per year, all of which he knew was the result of fictitious trading activity.

111.    Mendelow directed that the Extra P&L be credited, at various times, to his IRA account (Account No. 1ZR179), Nancy Mendelow's IRA account (Account No. 1ZR180), and

C&P Associates account (Account No. 1ZA542). From 1994 to 1997, Mendelow directed BLMIS to add the Extra P&L to the C&P Associates account. Starting in 1998 and until 2007, Mendelow directed BLMIS to split the Extra P&L between his IRA account and Nancy Mendelow's IRA account.

112.    As discussed *infra* at ¶¶ 136-148, during the first few years that Mendelow received the Extra P&L, Mendelow and BLMIS were still working out its mechanics, and the amounts of the Extra P&L fluctuated. Among other things, while Madoff and Mendelow agreed that Mendelow would receive an Extra P&L in 1993, the first gains were not manufactured in his accounts until 1994. Mendelow received $492,095 in Extra P&L in 1994 and $704,294 in Extra P&L in 1995 corresponding to the Extra P&L for 1993 through 1995.

113.    By 1996, BLMIS had worked out the mechanics and Mendelow's Extra P&L was consistently around the $432,000 he was promised each year through 2001. The amounts received were as follows:

- $430,920 in 1996

- $431,592 in 1997

- $444,640 in 1998

- $426,560 in 1999

- $432,446 in 2000

- $430,950 in 2001

114.    The Extra P&L calculation changed in 2002. The Telfran-related percentage was cut to a combined .5% and the $200,000 "FA+MB contrib" was also cut in half. These new levels remained unchanged until BLMIS's collapse. This structure resulted in an Extra P&L boost to Mendelow of approximately $216,000 per year from 2002 through 2007. The amounts received were as follows:

- $216,432 in 2002

- $215,860 in 2003

- $216,900 in 2004

- $211,848 in 2005

- $229,460 in 2006

- $232,480 in 2007

115.    The total amount of the paper income generated by the Extra P&L for the period

from 1994 through 2007 was $5,116,478.

### 3.    The Extra P&L and Guaranteed Returns Were Generated By Fictitious Options Transactions Reported on Mendelow's Account Statements

116.    BLMIS did not compensate Mendelow through legitimate means such as checks

or cash transfers or even actual securities.  Rather, BLMIS provided Mendelow's designated

accounts with an Extra P&L boost by reporting blatantly fictitious and highly profitable,

speculative S&P 100 index put and call options transactions on their account statements.

According to Mendelow's account statements, BLMIS would engage in purported options

trading outside of the SSC that yielded additional gains in Mendelow's accounts by the pre-

determined amount. This fraudulent increase in Mendelow's account balances made additional

cash immediately available for withdrawal.

117.    For example, in December 1999, Mendelow's BLMIS IRA account statement

showed a cash balance of $0.31.  In order to create the Extra P&L Mendelow expected in his

IRA account, his IRA BLMIS statement showed a purchase of S&P 100 Index call options with

a cost of $510,600.  On December 28, 1999 those options were purportedly sold, generating

proceeds of $1,169,400.  In a separate transaction, on December 18, 1999, the statement shows a

sale S&P 100 Index call options generating proceeds of $509,400.  On December 28, 1999, those

29

options were purportedly bought back for a cost of $870,600. The net reported gain on those four transactions was $297,600. The same transactions were listed on Nancy Mendelow's BLMIS IRA account statement, at a lower volume, reporting a gain of $128,960. In total, the purported options transactions in these accounts generated the Extra P&L of $426,560.

118.    To identify, track and reconcile accounts to ensure the guaranteed rates of return and/or Extra P&L to dozens of different customers of BLMIS, BLMIS employees created handwritten schedules that showed the amount of fictitious gains needed to bring the account to the promised return and the calculation of the Extra P&L. The schedule used to determine the amounts owed to these customers was referred to internally at BLMIS as either the "Shupt," "Schupt" or "Bingo" number (hereinafter "Schupt").

119.    In addition to calculating the amount "owed," the handwritten Shupt schedules also indicated the type of option and the amount of options contracts that would be "purchased or sold" to create the predetermined gain. An account statement was generated to reflect those purported transactions and the associated gains generated. The balance within these accounts, including the Extra P&L, was then available for withdrawal by the accountholder.

120.    DiPascali typically worked on these fictitious options transactions in the end of December every year. He waited until the end of the year so that he could determine the returns that the accounts had received over the course of the year. If the account had not purportedly achieved the guaranteed return agreed to by Madoff, DiPascali would manufacture sufficient fictitious options transactions to reach that return and then add additional fictitious options transactions for the Extra P&L on top of the returns. For example, in December 1996 Mendelow's and Nancy Mendelow's BLMIS IRA account statements reported speculative

options transactions generating $210,672 in fictitious profits to bring their respective annual returns to 17%.

121.   Mendelow knew that it was impossible to generate a specific gain through actual securities trading, and therefore that the speculative options transactions purportedly made to give him the guaranteed return were fraudulent.

122.   Combined, the BLMIS accounts for Mendelow, Nancy Mendelow and C&P Associates received Extra P&L totaling $5,116,478.   All of this Extra P&L was generated through fictitious options transactions.  The account statements for each of these accounts do not indicate any cash deposits, wires, inter-account transfers, or contributions of securities to the accounts to produce these increases in account balances.

123.   BLMIS's delivery of the Extra P&L through purported speculative options transactions resulting in specific, on-demand gains is impossible under any circumstance, and Mendelow knew the specific gains could not have been achieved without the benefit of hindsight and backdating.

## VI.   MENDELOW BEGAN ACTIVELY RECRUITING INVESTORS INTO ENTITIES HE CREATED TO FUNNEL ADDITIONAL MONEY INTO BLMIS

124.   Beginning in 1998, Mendelow returned to his old ways by recruiting additional investors to feeder funds he created to help prop up BLMIS.

125.   Mendelow began using C&P Associates as he had Telfran, issuing letters to people offering them a specified return.   As with Telfran, Mendelow structured the "investments" with C&P as a loan.  Mendelow's willingness to offer a guaranteed return to C&P Associate's "investors" was based on his knowledge that BLMIS did not engage in actual securities trading in C&P Associate's BLMIS account as well as his knowledge that he would receive an even higher return from Madoff.

126.    When accepting money, Mendelow sent the following letter to at least one "investor" stating: "This letter will confirm your arrangement with C&P Associates where, as an accommodation to you, you had deposited with C&P Associates the sum of $419,198 for the express purpose that those monies be further deposited in the C&P Associates account at Bernard L. Madoff…You are to receive interest at the rate of 15% per annum unless otherwise notified."

127.    Upon information and belief, Mendelow did not use the term "loan" purposefully in these letter agreements, so as not to appear to be recreating Telfran, and thus violating the SEC injunction against him.  However, the letter he sent to people regarding the "arrangements" with C&P Associates served the same purpose as the loans issued to Telfran customers.  In fact, some of the C&P Associates "investors" referred to "loans" when corresponding with Mendelow regarding their "investments."

128.    From at least 1999 through 2006, Mendelow, through C&P Associates, paid himself and  Nancy Mendelow a salary as high as $159,100 and $144,000, respectively, for their management of C&P Associates.

129.    In Mendelow's letter to "investors," C&P Associates disclaimed any liability in the event of "default by Bernard L. Madoff."  The term default is commonly used to refer to a failure to make a required payment on a note, loan or other obligation. Mendelow's use of terms such as interest and default demonstrate that he considered the C&P Associates account at BLMIS to perform as a fixed-interest investment, not an account trading actual securities.

130.    In 2002, Mendelow created another entity, FGLS, for the sole purpose of funneling investor money into BLMIS.  Once FGLS was created, Mendelow transferred many of his clients' "investments" from C&P Associates into FGLS.

131.    As part of his solicitation of investors into FGLS, Mendelow represented to at least one investor that he had performed and continued to perform due diligence regarding Madoff's operation.

132.    To effectuate the transfer from C&P Associates to FGLS, Mendelow provided these clients with a form letter for their signature asking them to "[p]lease sign the attached letter where indicated and fax it back to my attention as soon as possible…"  The form letter stated, "[p]lease use this letter as authorization to transfer as of November 1, 2002, the funds that I have loaned to C&P Associates, along with accrued interest, to a newly formed entity, FGLS, LLC, in a new account to be managed by Bernard L. Madoff Investment Securities LLC."  FGLS did not issue loans promising a 15% return, but instead provided investors with the return purportedly provided by BLMIS.

### B.    Mendelow Closely Tracked the Extra P&L and Worked with DiPascali  to Ensure he Received the Promised Amount From BLMIS

133.    Mendelow closely monitored his accounts and worked with Madoff and DiPascali to ensure that BLMIS gave him the full, promised amount of his Extra P&L and guaranteed returns each year. Mendelow received quarterly and annual Portfolio Management Reports, BLMIS generated documents, which listed each accounts' annualized return for the current year, in addition to account statements and trade confirmations, allowing him to more easily track his rates of return.

134.    Mendelow regularly called BLMIS and sent letters and notes with instructions concerning the accounts he controlled.   In particular, Mendelow called DiPascali every December to tell DiPascali how he wanted his Extra P&L to be divided among his accounts. Referring to the Extra P&L in his account balances generated through fictitious options

transactions, Mendelow would cryptically say to DiPascali something to the effect of, "on that thing you do, I want 115 for me, 115 for my wife."

135.    For example, on December 11, 2007, Mendelow called DiPascali at BLMIS. Mendelow followed up that telephone conversation with a note to DiPascali on Mendelow's letterhead dated December 14, 2007.  The note simply listed the BLMIS account numbers for his IRA and Nancy Mendelow's IRA with an arrow pointing to "$215m" and concluded with "Thanks Merry Christmas Steve"  Options transactions were then reported on both Mendelow's and Nancy Mendelow's IRA BLMIS account statements for December 2007 to manufacture the demanded amount.  These options transactions had purported settlement dates of December 7, 2007 – days prior to Mendelow's first communication with BLMIS.  Therefore, Mendelow knew the transactions must have been fictitious as they pre-dated his instructions to DiPascali.

136.    In the beginning of the new payment structure, between 1994 and 1996, Mendelow worked closely with BLMIS, particularly with DiPascali, to systematize the mechanics of the guaranteed returns and Extra P&L and to ensure that his designated accounts received the full value that Madoff had promised.  Mendelow contacted DiPascali if there was any shortfall and instructed him to make up the difference.

137.    From 1993 to1995, BLMIS manufactured several fictitious options transactions in Mendelow's designated account statements in order to bring the return in the designated accounts back to the promised 17% and to provide Mendelow with the full amount of the agreed upon Extra P&L.

138.    In early 1995, Mendelow calculated the guaranteed returns and Extra P&L he had demanded in his BLMIS accounts for 1993 and 1994 and compared it to the actual balances in his BLMIS accounts as of December 31, 1994.  On accounting columnar workpaper, Mendelow

tabulated the demanded returns for his two IRA accounts, Nancy Mendelow's IRA account, and the C&P Associates account on separate worksheets.

139.    For each account, Mendelow included the opening balance in 1993 and calculated the balance at the end of 1993 based upon a 17% annual return which he called the "Int at 17%" or the "Yield at 17%."  He then added deposits and deducted withdrawals and calculated the expected 17% "interest" on each, weighted by the number of days those amounts were in the account, to determine the expected balances as of December 31, 1993.  Mendelow engaged in similar calculations to determine the expected balances as of December 31, 1994.

140.    On a separate sheet, Mendelow calculated the expected Extra P&L for 1993 and 1994.  Mendelow calculated the Extra P&L based on two components: the "vig" and the "FA + MB contrib."  Mendelow's spreadsheets calculated the "vig" based upon his apparently incorrect belief that former Telfran investors had reinvested a total of $70 million directly in BLMIS.  Thus, he performed the following calculation to determine his demanded amount of the Extra P&L: "70 million @ 1%  x ½ x 75% = 262,500.  FA + MB contrib 200,000" for a total of $462,500 per year.



141.    Finally, based upon BLMIS account records that were sent to him, Mendelow compared the "Computed A/C Bal" with the "Actual A/C Bal" for each of the BLMIS accounts

and the "Vig" and determined that as of December 31, 1994, BLMIS owed him the difference of $730,830.

142.    Mendelow sent these calculations, along with supporting Portfolio Management Reports to BLMIS.  DiPascali performed his own similar calculations in which he tabulated the returns for each account at 17%, weighting all cashflows, and added "fees" for 1993 and 1994. Thereafter, Mendelow's accounts received the requisite amounts via fictitious, speculative options transactions.

143.    In 1995, BLMIS started to "catch up" Mendelow on the Extra P&L he demanded. In March and December 1995, Mendelow's C&P BLMIS account statements reported speculative options transactions reflecting a gain of, $704,294.  However, this was not the full amount "owed" to Mendelow based on his agreement with Madoff and thus BLMIS sought to make up the difference in 1996.

144.    In early 1996, Mendelow performed a similar reconciliation of his expected account balances with the actual balances reported on his BLMIS account documents at the end of 1995.  For each account he performed a weighted cash flow analysis based on "Int. at 17%." However, instead of separately calculating the "vig," he included it in his worksheet for the C&P Account, which is the exclusive account in which the fictitious options transactions used to generate the Extra P&L were reported from 1993 through 1996.  Also, rather than calculating the P&L based upon the amount reinvested by former Telfran investors, Mendelow's notes simply added a "fee" of $432,000.

145.    Mendelow again sent DiPascali a packet containing these calculations of the expected value of his accounts along with the BLMIS Portfolio Management Reports for the relevant accounts.

146.    For example, in the reconciliation packet Mendelow sent to BLMIS in early 1996,

he calculated that the account balances for his and Nancy Mendelow's IRAs at the end of 1995

lagged behind the value they should have reached based upon the guaranteed return. According

to his calculation, at the end of 1995, the cumulative balance "per A/C at 17%" should have been

$2,023,000.  According to the account statements he received, the balance in these accounts was

only $1,826,000, leaving Mendelow "due" $197,000 as of December 31, 1995.



147.    In December 1996, in order to correct the value of Mendelow's accounts so as to

yield a cumulative 17% return, the statement for Mendelow's IRA account at BLMIS showed a

purchase of S&P 100 Index call options with a cost of $68,860.  On December 31, 1996 those

options were purportedly sold, resulting in a reported gain of $137,390.   In a separate

transaction, on December 13, 1996, the statement shows a sale of S&P 100 Index put options

resulting in a reported gain of $186,890.  On December 28, 1996, those options were purportedly

bought back at a cost of $79,860.  The net gain reported on those four transactions was $175,560.

The same transactions appeared on Nancy Mendelow's BLMIS IRA account statements, at a

lower volume, reporting a gain of $35,112.   In total, these purported, speculative options

transactions yielded a reported profit of $210,672, compensating for the shortfall of $197,000 in

1995.

148.    The total amount of the Extra P&L and guaranteed rates of returns allocated to each account for the period from 1994 through 2007 was $1,732,896, $1,249,512, and $2,344,742, for accounts 1ZR179, 1ZR180, and 1ZA542, respectively.

## VII.    MENDELOW KNEW THAT THE EXTRA P&L AND GUARANTEED RETURNS HE WAS PROMISED WERE NOT THE RESULT OF ACTUAL SECURITIES TRADING

### A.    Mendelow Treated His Accounts As if No Securities Were Being Traded

149.    Mendelow's own handwritten notes and schedules demonstrate that he knew BLMIS was not trading securities on his behalf and that his account statements were fraudulent. Nowhere in his yearly calculations did Mendelow consider any actual securities transactions to have occurred in his accounts.  Mendelow analyzed the accounts as if they were some form of fixed income investment in which the year-end account balances could be determined based solely upon the cashflow and the fixed return.  He even used terminology commonly associated with bonds or other debt instruments such as "interest" and "yield."  Mendelow knew that the purported trading activity in his accounts was fictitious and could be ignored.

150.    As discussed above, in tracking the Extra P&L and guaranteed return, Mendelow referred to it as either a "vig" or "fee."  "Vig" is short for "vigorish" which is commonly used by bookies or individuals involved with organized crime to describe the interest, "take" or "juice" on a usurious loan.  Mendelow use of the work "vig" reveals his awareness of BLMIS's fraudulent practices that were used to enrich individuals such as Mendelow.

### B.    The Fictitious Options Transactions Were Apparent to Mendelow on the Face of His Account Statements

151.    Mendelow received and reviewed the BLMIS account statements for both the Defendants and his numerous BLMIS clients, where implausible options activity on his BLMIS customer statements was evident.  Mendelow or someone at his direction made handwritten

notations on various statements.  He also saw the difference between the accounts where he received Extra P&L and guaranteed returns, and other accounts that did not receive preferential treatment.  Based on these facts, as a trained accountant and financial advisor, Mendelow knew that actual securities trading was not occurring at BLMIS.

152.    The purported speculative option transactions, by which the Extra P&L was reported, were not only consistently, hugely, and impossibly profitable, but also almost exactly matched the predetermined amounts of the Extra P&L to be credited to Mendelow.  As a trained accountant and financial advisor, Mendelow knew that this was simply not possible to generate specific, on demand gains through actual securities trading.

153.    The fraudulent character of the purported option transactions by which BLMIS provided the Extra P&L to Mendelow was particularly apparent because, from 1996 through 2007, BLMIS always recorded those transactions in the month of December.  Thus, no matter the market conditions, BLMIS purported to be able to reach the predetermined amount on demand.

154.    Moreover, as a result of the Extra P&L, each December, the statements for Mendelow's accounts that received the Extra P&L showed greater percentage gains than the statements for other BLMIS accounts managed by Mendelow.  This purported outperformance by certain accounts each December starkly contrasted with the virtually uniform performance across all the accounts managed by Mendelow for each of the other eleven months.

155.    From January to November 2007, the highest return recorded in any of Mendelow's BLMIS accounts in any month was 2.1%.  Additionally, the highest difference in return among the Defendants' Accounts from January to November 2007 was less than 1%.  In December 2007, however, Mendelow purportedly achieved 12% and 11.6% returns in the two

accounts which received the Extra P&L, and purportedly achieved between 0.7% and 0.9% returns in the other four Mendelow BLMIS Accounts.

156.    A chart depicting the unusually consistently high rates of return generated across Mendelow's accounts that received the Extra P&L is attached to the Complaint as Exhibit C. This consistent spike in returns every December was evident on the face of the Defendants' BLMIS account documents, providing the Defendants with clear evidence that Madoff was not engaged in actual securities trading activity.

157.    As a result of the Extra P&L and guaranteed returns, certain accounts that Mendelow controlled received annual rates of return as high as 43%, 34.7%, and 28.7%, while other Mendelow controlled accounts in the same investment strategy received returns that were less than half those amounts, ranging from no greater than 10.4% to 14.5% over the same period.

158.    Mendelow knew that those uncharacteristically high monthly and annual returns were the result of purported speculative options transactions in the designated accounts. The December BLMIS statements for those accounts did not show any corresponding deposits or transfers of cash or securities to account for such a substantial increase in the year end account balances.

159.    The speculative options were readily apparent on the face of the account statements. For several years, the speculative options were the only securities transactions reported on the December BLMIS account statements for Mendelow's and Nancy Mendelow's IRAs. For example, the fictitious options transactions used to generate the Extra P&L in December 1999, *see supra* at ¶ 117, were the only purported securities transactions on Mendelow's and Nancy Mendelow's IRA BLMIS statements that month. BLMIS purported to be out of the market at the end of November 1999, and therefore these options transactions were

the only entries on his BLMIS IRA statements in December 1999. Similar stand-alone speculative options transactions appeared on their BLMIS account statements in December 2001, 2002 and 2003. It was clear that this purported speculative option trading was done solely for the purpose of generating profit to provide Mendelow with his Extra P&L.

160.    Additionally, there were no cash or securities deposits made into either Mendelow's or Nancy Mendelow's BLMIS IRA accounts in the months when they received the Extra P&L boost. Therefore, from the face of the BLMIS statements Mendelow knew that only the speculative options transactions could have generated the Extra P&L.

161.    These speculative option trades were inconsistent with Madoff's strategy as well as inconsistent with the activity in the other BLMIS accounts that Mendelow controlled. In the months when Mendelow's designated accounts received the Extra P&L, his other accounts did not engage in the purported speculative option transactions.

### C.    Mendelow Knew that BLMIS Was Using Fictitious Options Transactions to Manufacture the Extra P&L in his IRA Accounts

162.    Every December from 1999 through 2007, Mendelow instructed BLMIS to split the Extra P&L between his and Nancy Mendelow's IRA accounts. By using IRA accounts they were able to defer taxes on their purported gains. Mendelow and Nancy Mendelow saved tens of thousands of dollars each year by deferring taxes in this manner.

163.    As a sophisticated investor, accountant and financial adviser with expertise in "family wealth building and generational matters," Mendelow knew that this tax avoidance strategy was only possible if the Extra P&L he received from BLMIS was in the form of gains from purported securities transactions in his accounts. BLMIS could not have transferred securities into these accounts because IRA contributions are required to be in cash. But, BLMIS could not have paid Mendelow in cash because the amount of the Extra P&L far exceeded the

allowable cash contribution limits, which ranged from $2000 to $5000, in every year from 1999 through 2007.

164.    For the majority of the years in which Mendelow received Extra P&L in his and Nancy Mendelow's IRAs, the accounts did not have sufficient cash to fund the purchase of the speculative options listed on his account statement.  For example, in December 1999 the cash balance in Mendelow's IRA was reported to be only $0.31.  Yet, as discussed *supra* at ¶ 119, his IRA BLMIS statement showed a purchase of S&P 100 Index call options with a cost of $510,600.  Such a negative cash position would only be possible in an investment account trading on margin. However, as a sophisticated investor, accountant and financial advisor, Mendelow knew that he could not trade on margin in an IRA account.  Thus, Mendelow knew that the purported speculative option transactions used to generate the Extra P&L could not have actually occurred in his IRA account.

## VIII.   MENDELOW INVOKED HIS FIFTH AMENDMENT RIGHT WHEN ASKED ABOUT BLMIS

165.    At a Rule 2004 examination by the Trustee on September 23, 2010, Mendelow invoked his Fifth Amendment right over 390 times, refusing to answer virtually any question. Specifically, Mendelow asserted the Fifth Amendment when asked whether he reviewed the Defendants' BLMIS statements, whether he spoke with DiPascali about the balances in his BLMIS account, whether he sent written correspondence to BLMIS regarding the amount of money he thought should be available in his account, whether he received a guaranteed return for his investments in BLMIS, whether he was paid a finder's fee for referring investors to BLMIS, and other questions regarding Telfran and BLMIS.

## IX.    MENDELOW'S ACTUAL KNOWLEDGE AND BAD FAITH SHOULD BE IMPUTED TO THE OTHER DEFENDANTS

166.    Based upon the allegations set forth herein, Mendelow had actual knowledge of fraud at BLMIS and this knowledge is imputed to the other Defendants as set forth below.

167.    Mendelow's actual knowledge is imputed to C&P Associates and C&P Associates, Inc.  At all relevant times, Mendelow was the president and a director of C&P Associates, Inc., which was the General Partner of C&P Associates. As an officer of C&P Associates, Inc., all knowledge gained by Mendelow within the scope of his agency is imputed to C&P Associates Inc.  As C&P Associates Inc. is the general partner of C&P Associates, C&P Associates Inc.'s knowledge is imputed to C&P Associates.

168.    As a general partner, C&P Associates Inc. is liable for the debts and obligations of C&P Associates, including the fraudulent transfers it received from BLMIS as set forth herein.

169.    Mendelow was the agent of C&P Associates.   All knowledge gained by Mendelow within the scope of this agency, including his actual knowledge of fraud at BLMIS, is imputed to C&P Associates.  Mendelow opened C&P Associates' BLMIS account, the account statements were addressed to his home and principal place of business, he directed all contributions and withdrawals into and out of the BLMIS account and corresponded with BLMIS on C&P Associates' behalf.  Mendelow requested that withdrawal checks be sent to him at his home address.  Mendelow also directed that BLMIS manufacture the Extra P&L reflected on C&P Associates' BLMIS account statements.

170.    At all times discussed herein, Mendelow dominated, influenced, and controlled C&P Associates.  Mendelow was the sole decision maker for C&P Associates.  Mendelow ignored all corporate formalities and treated C&P Associates' BLMIS  as a bank account for his

family.  On more than one occasion, Mendelow deposited checks from C&P Associates into the Defendants' BLMIS account.

171.    The Mendelow Defendants used C&P Associates to hold assets for their benefit. For example, Mendelow owned a residence in Pound Ridge, New York and he transferred the title into Nancy Mendelow's name in 1992.  In 2000, a 50% stake of the home was sold to Pamela Christian.  Then in 2001, Nancy Mendelow sold her remaining share of that home to C&P Associates.  A year later, Pamela Christian sold her 50% stake of the same property to C&P Associates.

172.    Mendelow and Nancy Mendelow used C&P Associates to fund their living expenses.  For example, in 2006 C&P Associates paid monthly fees to "88 CPW," which is the address of Mendelow and Nancy Mendelow's residence at the time.  C&P Associates also made monthly car payments.

173.    Mendelow so dominated and controlled C&P Associates that no corporate veil should be maintained between them.  Mendelow is thus liable for the debts and obligations of C&P Associates, including the fraudulent transfers they received from BLMIS as set forth below.

174.    Mendelow's actual knowledge of fraud at BLMIS is imputed to Nancy Mendelow.  At all relevant times, Mendelow acted as Nancy Mendelow's agent in connection with her BLMIS investments.    Mendelow dominated, influenced and controlled Nancy Mendelow's BLMIS account by closely tracking the value of her BLMIS account and directing that BLMIS place Mendelow's Extra P&L into Nancy Mendelow's BLMIS IRA account. Mendelow also arranged for and ensured that Nancy Mendelow's BLMIS account received the guaranteed return he was promised by Madoff.

175.    At all relevant times, Mendelow acted as Cara Mendelow's and Pamela Christian's agent in connection with their BLMIS investments.    Mendelow dominated, influenced and controlled their BLMIS accounts, by directing contributions and withdrawals and communicating with BLMIS on their behalf.    All knowledge gained by Mendelow within the scope of this agency, including his actual knowledge of fraud at BLMIS, is imputed to Cara Mendelow and Pamela Christian.

## THE TRANSFERS

176.    According to BLMIS's records, multiple accounts (Nos. 1ZA542, 1ZB336, 1ZB337, 1ZR179, 1ZR180, and 1ZR208) were maintained with BLMIS, as set forth on Exhibit A (collectively, the "Accounts").    Upon information and belief, for each Account, a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements") were executed and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

177.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.    The Accounts were held in New York, New York and Defendants sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #XXXXXXXXXXXX703 (the "BLMIS Bank Account") in New York, New York for application to the Accounts and the conducting of trading activities.    Defendants made deposits to BLMIS through checks and/or wire transfers into bank accounts controlled by BLMIS, including the BLMIS Bank Account, and/or received inter-account transfers from other BLMIS accounts.

178.    Prior to the Filing Date, BLMIS made payments or other transfers (collectively, the "Transfers") directly or indirectly to Defendants totaling the amount of $20,250,720.

179.    Based upon the information available to them, the Defendants knew that BLMIS was a fraud.  Of the Transfers, $11,435,809 constituted non-existent profits supposedly earned in the Accounts ("Fictitious Profits"), and $8,814,911 constituted the return of principal.  The Fictitious Profits received by the Defendants came from other people's money.  The Transfers were directly or indirectly made to the Defendants and include, but are not limited to, the Transfers listed on Exhibit B.

180.    The Transfers are avoidable and recoverable under §§ 544, 548, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) and 213(8) (McKinney 2001) and DCL §§ 273-279 (McKinney 2001).

181.    Of the Transfers, BLMIS made payments to Defendants of at least $9,185,000 (the "Six Year Transfers") during the six years prior to the Filing Date, which are avoidable and recoverable under §§ 544, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable provisions of DCL §§ 273-279.  Of these Six Year Transfers, $7,877,066 represented Fictitious Profits from the Ponzi scheme, which constitute other people's money.  Of such fictitious profits, $4,250,000 was received by C&P Associates, $135,000 was received by Cara Mendelow, $170,000 was received by Pamela Christian, $1,750,000 was received by Mendelow, and $1,572,066 was received by Nancy.

182.    Of the Six Year Transfers, BLMIS made payments to Defendants C&P Associates and Cara Mendelow of at least $825,000 (the "Two Year Transfers") during the two years prior to the Filing Date, which are avoidable and recoverable under §§ 548, 550(a) and 551 of the

Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3). All of these Two Year Transfers were Fictitious Profits. Of the Two Year Transfers, $700,000 was received by C&P Associates, and $125,000 was received by Cara Mendelow.

183.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

184.    The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT ONE

### FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551

185.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

186.    Each of the Two Year Transfers was made on or within two years before the filing date of BLMIS's case.

187.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to § 78fff-2(c)(3) of SIPA.

188.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing or future creditors.

189.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendants C&P Associates and Cara Mendelow pursuant to § 550(a) of the Bankruptcy Code and § 78fff-(2)(c)(3) of SIPA.

190.    As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Defendants C&P Associates and Cara Mendelow: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendants C&P Associates and Cara Mendelow for the benefit of the estate of BLMIS.

## COUNT TWO

### FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550 AND 551

191.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

192.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

193.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to § 78fff-2(c)(3).

194.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

195.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

196.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

197.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

198.    Each of the Two Year Transfers constitutes fraudulent transfers avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from Defendants C&P Associates and Cara Mendelow pursuant to § 550(a) and § 78fff-(2)(c)(3) of SIPA.

199.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Defendants C&P Associates and Cara Mendelow: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendants C&P Associates and Cara Mendelow for the benefit of the estate of BLMIS.

## COUNT THREE

### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

200.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

201.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

202.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined under DCL § 270.

203.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

204.    Each of the Six Year Transfers were received by the Defendants with actual intent to hinder, delay or defraud the creditors of BLMIS at the time of each of the Transfers, and/or future creditors of BLMIS.

205.    As a result of the foregoing, pursuant to DCL §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants.

## COUNT FOUR

**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR
LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551**

206.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

207.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

208.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined under DCL § 270.

209.    BLMIS did not receive fair consideration for the Six Year Transfers.

210.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

211.    As a result of the foregoing, pursuant to DCL §§ 273, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## COUNT FIVE

### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551

212.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

213.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

214.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined under DCL§ 270.

215.    BLMIS did not receive fair consideration for the Six Year Transfers.

216.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

217.    As a result of the foregoing, pursuant to DCL §§ 274, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a

judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing

that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS.

## COUNT SIX

**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR
LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551**

218.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

219.    At all times relevant to the Six Year Transfers, there have been and are one or

more creditors who have held and still hold matured or unmatured unsecured claims against

BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not

allowable only under § 502(e) of the Bankruptcy Code.

220.    Each of the Six Year Transfers constitutes a conveyance by BLMIS as defined

under DCL § 270.

221.    BLMIS did not receive fair consideration for the Six Year Transfers.

222.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay them as the

debts matured.

223.    As a result of the foregoing, pursuant to DCL § 275, 278 and/or 279, §§ 544(b),

550(a), and 551 of the Bankruptcy Code, and § 78fff-2(c)(3) of SIPA, the Trustee is entitled to a

judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing

that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS.

## COUNT SEVEN

**RECOVERY OF ALL FRAUDULENT TRANSFERS NEW YORK CIVIL PROCEDURE LAW AND RULES §§ 203(g) AND 213(8) AND NEW YORK DEBTOR AND CREDITOR LAW§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a) AND 551**

224.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

225.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

226.    At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

227.    Each of the Transfers prior to the six years before the Filing Date constitutes a conveyance by BLMIS as defined under DCL § 270.

228.    Each of the Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

229.    Each of the Six Year Transfers were received by the Defendants with actual intent to hinder, delay or defraud the creditors of BLMIS at the time of each of the Transfer, and/or future creditors of BLMIS.

230.    As a result of the foregoing, pursuant to NY CPLR §§ 203(g) and 213(8), DCL §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside; (c) recovering the

Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(i)    On the First Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendants C&P Associates and Cara Mendelow for the benefit of the estate of BLMIS;

(ii)    On the Second Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Defendants C&P Associates and Cara Mendelow for the benefit of the estate of BLMIS;

(iii)    On the Third Claim for Relief, pursuant to DCL §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants;

(iv)    On the Fourth Claim for Relief, pursuant to DCL §§ 273, 278 and/or 279, §§ 544(b), 550 and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c)

recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

(v)    On the Fifth Claim for Relief, pursuant to DCL §§ 274, 278 and/or 279, §§ 544(b), 550 and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the state of BLMIS;

(vi)    On the Sixth Claim for Relief, pursuant to DCL §§ 275, 278 and/or 279, §§ 544(b), 550 and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

(vii)    On the Seventh Claim for Relief, pursuant to NY CPLR 203(g) and 213(8) DCL §§ 276, 276-a, 278 and/or 279, §§ 544(b), 550(a), and 551 of the Bankruptcy Code and § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants;

(viii)    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

(ix)    On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

(x)     On all Claims for Relief, assignment of Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme;

(xi)    Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

(xii)   Granting Plaintiff such other, further, and different relief as the Court deems just, proper, and equitable.

Date: _____, 2016
         New York, New York

By: */s/* David J. Sheehan
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Jonathan B. New
Email:  jnew@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Robyn M. Feldstein
Email: rfeldstein@bakerlaw.com
*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| C & P ASSOCIATES C/O STEVE MENDELOW | 1ZA542 |
| CARA MENDELOW | 1ZB336 |
| PAMELA MENDELOW | 1ZB337 |
| NTC & CO. FBO STEVEN MENDELOW (XXXXX) | 1ZR179 |
| NTC & CO. FBO NANCY MENDELOW (XXXXX) | 1ZR180 |
| NTC & CO. FBO STEVEN MENDELOW (XXXXX) | 1ZR208 |

BLMIS ACCOUNT NO. 1ZA542 - STERLING 20 LLC C/O STEVE MENDELOW

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 | Column 13 | Column 14 | Column 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 90-Day Preferential Initial Transfers | Two Year Fraudulent Transfers | Two Year Principal Transfers | Six Year Fraudulent Transfers | Six Year Principal Transfers | Full History Fraudulent Transfers | Full History Principal Transfers |
| | Date | Transaction Description as Reported in Customer Statement | Amount as Reported in Customer Statement | Deposits | Withdrawals | Transfers In | Transfers Out | Balance of Principal | | | | | | | |
| 12/14/1992 | CHECK | 244,000 | 244,000 | - | - | - | 244,000 | - | - | - | - | - | - | - |
| 12/21/1992 | CHECK | 638,079 | 638,079 | - | - | - | 882,079 | - | - | - | - | - | - | - |
| 12/23/1992 | CHECK | 50,500 | 50,500 | - | - | - | 932,579 | - | - | - | - | - | - | - |
| 2/3/1993 | CHECK | 517,500 | 517,500 | - | - | - | 1,450,079 | - | - | - | - | - | - | - |
| 2/18/1993 | CHECK | 110,000 | 110,000 | - | - | - | 1,560,079 | - | - | - | - | - | - | - |
| 3/5/1993 | CHECK | (30,000) | - | (30,000) | - | - | 1,530,079 | - | - | - | - | - | - | (30,000) |
| 3/9/1993 | CHECK | (30,000) | - | (30,000) | - | - | 1,500,079 | - | - | - | - | - | - | (30,000) |
| 3/15/1993 | CHECK | 20,000 | 20,000 | - | - | - | 1,520,079 | - | - | - | - | - | - | - |
| 3/22/1993 | CHECK | 30,000 | 30,000 | - | - | - | 1,550,079 | - | - | - | - | - | - | - |
| 5/4/1993 | CHECK | (115,000) | - | (115,000) | - | - | 1,435,079 | - | - | - | - | - | - | (115,000) |
| 6/16/1993 | CHECK | 165,000 | 165,000 | - | - | - | 1,600,079 | - | - | - | - | - | - | - |
| 6/24/1993 | TRANS FROM 1ZA93030 (*1ZA930*) | 45,348 [1] | - | - | 42,500 | - | 1,642,579 | - | - | - | - | - | - | - |
| 7/21/1993 | TRANS FROM 1ZA93030 (*1ZA930*) | 136 [2] | - | - | - | - | 1,642,579 | - | - | - | - | - | - | - |
| 7/28/1993 | CHECK | 147,500 | 147,500 | - | - | - | 1,790,079 | - | - | - | - | - | - | - |
| 9/16/1993 | CHECK | (30,000) | - | (30,000) | - | - | 1,760,079 | - | - | - | - | - | - | (30,000) |
| 9/22/1993 | CHECK | (75,000) | - | (75,000) | - | - | 1,685,079 | - | - | - | - | - | - | (75,000) |
| 11/16/1993 | CHECK | 70,000 | 70,000 | - | - | - | 1,755,079 | - | - | - | - | - | - | - |
| 12/23/1993 | CHECK | 20,000 | 20,000 | - | - | - | 1,775,079 | - | - | - | - | - | - | - |
| 1/12/1994 | CHECK | 20,000 | 20,000 | - | - | - | 1,795,079 | - | - | - | - | - | - | - |
| 2/8/1994 | CHECK | 45,000 | 45,000 | - | - | - | 1,840,079 | - | - | - | - | - | - | - |
| 3/8/1994 | CHECK | (60,000) | - | (60,000) | - | - | 1,780,079 | - | - | - | - | - | - | (60,000) |
| 9/1/1994 | CHECK | (100,000) | - | (100,000) | - | - | 1,680,079 | - | - | - | - | - | - | (100,000) |
| 10/19/1994 | CHECK | (250,000) | - | (250,000) | - | - | 1,430,079 | - | - | - | - | - | - | (250,000) |
| 11/14/1994 | CHECK | (500,000) | - | (500,000) | - | - | 930,079 | - | - | - | - | - | - | (500,000) |
| 7/22/1996 | CHECK | (600,000) | - | (600,000) | - | - | 330,079 | - | - | - | - | - | - | (600,000) |
| 11/20/1997 | CHECK | (1,800,000) | - | (1,800,000) | - | - | (1,469,921) | - | - | - | - | - | - | (1,800,000) |
| 12/1/1998 | CHECK | (900,000) | - | (900,000) | - | - | (2,369,921) | - | - | - | - | - | - | (900,000) |
| 11/22/1999 | CHECK | (700,000) | - | (700,000) | - | - | (3,069,921) | - | - | - | - | - | - | (700,000) |
| 5/1/2001 | CHECK | 50,000 | 50,000 | - | - | - | (3,019,921) | - | - | - | - | - | - | - |
| 5/7/2001 | CHECK | 45,000 | 45,000 | - | - | - | (2,974,921) | - | - | - | - | - | - | - |
| 7/30/2001 | CHECK | 100,000 | 100,000 | - | - | - | (2,874,921) | - | - | - | - | - | - | - |
| 11/2/2001 | CHECK | 165,000 | 165,000 | - | - | - | (2,709,921) | - | - | - | - | - | - | - |
| 5/6/2002 | CHECK | 75,000 | 75,000 | - | - | - | (2,634,921) | - | - | - | - | - | - | - |
| 7/16/2002 | CHECK | (1,725,000) | - | (1,725,000) | - | - | (4,359,921) | - | - | - | - | - | (942,421) | (782,579) |
| 7/24/2002 | CHECK | 1,725,000 | 1,725,000 | - | - | - | (2,634,921) | - | - | - | - | - | - | - |
| 8/8/2002 | CHECK | 50,000 | 50,000 | - | - | - | (2,584,921) | - | - | - | - | - | - | - |
| 11/1/2002 | TRANS TO 1F017830 (*1F0178*) | (3,149,075) [3] | - | - | - | - | (2,584,921) | - | - | - | - | - | - | - |
| 11/6/2002 | CHECK | 87,500 | 87,500 | - | - | - | (2,497,421) | - | - | - | - | - | - | - |
| 1/16/2003 | CHECK | 300,000 | 300,000 | - | - | - | (2,197,421) | - | - | - | - | - | - | - |
| 2/11/2003 | CHECK | 50,000 | 50,000 | - | - | - | (2,147,421) | - | - | - | - | - | - | - |
| 5/2/2003 | CHECK | 65,000 | 65,000 | - | - | - | (2,082,421) | - | - | - | - | - | - | - |
| 7/30/2003 | CHECK | 65,000 | 65,000 | - | - | - | (2,017,421) | - | - | - | - | - | - | - |
| 7/31/2003 | CHECK | 70,000 | 70,000 | - | - | - | (1,947,421) | - | - | - | - | - | - | - |
| 11/7/2003 | CHECK | 60,000 | 60,000 | - | - | - | (1,887,421) | - | - | - | - | - | - | - |
| 11/25/2003 | CHECK | 650,000 | 650,000 | - | - | - | (1,237,421) | - | - | - | - | - | - | - |
| 12/18/2003 | CHECK | 190,000 | 190,000 | - | - | - | (1,047,421) | - | - | - | - | - | - | - |
| 1/14/2004 | CHECK | 25,000 | 25,000 | - | - | - | (1,022,421) | - | - | - | - | - | - | - |
| 2/6/2004 | CHECK | 45,000 | 45,000 | - | - | - | (977,421) | - | - | - | - | - | - | - |
| 5/11/2004 | CHECK | 35,000 | 35,000 | - | - | - | (942,421) | - | - | - | - | - | - | - |
| 5/18/2004 | CHECK | (1,350,000) | - | (1,350,000) | - | - | (2,292,421) | - | - | - | - | (1,350,000) | - | (1,350,000) |
| 6/17/2004 | CHECK | (400,000) | - | (400,000) | - | - | (2,692,421) | - | - | - | - | (400,000) | - | (400,000) |
| 9/28/2004 | CHECK | (350,000) | - | (350,000) | - | - | (3,042,421) | - | - | - | - | (350,000) | - | (350,000) |
| 6/17/2005 | CHECK | (800,000) | - | (800,000) | - | - | (3,842,421) | - | - | - | - | (800,000) | - | (800,000) |
| 3/3/2006 | CHECK | (650,000) | - | (650,000) | - | - | (4,492,421) | - | - | - | - | (650,000) | - | (650,000) |
| 7/25/2007 | CHECK | (700,000) | - | (700,000) | - | - | (5,192,421) | - | - | - | (700,000) | (700,000) | - | - |
| | | **Total:** | $ 5,930,079 | $ (11,165,000) | $ 42,500 | $ - | $ (5,192,421) | $ - | $ - | $ (700,000) | $ - | $ (4,250,000) | $ - | $ (5,192,421) | $ (5,972,579) |

[1] Although BLMIS Customer Statements reflect that a larger transfer was made into the account on this date, a portion of the "transferred" funds consisted of fictitious profits which were never achieved and thus could not have been transferred. Accordingly, only the principal remaining in the originating account was transferred into this account on this date.

[2] Although BLMIS Customer Statements reflect that funds were transferred into this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

[3] Although BLMIS Customer Statements reflect that funds were transferred out of this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred out of the account on this date. Accordingly, the account balance has remained unchanged.

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 | Column 13 | Column 14 | Column 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description as Reported in Customer Statement | Amount as Reported in Customer Statement | Deposits | Withdrawals | Transfers In | Transfers Out | Balance of Principal | 90-Day Preferential Initial Transfers | Two Year Fraudulent Transfers | Two Year Principal Transfers | Six Year Fraudulent Transfers | Six Year Principal Transfers | Full History Fraudulent Transfers | Full History Principal Transfers |
| 11/24/1997 | CHECK | 300,000 | 300,000 | - | - | - | 300,000 | - | - | - | - | - | - | - |
| 11/24/1997 | CANCEL CHECK 11/24/97 | 300,000 | - | 300,000 | - | - | 600,000 | - | - | - | - | - | - | - |
| 11/24/1997 | CHECK | (300,000) | - | (300,000) | - | - | 300,000 | - | - | - | - | - | - | - |
| 1/6/2000 | CHECK | (15,000) | - | (15,000) | - | - | 285,000 | - | - | - | - | - | - | (15,000) |
| 4/18/2000 | CHECK | 50,000 | 50,000 | - | - | - | 335,000 | - | - | - | - | - | - | - |
| 6/21/2000 | CHECK | (15,000) | - | (15,000) | - | - | 320,000 | - | - | - | - | - | - | (15,000) |
| 10/3/2000 | CHECK | (15,000) | - | (15,000) | - | - | 305,000 | - | - | - | - | - | - | (15,000) |
| 12/8/2000 | CHECK | (15,000) | - | (15,000) | - | - | 290,000 | - | - | - | - | - | - | (15,000) |
| 2/7/2001 | CHECK | 50,000 | 50,000 | - | - | - | 340,000 | - | - | - | - | - | - | - |
| 5/15/2001 | CHECK | (20,000) | - | (20,000) | - | - | 320,000 | - | - | - | - | - | - | (20,000) |
| 8/7/2001 | CHECK | (10,000) | - | (10,000) | - | - | 310,000 | - | - | - | - | - | - | (10,000) |
| 10/10/2001 | CHECK | (20,000) | - | (20,000) | - | - | 290,000 | - | - | - | - | - | - | (20,000) |
| 3/14/2002 | CHECK | (20,000) | - | (20,000) | - | - | 270,000 | - | - | - | - | - | - | (20,000) |
| 4/12/2002 | CHECK | 50,000 | 50,000 | - | - | - | 320,000 | - | - | - | - | - | - | - |
| 6/10/2002 | CHECK | (25,000) | - | (25,000) | - | - | 295,000 | - | - | - | - | - | - | (25,000) |
| 9/3/2002 | CHECK | (35,000) | - | (35,000) | - | - | 260,000 | - | - | - | - | - | - | (35,000) |
| 10/25/2002 | CHECK | 85,000 | 85,000 | - | - | - | 345,000 | - | - | - | - | - | - | - |
| 2/25/2003 | CHECK | (35,000) | - | (35,000) | - | - | 310,000 | - | - | - | - | (35,000) | - | (35,000) |
| 6/16/2003 | CHECK | (30,000) | - | (30,000) | - | - | 280,000 | - | - | - | - | (30,000) | - | (30,000) |
| 12/17/2003 | CHECK | (35,000) | - | (35,000) | - | - | 245,000 | - | - | - | - | (35,000) | - | (35,000) |
| 1/13/2004 | CHECK WIRE | 100,000 | 100,000 | - | - | - | 345,000 | - | - | - | - | - | - | - |
| 5/26/2004 | CHECK | (35,000) | - | (35,000) | - | - | 310,000 | - | - | - | - | (35,000) | - | (35,000) |
| 11/2/2004 | CHECK | (35,000) | - | (35,000) | - | - | 275,000 | - | - | - | - | (35,000) | - | (35,000) |
| 1/5/2005 | CHECK | 75,000 | 75,000 | - | - | - | 350,000 | - | - | - | - | - | - | - |
| 4/1/2005 | CHECK | (35,000) | - | (35,000) | - | - | 315,000 | - | - | - | - | - | - | - |
| 4/12/2005 | STOP PAYMENT | 35,000 | - | 35,000 | - | - | 350,000 | - | - | - | - | - | - | - |
| 4/12/2005 | CHECK | (35,000) | - | (35,000) | - | - | 315,000 | - | - | - | - | (35,000) | - | (35,000) |
| 8/11/2005 | CHECK | (35,000) | - | (35,000) | - | - | 280,000 | - | - | - | - | (35,000) | - | (35,000) |
| 1/20/2006 | CHECK | (35,000) | - | (35,000) | - | - | 245,000 | - | - | - | - | (35,000) | - | (35,000) |
| 4/20/2006 | CHECK | (500,000) | - | (500,000) | - | - | (255,000) | - | - | - | - | (500,000) | - | (500,000) |
| 5/4/2006 | CHECK | 100,000 | 100,000 | - | - | - | (155,000) | - | - | - | - | - | - | - |
| 8/31/2006 | CHECK | (35,000) | - | (35,000) | - | - | (190,000) | - | - | - | (10,000) | (25,000) | (10,000) | (25,000) |
| 12/12/2006 | CHECK | (35,000) | - | (35,000) | - | - | (225,000) | - | (35,000) | - | (35,000) | - | (35,000) | - |
| 1/31/2007 | CHECK | 100,000 | 100,000 | - | - | - | (125,000) | - | - | - | - | - | - | - |
| 8/8/2007 | CHECK | (35,000) | - | (35,000) | - | - | (160,000) | - | (35,000) | - | (35,000) | - | (35,000) | - |
| 11/27/2007 | CHECK | 80,000 | 80,000 | - | - | - | (80,000) | - | - | - | - | - | - | - |
| 1/9/2008 | CHECK | (35,000) | - | (35,000) | - | - | (115,000) | - | (35,000) | - | (35,000) | - | (35,000) | - |
| 7/16/2008 | CHECK | (10,000) | - | (10,000) | - | - | (125,000) | - | (10,000) | - | (10,000) | - | (10,000) | - |
| 12/2/2008 | CHECK | (10,000) | - | (10,000) | - | - | (135,000) | - | (10,000) | - | (10,000) | - | (10,000) | - |
| | **Total:** | | **$ 990,000** | **$ (1,125,000)** | **$ -** | **$ -** | **$ (135,000)** | **$ -** | **$ (125,000)** | **$ -** | **$ (135,000)** | **$ (800,000)** | **$ (135,000)** | **$ (990,000)** |

BLMIS ACCOUNT NO. 1ZB337 - MARCIA MENDELOW

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 | Column 13 | Column 14 | Column 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description as Reported in Customer Statement | Amount as Reported in Customer Statement | Deposits | Withdrawals | Transfers In | Transfers Out | Balance of Principal | 90-Day Preferential Initial Transfers | Two Year Fraudulent Transfers | Two Year Principal Transfers | Six Year Fraudulent Transfers | Six Year Principal Transfers | Full History Fraudulent Transfers | Full History Principal Transfers |
| 11/24/1997 | CHECK | 320,000 | 320,000 | - | - | - | 320,000 | - | - | - | - | - | - | - |
| 11/24/1997 | CANCEL CHECK 11/24/97 | 320,000 | - | 320,000 | - | - | 640,000 | - | - | - | - | - | - | - |
| 11/24/1997 | CHECK | (320,000) | - | (320,000) | - | - | 320,000 | - | - | - | - | - | - | - |
| 12/1/2000 | CHECK | (50,000) | - | (50,000) | - | - | 270,000 | - | - | - | - | - | - | (50,000) |
| 6/27/2001 | CHECK | 60,000 | 60,000 | - | - | - | 330,000 | - | - | - | - | - | - | - |
| 4/20/2006 | CHECK | (500,000) | - | (500,000) | - | - | (170,000) | - | - | - | (170,000) | (330,000) | (170,000) | (330,000) |
| | Total: | $ 380,000 | $ (550,000) | $ - | $ - | $ (170,000) | $ - | $ - | $ - | $ (170,000) | $ (330,000) | $ (170,000) | $ (380,000) |

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 | Column 13 | Column 14 | Column 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Transaction Description as Reported in Customer Statement | Amount as Reported in Customer Statement | Deposits | Withdrawals | Transfers In | Transfers Out | Balance of Principal | 90-Day Preferential Initial Transfers | Two Year Fraudulent Transfers | Two Year Principal Transfers | Six Year Fraudulent Transfers | Six Year Principal Transfers | Full History Fraudulent Transfers | Full History Principal Transfers |
| | 2/4/1993 | CHECK | 1,197,967 | 1,197,967 | - | - | - | 1,197,967 | - | - | - | - | - | - | - |
| | 11/29/1994 | CHECK | (18,726) | - | (18,726) | - | - | 1,179,241 | - | - | - | - | - | - | (18,726) |
| | 12/1/1995 | CHECK | (130,044) | - | (130,044) | - | - | 1,049,197 | - | - | - | - | - | - | (130,044) |
| | 7/23/1996 | CHECK | (130,044) | - | (130,044) | - | - | 919,153 | - | - | - | - | - | - | (130,044) |
| | 9/22/1997 | CHECK | (130,044) | - | (130,044) | - | - | 789,109 | - | - | - | - | - | - | (130,044) |
| | 11/19/1998 | CHECK | (130,044) | - | (130,044) | - | - | 659,065 | - | - | - | - | - | - | (130,044) |
| | 6/8/1999 | CHECK | 5,765 | 5,765 | - | - | - | 664,830 | - | - | - | - | - | - | - |
| | 8/4/1999 | CHECK | (130,044) | - | (130,044) | - | - | 534,786 | - | - | - | - | - | - | (130,044) |
| | 10/16/2000 | CHECK | (130,044) | - | (130,044) | - | - | 404,742 | - | - | - | - | - | - | (130,044) |
| | 1/12/2001 | CHECK | (1,500,000) | - | (1,500,000) | - | - | (1,095,258) | - | - | - | - | - | (1,095,258) | (404,742) |
| | 10/5/2001 | CHECK WIRE | (1,500,000) | - | (1,500,000) | - | - | (2,595,258) | - | - | - | - | - | (1,500,000) | - |
| | 1/29/2003 | CHECK | (500,000) | - | (500,000) | - | - | (3,095,258) | - | - | - | (500,000) | - | (500,000) | - |
| | 2/24/2005 | CHECK | (500,000) | - | (500,000) | - | - | (3,595,258) | - | - | - | (500,000) | - | (500,000) | - |
| | 4/18/2006 | CHECK | (750,000) | - | (750,000) | - | - | (4,345,258) | - | - | - | (750,000) | - | (750,000) | - |
| Total: | | | $ 1,203,732 | $ (5,548,990) | $ - | $ - | $ (4,345,258) | $ - | $ - | $ - | $ (1,750,000) | $ - | $ (4,345,258) | $ (1,203,732) |

BLMIS ACCOUNT NO. 1ZR180 - NTC & CO. FBO NANCY MENDELOW (XXXXX)

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 | Column 13 | Column 14 | Column 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **90-Day Preferential Initial** | **Two Year Fraudulent** | **Two Year Principal** | **Six Year Fraudulent** | **Six Year Principal** | **Full History Fraudulent** | **Full History Principal** |
| **Date** | **Transaction Description as Reported in Customer Statement** | **Amount as Reported in Customer Statement** | **Deposits** | **Withdrawals** | **Transfers In** | **Transfers Out** | **Balance of Principal** | **Transfers** | **Transfers** | **Transfers** | **Transfers** | **Transfers** | **Transfers** | **Transfers** |
| 2/4/1993 | CHECK | 173,457 | 173,457 | - | - | - | 173,457 | - | - | - | - | - | - | - |
| 5/26/1993 | CHECK | 4,477 | 4,477 | - | - | - | 177,934 | - | - | - | - | - | - | - |
| 1/29/2003 | CHECK | (500,000) | - | (500,000) | - | - | (322,066) | - | - | - | (322,066) | (177,934) | (322,066) | (177,934) |
| 3/2/2005 | CHECK | (500,000) | - | (500,000) | - | - | (822,066) | - | - | - | (500,000) | - | (500,000) | - |
| 4/18/2006 | CHECK | (750,000) | - | (750,000) | - | - | (1,572,066) | - | - | - | (750,000) | - | (750,000) | - |
| | **Total:** | **$ 177,934** | **$ (1,750,000)** | **$      -** | **$      -** | **$ (1,572,066)** | **$      -** | **$      -** | **$      -** | **$ (1,572,066)** | **$ (177,934)** | **$ (1,572,066)** | **$ (177,934)** | |

BLMIS ACCOUNT NO. 1ZR208 - STEVEN MENDELOW (XXXXX)

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 | Column 13 | Column 14 | Column 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Transaction Description as Reported in Customer Statement | Amount as Reported in Customer Statement | Deposits | Withdrawals | Transfers In | Transfers Out | Balance of Principal | 90-Day Preferential Initial Transfers | Two Year Fraudulent Transfers | Two Year Principal Transfers | Six Year Fraudulent Transfers | Six Year Principal Transfers | Full History Fraudulent Transfers | Full History Principal Transfers |
| 5/24/1993 | CHECK WIRE | 90,666 | 90,666 | - | - | - | 90,666 | - | - | - | - | - | - | - | |
| 11/29/1994 | CHECK | (111,318) | - | (111,318) | - | - | (20,652) | - | - | - | - | - | (20,652) | (90,666) | |
| 1/12/1995 | CHECK | (411) | - | (411) | - | - | (21,064) | - | - | - | - | - | (411) | - | |
| | Total: | | $ 90,666 | $ (111,730) | $ - | $ - | $ (21,064) | $ - | $ - | $ - | $ - | $ - | $ (21,064) | $ (90,666) | |



# Exhibit C

## Steven and Nancy Mendelow IRA Accounts (1ZR179 & 1ZR180) vs. C&P Associates (1ZA542), Monthly Rate of Return